UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Chapter 11 |
| Genmar Holdings, Inc., et al.[1] | Case No. 09-43537 |
| Debtors. | Jointly Administered |

**NOTICE OF MOTION AND MOTION FOR ORDERS (I) AUTHORIZING DEBTORS TO SELL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (II) AUTHORIZING ASSUMPTION AND ASSIGNMENT OR REJECTION OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS; (III) APPROVING BIDDING PROCEDURES AND AUCTION; (IV) APPROVING BREAK UP FEE AND EXPENSE REIMBURSEMENT; (V) APPROVING FORM AND MANNER OF NOTICE; AND (VI) SCHEDULING FURTHER HEARING**

TO:    The Parties in Interest as Specified in Local Rule 9013-3(a)(2).

1.    The above-referenced Debtors move the Court for the relief requested below and give notice of hearings.

2.    The Court will hold a hearing ("Sale Procedures Hearing") on this motion ("Sale Motion") at 1:30 p.m. on December 8, 2009, in Courtroom No. 2B, United States Courthouse, 316 North Robert Street, St. Paul, Minnesota.  In addition, it is anticipated that the Court will hold a further hearing ("Sale Approval Hearing") on this Sale Motion at 9:30 a.m. on January 13, 2010 at the same location.

---

[1]    Jointly administered debtors: Genmar Holdings, Inc., Case No. 09-43537; Carver Industries, L.L.C., Case No. 09-43538; Carver Italia, L.L.C., Case No. 09-33773; Carver Yachts International, L.L.C., Case No. 09-33774; Genmar Florida, Inc., Case No. 09-43539; Genmar Industries, Inc., Case No. 09-43540; Genmar IP, LLC, Case No. 09-43541; Genmar Manufacturing of Kansas, Inc., Case No. 09-43542; Genmar Michigan, L.L.C., Case No. 09-43543; Genmar Minnesota, Inc., Case No. 09-33775; Genmar Tennessee, Inc., Case No. 09-43544; Genmar Transportation, Inc., Case No. 09-43545; Genmar Yacht Group, LLC, Case No. 09-43546; Marine Media, LLC, Case No. 09-43547; Minstar, LLC, Case No. 09-43548; Triumph Boats, Inc., Case No. 09-43550; Triumph Boat Rentals, L.L.C., Case No. 09-43551; VEC Leasing Services, L.L.C., Case No. 09-43552; VEC Management Co., L.L.C., Case No. 09-43553; VEC Technology, Inc., Case No. 09-43554; Windsor Craft Yachts, L.L.C., Case No. 09-43555; Wood Manufacturing Company, Inc., Case No. 09-43556.

3.     Local Rule 9006-1(b) provides deadlines for responses to this Sale Motion.  Any response to the relief sought at the Sale Procedures Hearing must be filed and served by delivery not later than December 3, 2009, which is three days before the time set for the hearing (excluding Saturdays, Sundays, and holidays), or filed and served by mail not later than November 27, 2009, which is seven days before the time set for the hearing (excluding Saturdays, Sundays, and holidays).  Any response to the relief sought at the Sale Approval Hearing must be filed and served by delivery not later than January 8, 2010, which is three days before the time set for the hearing (excluding Saturdays, Sundays, and holidays), or filed and served by mail not later than January 4, 2010, which is seven days before the time set for the hearing (excluding Saturdays, Sundays, and holidays).  **UNLESS A RESPONSE OPPOSING THE SALE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE SALE MOTION WITHOUT A HEARING.**

4.     This Court has jurisdiction over this Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334, Fed. R. Bankr. P. 5005 and Local Rules 1070-1 and 1073-1.  This is a core proceeding.  The petitions commencing the above-captioned chapter 11 cases were filed on June 1, 2009 (the "Filing Date").  The cases are now pending in this Court.

5.     The relief sought in this Sale Motion is based upon 11 U.S.C. § 105(a), § 363, § 363(b), § 363(f), § 363(m), § 364(c), § 364(f), § 365, § 365(a), § 365(b), § 365(f), § 365(g), § 503, § 507, § 541, and § 554(a) and Fed. R. Bankr. P. 2002(a)(2) 6004, 6004(h), 6006 and 6006(d).  Debtors propose to sell a substantial part of their assets and to assign related unexpired leases and executory contracts to the highest and best bidder.  The Asset Purchase Agreement with the Stalking Horse (as defined below) is an important step to achieve the ultimate goal of the chapter 11 reorganization process – maximizing value available to stakeholders, including by

2

preserving the going concern value of the Debtors' businesses.  To that end, Debtors seek this Court's approval of the proposed sale transaction and related bidding procedures to enable the Debtors to solicit competing offers for substantially all of their assets to ensure maximum recovery for the estates.  To preserve going concern value and obtain the anticipated benefits of the proposed transaction, it is imperative that this process be completed expeditiously.  Given the continuing stress on all aspects of the boat industry and the current idling of some of the Debtors' manufacturing facilities, key relationship with suppliers, dealers and other business partners simply may not be preserved if this sale process is not concluded timely.

## BACKGROUND

6.      On the Filing Date, each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

7.      The Debtors have continued in possession of their respective assets and the management of their business as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  The Official Committee of Unsecured Creditors ("Committee") was appointed on June 9, 2009.

8.      Genmar Holdings, Inc. ("Genmar") was formed in 1994 to combine the operations of IJ Holdings Corp. and Miramar Marine Corporation, each of which were under the control of investor groups led by Irwin L. Jacobs ("Jacobs").  Jacobs became involved in the boating industry in the late 1970's with the Larson and Lund brands.  He subsequently expanded his boat manufacturing business with a number of acquisitions, often acquiring companies out of bankruptcy or other troubled financial situations.

9.      Genmar, through its subsidiaries, is primarily engaged in the manufacture and/or sale of recreational power boats under the brand names of Carver, Champion, Four Winns,

3

Glastron, HydraSports, Larson, Marquis, Ranger, Scarab, Seaswirl, Stratos, Triumph, Wellcraft, FinCraft, and Windsor Craft Yachts. Debtors sell their products primarily through an established network of more than 1,000 independent dealers in the United States and throughout the world.

10.     Overall, Debtors as a group are the second largest manufacturer and distributor of fiberglass powerboats in the world, selling more than 24,000 units during its fiscal year ended June 30, 2008. As of May 1, 2009, Genmar and its subsidiaries had approximately 1,500 employees with an average monthly payroll of $4.6 million.

11.     Genmar's subsidiaries included in the filing are all borrowers under Genmar's senior credit facility, described below. Genmar has subsidiaries who are not borrowers and who are not debtors in these cases.

12.     Genmar and its Debtor subsidiaries fall into the following categories:

**Holding Companies**

**Genmar Holdings, Inc.**—headquartered in Minneapolis, MN is the parent of wholly-owned Debtor subsidiaries Minstar, LLC, Marine Media, LLC, Windsor Craft Yachts, LLC, and Genmar Yacht Group, LLC. It employs corporate level professionals and staff to assist its subsidiaries in their operations.

**Minstar, LLC** –headquartered in Minneapolis, MN is the parent of wholly-owned Debtor subsidiary Genmar Industries, Inc.

**Genmar Industries, Inc.**—headquartered in Minneapolis, MN is the parent of wholly-owned Debtor subsidiaries Genmar Minnesota, Inc., Genmar Michigan, LLC, Genmar Tennessee, Inc., Carver Industries, LLC, Genmar IP, LLC, Genmar Florida, Inc., Triumph Boats, Inc., Triumph Boat Rentals, LLC, Genmar Transportation, Inc., and VEC Technology, Inc. These are the majority of the Debtor group operating assets. It also owns real property in Florida and Minnesota, and certain patents and trademarks used in some subsidiaries' manufacturing and sales.

**Marine Media, LLC**—headquartered in Minneapolis, MN is the owner of 37.75% of non-debtor Wave South Florida, LLC and 50% owner of non-debtor Boat Show Group, LLC. It is a holding company for small investments in start-up companies related to the marine industry.

4

**VEC Technology, Inc**—is a former operating company that is now inactive and holds the stock of Debtor subsidiaries VEC Management Co., LLC and VEC Leasing Services, Inc.

**VEC Management Co., LLC** and **VEC Leasing Services, Inc.**—headquartered in Minneapolis, MN are the majority owners of non-debtor VEC Technology, LLC.

## Boat Manufacturing and Sales Companies

**Carver Yachts International, LLC**—headquartered in Pulaski, WI, this company engages in sales of Carver and Marquis yachts through an office in Monaco.

**Genmar Michigan, LLC**—headquartered in Cadillac, MI, and formerly known as Four Winns Boats, LLC, this company owns and operates a manufacturing facility for and sells Four Winns and Wellcraft boats.

**Genmar Minnesota, Inc.**–headquartered in Little Falls, MN, and formerly known as Larson/Glastron Boats, Inc., this company owns and operates a manufacturing facility for and sells Larson, Glastron, Seaswirl, and FinCraft boats.

**Genmar Tennessee, Inc.**—headquartered in Murfreesboro, TN, and formerly known as Stratos Boats, Inc., this company owns and operates a manufacturing facility for and sells Stratos, Champion, and HydraSports boats.

**Genmar Yacht Group, LLC**—headquartered in Pulaski, WI, and formerly known as Carver Boat Corporation, LLC, this company owns and operates a manufacturing facility for and sells Carver and Marquis yachts.

**Triumph Boats, Inc.**—headquartered in Durham, NC, this company leases and operates a manufacturing facility for and sells Triumph boats.

**Windsor Craft Yachts, LLC**--headquartered in Minneapolis, MN, this company purchases, brands, and sells direct to the public wooden yachts that are manufactured on an exclusive basis by a third party in Turkey.

**Wood Manufacturing Company, Inc.**—headquartered in Flippin, AR, this company owns and operates a manufacturing facility for and sells Ranger boats.

## Other Debtor Entities

**Carver Industries, LLC** and **Genmar IP, LLC** are headquartered in Minneapolis, MN. They own various items of intellectual property for the operating companies.

**Genmar Transportation, Inc.**–headquartered in Little Falls, MN, this company owns real property adjacent to the Genmar Minnesota property and leases a fleet of semi-tractors and trailers to transport boats and other products for other subsidiaries and for third parties.

5

**Carver Italia, LLC**—now headquartered in Minneapolis, MN, this former operating company owns certain boat tooling and molds located in Fano, Italy and is liquidating its operating assets.

**Genmar Florida, Inc. (f/k/a Wellcraft Marine Corp.), Genmar Manufacturing of Kansas, Inc.,** and **Triumph Boat Rentals, LLC** are inactive companies and borrowers under the Wells Fargo N.A. credit facility described below.

13.    The Debtors' primary financing is through a credit facility with Wells Fargo, N.A. and Fifth Third Bank, with obligations totaling approximately $70,800,000 plus accrued costs as of June 1, 2009.

14.    A number of factors lead to these Chapter 11 filings.  The marine industry began to be negatively impacted by a number of macro-economic factors and other factors unique to the industry beginning in the fall of 2007.  The Debtors responded immediately to these market conditions with operational changes, and infused additional equity, but conditions continued to erode as overall economic concerns lead to falling customer confidence and declines in retail sales.  In addition, financing sources previously available to Debtors and their dealers became more restrictive and, in some cases, unavailable.

## BACKGROUND FOR RELIEF REQUESTED

## I.    LIENHOLDERS.

15.    The proposed sale of the Debtors' assets will be a sale free and clear of all liens, claims, interests and encumbrances.  The following summarizes the nature, extent and amount of all such secured interests.

### A.    Senior Secured Lender Parties.

16.    Prior to the Filing Date, Debtors were indebted to Wells Fargo Bank, National Association, acting through its Wells Fargo Business Credit operating division, in its capacity as administrative agent for the Lenders under the Credit Agreement as described below (in such capacity, the "Administrative Agent") in its capacity as letter of credit issuer under the Credit

6

Agreement (in such capacity the "Letter of Credit Issuer"), and Wells Fargo Bank, National

Association, National Banking Association, and Fifth Third Bank, N.A., an Ohio Banking

Corporation, in their capacity as lenders under the Credit Agreement (in such capacity, the

"Lenders"; together with the Administrative Agent and the Letter of Credit Issuer, the "Secured

Lender Parties") under the terms of certain loan documents, including the following:

|   |   |
|---|---|
| A. | Amended and Restated Credit and Security Agreement dated November 1, 2007, Forbearance Agreement and First Amendment to Amended and Restated Credit and Security Agreement, and all subsequent amendments (collectively, the "Credit Agreement"); |
| B. | Revolving Notes dated November 1, 2007 in the amount of $38,888,889 and $11,111,111; |
| C. | Term Notes dated November 1, 2007 in the amount of $31,111,111 and $8,888,889; |
| D. | Amended and Restated Standby Letter of Credit Agreement dated November 1, 2007; |
| E. | Commercial Letter of Credit Agreement dated November 1, 2007; |
| F. | Pledge and Security Agreement dated November 1, 2007; |
| G. | Amended and Restated Licensor Agreement dated November 1, 2007; |
| H. | Amended and Restated Restricted Account Agreement dated November 1, 2007; |
| I. | Amended and Restated Patent and Trademark Security Agreement dated November 1, 2007; |
| J. | Copyright Security Agreement dated November 1, 2007; and |
| K. | Certain Mortgages, Assignment of Rents and Leases, Security Agreements and Fixture Filings dated November 1, 2007. |

(collectively, the "Loan Documents").

17.    In the Credit Agreement, the Debtors granted the Secured Lender Parties

security interests in the following assets:

All of such Borrower's Accounts, Chattel Paper and Electronic Chattel
Paper, Deposit Accounts, Documents, Equipment, General Intangibles,
Goods, Instruments, Investment Property, Intellectual Property Rights,
Inventory Intellectual Property Rights, Inventory, Letter-of-Credit Rights,
letters of credit, all sums on deposit in any collateral account, and any
items in any lockbox; together with (i) all substitutions and replacements
for and products of any of the foregoing; (ii) in the case of all goods, all
accessions; (iii) all accessories, attachments, parts, and repairs now or
hereafter attached or affixed to or used in connection with any goods;

(iv) all warehouse receipts, bills of lading and other documents of title now or hereafter covering any of the foregoing; (v) all collateral subject to the Lien of any Security Document; (vi) any money, or other assets of such Borrower that now or hereafter come into the possession, custody, or control of any Lender Party; (vii) all sums on deposit in the Special Account; (viii) proceeds of any and all of the foregoing; (ix) books and records of such Borrower, including all mail or electronic mail addressed to such Borrower; and (x) all of the foregoing, whether now owned or existing or hereafter acquired or arising or in which such Borrower now has or hereafter acquires any rights.

(collectively, the "Collateral").

18.     On June 24, 2005, the Secured Lender Parties filed a financing statement with the Delaware Secretary of State appearing as Document No. 5195082 4, naming Genmar Holdings, Inc. as the debtor.   On July 5, 2005, Secured Lender Parties filed an amended financing statement with the Delaware Secretary of State appearing as Document No. 5195082 4 Amendment No. 5204979 0, revising the description of collateral.   On November 7, 2007, Secured Lender Parties filed another amended financing statement appearing as Document No. 5195082 4 and Amendment No. 2007 4240619, further revising the description of collateral to include "All assets."

19.     Similar financing statements for the other Debtors appear to have been filed with the applicable offices of the secretaries of state.

20.     As of the Filing Date, Debtors were indebted to the Secured Lender Parties in the amount of approximately $70.8 million.

21.     On July 1, 2009, the Bankruptcy Court entered the Final Order Approving Stipulation for Secured Borrowing and Adequate Protection (the "Final DIP Order") authorizing Debtors to obtain post-petition financing from the Secured Lender Parties pursuant to that certain Stipulation for Secured Borrowing and Adequate Protection dated as of June 4, 2009, and a Second Amendment to Amended and Restated Credit and Security Agreement

dated as of June 4, 2009.   On September 4, 2009, the Bankruptcy Court entered an Order approving the Third Amendment to Amended and Restated Credit and Security Agreement dated as of September 2, 2009 (collectively, the "Secured Lender Parties DIP Loan").   On November 4, 2009, the Bankruptcy Court entered an Order approving a Fourth Amendment to Amended and Restated Credit and Security Agreement dated as of November 2, 2009.

22.     As of the date of this Sale Motion, the outstanding balance of the obligations under the Secured Lender Parties DIP Loan totaled approximately $61 million including letters of credit, principal and interest, but excluding other fees and costs including attorneys' fees.

23.     The Debtors' relationship with the Secured Lender Parties are described more thoroughly in the Notice of Motion and Motion for (I) Expedited Relief; (II) Interim and Final Orders Authorizing Debtors to Use Cash Collateral, and (III) Interim and Final Orders Authorizing Debtors to Obtain Debtor-In-Possession Financing (Docket Entry No. 6) and Notice of Hearing and Motion for Order Authorizing Amendment of Debtor-In-Possession Financing with Secured Lender Parties (Docket Entry No. 353).

**B.     GE Commercial Distribution Finance Corporation.**

24.     On July 1, 2009, the Bankruptcy Court entered the Agreed Final Order By and Among the Debtors and GE Commercial Distribution Finance Corporation pursuant to 11 U.S.C. §§ 105, 363, 364, 365, 503 and 507 (I) Approving Assumption of Vendor Agreement as Modified, (II) Approving Post-Petition Financing, and (III) Granting Liens and Providing Superpriority Administrative Expense Status ("CDFC Final DIP Order").   Pursuant to the terms of the CDFC Final DIP Order, Debtors were authorized to enter into a Debtor-In-Possession Working Capital Financing Agreement with GE Commercial Distribution Finance Corporation

("CDFC").  Under the terms of that agreement, CDFC was granted a security interest in all of the

Debtors' assets.  That security interest, however, is junior in all respects to that of the Senior

Lender Parties according to the terms of the Subordination Agreement between CDFC and

Secured Lender Parties.

25.     As of the date of the Sale Motion, the outstanding obligations to CDFC under

the Debtor-In-Possession Working Capital Financing Agreement totaled approximately

$10 million including principal and interest, but excluding certain costs including attorneys' fees.

26.     The Debtors' relationship with CDFC is described more fully in the Notice of

Motion and Motion and Joint Motion for Expedited Relief and for Interim and Final Order

Authorizing Debtors (I) to Assume Vendor Agreement with GE Commercial Distribution

Finance, and (II) Obtain Credit Secured by a Junior Lien on Property of the Estates (Docket

Entry No. 62).

### C.     Textron Finance Corporation.

27.     Wood Manufacturing Company, Inc. ("Wood") entered into a Receivables

Financing Agreement dated December 17, 2008, with Textron Financial Corporation ("Textron")

as the lender (as amended, modified or supplemented and in effect from time to time, the

"Pre-Petition Credit Agreement").  The purpose of the Pre-Petition Credit Agreement was to

allow Wood to sell Ranger boats to fishing professionals, who would enter a long-term purchase

agreement.  Under the Pre-Petition Credit Agreement, Textron would provide Wood an advance

equal to 70% of the invoiced purchase price of a specific Ranger boat, net of any down-

payments, sold pursuant to these long-term purchase agreements.  In return, Wood would grant

Textron a security interest in such receivables:

> [a]ll rights, titles, and interests of Borrower in, to and under all Scheduled
> Receivables, all present and future payment intangibles specifically

> relating to such Scheduled Receivables, supporting obligations specifically relating to such Scheduled Receivables, instruments and chattel paper specifically relating to such Scheduled Receivables and all proceeds thereof.

(collectively, the "Scheduled Receivables").  The Scheduled Receivables (listing the specific professional angler, the invoice number and the due date of the receivable) were specifically identified as part of the Pre-Petition Credit Agreement.

28.     Further, the Pre-Petition Credit Agreement also allowed for additional advances by Textron at future dates on terms and conditions substantially the same as those advances made in connection with the original transaction discussed above.  Such additional advances were subject to the same grant of a security interest in specifically scheduled receivables, subject to the approval of the Secured Lender Parties.

29.     On December 19, 2008, Textron filed a financing statement with the Arkansas Secretary of State appearing as document number 7131142452, perfecting its security interest in the Scheduled Receivables.  The financing statement described the collateral as "all rights, titles, and interests of Debtor in, to and under all Scheduled Receivables, all present and future payment intangibles specifically relating to such Scheduled Receivables and all proceeds thereof."

30.     Thereafter (i.e., after December 17, 2008), at the request of Wood, Textron financed certain additional long term contracts with fishing professionals that were in addition to the Scheduled Receivables.  These new contracts were not presented to the Secured Lender Parties for approval, and hence, are not Textron Financial Collateral under the Subordination Agreement with the Secured Lender Parties, Genmar Holdings, Inc., Wood and Textron.

31.     In addition, Textron did not file financing statements on the additional contracts, such that its security interest in the receivables generated from the additional contracts (the "Unscheduled Receivables") are not perfected.

32.     On June 2, 2009, Debtors filed their initial motion requesting authorization to use cash collateral (Docket No. 6).  On June 4, 2009, this Court authorized Debtors' use of cash collateral on an interim basis (Docket No. 22).  On July 1, 2009, this Court entered an order continuing the final hearing and authorizing the use of cash collateral for the interim period (Docket No. 174).  On July 30, 2009, this Court entered its final order authorizing Debtors to use cash collateral (Docket No. 271).  On November 13, 2009, the Court entered an order authorizing continued use of cash collateral through January 20, 2010 (Docket No. 546).

33.     As of September 30, 2009, the outstanding amount of Wood's obligations to Textron was approximately $5,088,118.60.  Of that amount, approximately $2,748,753.40 is secured by Textron Financial Collateral.  The remaining $2,339,365.20 represented Unscheduled Receivables.  Textron has waived its right to claim a security interest in the Unscheduled Receivables due to failing to secure a determination within 30 days after entry of the July 30, 2009 cash collateral order.

**D.     Other Secured Claims.**

34.     Certain other parties have filed financing statements covering certain equipment, goods, and other assets of the Debtors.  Those parties include Celtic Leasing Corp.; North American Composites Company; General Electric Capital Corp.; VFS Leasing, Inc.; Mid America Capital Services, Inc.; Toyota Motor Credit Corporation; Wells Fargo Financial Leasing, Inc.; Citicorp Del Lease, Inc.; and Twin Lakes Community Bank.  These creditors may have a lien on the Debtors' assets and, therefore, have been served with this Motion.

## MARKETING AND SALE PROCESS

35.     During the past several months, the Debtors, with the assistance of their professionals, have been actively engaged in soliciting interest in a sale of all of their assets.

36.     The Debtors engaged Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan") to serve as their investment banker.  Houlihan and the Debtors undertook an intensive effort to identify and track entities interested in purchasing the Debtors' businesses, facilitate potential buyers' due diligence, and assist in negotiating an asset purchase agreement. This included gathering financial, industry and corporate information, which were used to prepare an Offering Presentation dated September 2009 ("Memorandum") to market the Debtors' business.

37.     Copies of the Memorandum were provided to the attorneys for the Secured Lender Parties, CDFC, Textron, and the Committee.  Houlihan has conducted regular conference calls with attorneys and client representatives of those parties as well as others to keep them informed of the sale process.

38.     Houlihan identified potential buyers whose investment criteria and track record made them likely to pursue a transaction with the Debtors.  Potential buyers were sent copies of the Memorandum upon execution of a confidentiality agreement.  Over 80 copies were distributed to private equity groups, hedge funds, and strategic buyers approved by the Debtors.

39.     Officers and employees of the Debtors and Houlihan participated in due diligence conference calls and in-person meetings with approximately two dozen potential purchasers.

40.     On or before September 28, 2009, twelve bids to purchase some or all of the Debtors' assets were submitted to Houlihan.  A matrix describing these bids was provided to the

Secured Lender Parties, CDFC, and Committee.   Houlihan subsequently entered into negotiations with several potential purchasers chosen by Debtors with the advice of Houlihan. The negotiations advanced to the point that the Stalking Horse became the focus.

41.     The marketing efforts are described in greater detail in the accompanying Unsworn Declaration of Stephen Spencer.  As a result of these efforts, the Debtors believe there may be parties in addition to the Stalking Horse interested in pursuing a transaction with respect to the Debtors.

## STALKING HORSE BID

42.     The Debtors' and their professionals' efforts have culminated in an Asset Purchase Agreement ("APA"), which is attached as <u>Exhibit A</u> with Project Boat Holdings, LLC (the "Stalking Horse").

43.     The Stalking Horse is an affiliate of Platinum Equity ("Platinum") which is a global acquisition firm headquartered in Beverly Hills, California, with principal offices in Boston, New York and London. Since its founding in 1995, the firm has acquired more than 100 businesses with more than $27.5 billion in aggregate annual revenue at the time of acquisition. Platinum has a diversified capital base that includes the assets of its portfolio companies, which generated approximately $11 billion in revenue in 2008, as well as private equity fund vehicles backed by capital commitments from a diverse institutional investor base. The proposed acquisition would be made by Platinum Equity Capital Partners II and its affiliated entities ("Fund II"), a $2.75 billion investment fund launched by Platinum in 2008. Institutional investors in Fund II include public and private pension funds, insurance companies, endowments and family offices in North America, Europe and Japan.  The Stalking Horse is not an "insider"

or "affiliate" (as defined in the Bankruptcy Code) and the APA is the result of vigorous arm's-length negotiations.

44.     The assets to be sold consist of assets owned by the following Debtors – Genmar Holdings, Inc.; Genmar Industries, Inc.; Genmar IP, LLC; Genmar Michigan LLC; Genmar Minnesota, Inc.; Genmar Tennessee, Inc.; Genmar Transportation, Inc. and Wood Manufacturing, Inc.  The basic terms of the APA are summarized as follows.[2]

45.     The Acquired Assets (as defined in the APA) consist primarily of the assets that have historically been utilized by the Debtors in the design, manufacture and sale of boats under the following brands:  Ranger, Stratos, Champion, Wellcraft, Four Winns, Glastron and Larson.  The Acquired Assets also include the real estate and production facilities at Flippin, Arkansas; Cadillac, Michigan; and Murfreesboro, Tennessee; and real estate located in Sarasota, Florida.  In addition, the Stalking Horse would acquire certain real property leases and contracts associated with those businesses.  The purchase price is $55 million subject to working capital adjustments.

46.     The sale does not include the following brands:  Carver, Marquis, Seaswirl, FinCraft, Hydra-Sport, Javelin, and other brands not included in the APA.  The sale does not include the real estate and production facilities located at Little Falls, Minnesota; Polaski, Wisconsin, and other locations not identified in the APA.  The sale also does not include the ownership of approximately 93% of VEC Technology, LLC.

---

[2]   This Sale Motion contains only a summary description of the terms of the APA.  The parties are directed to the APA attached to the Sale Motion for a full recitation of its terms.  To the extent there are inconsistencies between the APA and the terms set forth in this Sale Motion, the terms of the APA shall control.  Capitalized terms not otherwise defined in the Sale Motion, shall have the meaning ascribed to them in the APA.

47.      The APA provides a Break-Up Fee of $2,500,000 as described in Section 8.3 of the APA.  The Break-Up Fee is payable to the Stalking Horse in the event of the breach of certain representations; Debtors' failure to adhere to certain deadlines such as for entry of the Sale Approval Order; the Sale Motion is withdrawn or case converted; the Bid Procedures are materially modified; or the Stalking Horse is not the highest bidder at the Auction.  The Break-Up Fee shall be deemed an allowed administrative expense claim in this chapter 11 case.  The APA also provides for a "carve-out" from lenders' collateral in the amount of $1,750,000 in the event there is not an Alternative Transaction from which the Break-Up Fee would be paid.

48.      The APA also provides an Expense Reimbursement of up to $1.5 million.  The Stalking Horse is not entitled to receive both the Break-Up Fee and Expense Reimbursement.  The Expense Reimbursement is limited to certain documented out-of-pocket expenses incurred negotiating the APA and related documents, appearing and participating in the Bankruptcy Case, and participating in the Auction.  As described in Section 8.3, the Expense Reimbursement is payable to the Stalking Horse in the event the Buyer has complied in all material respects with its obligations under the APA and the Stalking Horse terminates the APA because the sale doesn't close within certain deadlines, CDFC and the Stalking Horse have not reached a long-term financing arrangement, or the Sellers have breached certain representations and warranties.  The Expense Reimbursement will be deemed an allowed administrative expense claim in this chapter 11 case.  The "carve-out" described in the preceding paragraph also applies to the Expense Reimbursement.

49.      Debtors believe that the amount of the Break-Up Fee and Expense Reimbursement and the conditions under which they are payable to the Stalking Horse are reasonable under the circumstances.  The Break-Up Fee is approximately 4.5% of the stated

purchase price of the Stalking Horse Bid.  Additional monetary value is also provided through the contemplated assumed liabilities, assumption of contracts and associated cure costs, and continued operation of the businesses and attendant preservation of the relationships with suppliers, dealers, employees and other business partners.  The Break-Up Fee and Expense Reimbursement are also necessary to ensure that the Stalking Horse will continue to pursue its proposed acquisition of the Acquired Assets.  Such continued participation allows for the maximization of value of the Debtors' estates by, among other things, establishing a bid standard and minimum bid for other bids and to attract additional bidders.  The amount of the Break-Up Fee and Expense Reimbursement is also commensurate with the substantial efforts that have been and will be expended by the Stalking Horse, the size of each of the transaction, and benefits to the Debtors' estates.  Finally, as described in the Declaration of Stephen Spencer, the Break-Up Fee and Expense Reimbursement are customary in both nature and amount.

50.     Debtors seek authority to sell the Acquired Assets to the Stalking Horse pursuant to section 363 of the Bankruptcy Code, subject to higher and better bids received through an auction ("Auction") and by a process described in the proposed Bidding Procedures.  Because the Stalking Horse does not have any interest materially adverse to the Debtors or the estates, Debtors submit that the Stalking Horse is entitled to the protections afforded a good faith buyer under section 363(m), as the APA is a product of good-faith, arm's-length negotiations.  The Stalking Horse Bid (as defined in the Bidding Procedures) would be subject to any overbid at the Auction.

## ASSUMPTION AND ASSIGNMENT OF LEASES AND CONTRACTS

51.     Pursuant to Section 541 of the Bankruptcy Code, the Acquired Contracts and Assumed Leases (each as defined in the APA) constitute property of the Debtors' estates that

17

may be sold consistent with section 363 of the Bankruptcy Code.  In accordance with the provisions of section 365 of the Bankruptcy Code, the Debtors may assume and assign the Acquired Contracts and Assumed Leases and recover value from such assets.  In pertinent part, section 365(f) of the Bankruptcy Code provides:

> (f)(1)  [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.
>
> • • •
>
> (2)  The trustee may assign an executory contract or unexpired lease of the debtor only if-
>
> (A)  the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)  adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f).

52.      In connection with the sale of its business operations, the Debtors propose to sell, assume and assign one or more of the Acquired Contracts and Assumed Leases to the highest bidder at the Auction.  The Debtors believe cause exists to approve the sale, assumption and assignment of the Acquired Contracts and Assumed Leases pursuant to Sections 363 and 365(f) of the Bankruptcy Code.  As noted previously, the Debtors have determined, in the exercise of their sound business judgment, and with the concurrence of the Secured Lender Parties, that the sale of their business operations is in the best interests of the Debtors and their estates.  The Acquired Contracts and Assumed Leases are an integral part of those business operations.

53.     The proposed assumption and assignment of the Acquired Contracts and Assumed Leases complies with section 365 of the Bankruptcy Code in all respects.  Upon the assumption and assignment of the Leases, the Debtors (and/or the purchaser of such Acquired Contracts or Assumed Lease(s)) will promptly cure, except where waived by the counterparty, any and all defaults under the terms of the Acquired Contracts or Assumed Leases to be assumed, and compensate the corresponding party for its actual pecuniary loss(es), if any, as a result of such defaults, in each case as determined by the Court at the hearing to consider approval of the sale, assumption and assignment of the Acquired Contracts or Assumed Leases (the Sale Approval Hearing), or, alternatively, at a subsequent hearing.  In addition, where required, the Debtors will provide adequate assurance of future performance at such hearings.

54.     Accordingly, the Debtors request authority pursuant to sections 363 and 365(f) of the Bankruptcy Code for the sale, assumption and assignment of the Acquired Contracts or Assumed Leases to the Stalking Horse or the highest and best acceptable bidder for the assets at the Auction.

55.     The Debtors request authority to assume/assign and reject certain of their executory contracts and unexpired leases in accordance with the following procedures:

      a.     In accordance with the APA and Bidding Procedures, the Stalking Horse shall identify (i) the Acquired Contracts and Assumed Leases it wishes the Debtors to assume and assign and (ii) certain contracts it wishes the Debtors to reject.  Upon receiving this information, Debtors shall promptly give notice (the "Initial Contract and Lease Notice") to the counter-parties of the contracts or leases it proposes to reject and to the counter-parties of the Acquired Contracts or Assumed Leases it proposes to assume and assign, including as to the latter any cure amount ("Cure Amount") associated with such assumption an assignment.  Such notice shall be given at least twenty days prior to the time set for the Sale Approval Hearing.  Except as provided below, at the Sale Approval Hearing, Debtors will seek approval of the assumption

and assignment of Acquired Contracts and Assumed Leases and rejections of any other contracts or leases as set out in such notice.

b.  In the event Debtors' proposal regarding rejection or assumption and assignment of unexpired leases or executory contracts changes, whether due to change by the Stalking Horse or a Prevailing Bidder or Back-Up Bidder or for any other reason, Debtors will promptly give notice of such change to the affected counter-party to the contract or leases (the "Notice of Change"). The Notice of Change will be given at least three days (including weekends and holidays) prior to the date set of the Sale Approval Hearing (the "Notice of Change Deadline"). In the event of any change in the identify of the assignee after the Auction, such notice will be given as promptly as possible after the Auction. If a counter-party does not object to its treatment, including, if applicable, the Cure Amount, set forth on the Notice of Change within ten (10) days of service of such Notice of Change, the counter-party to such executory contract or unexpired lease shall be deemed to consent to such treatment. If necessary, the Debtors will request at the Sale Approval Hearing that the Court set a further hearing to consider any objections to the assumption-assignment or rejection proposed in the Notice of Change, so as to give affected counter-parties such notice.

56.   As part of this streamlined rejection process, the Debtors further request, pursuant to Bankruptcy Rules 2002 and 3003(c), that the Court require that any proof of claim for damages arising from the rejection of a contract or lease must be filed by the respective lessor(s) on or before thirty (30) days after the effective date of rejection.

**SALE OF THE ASSETS FREE AND CLEAR OF LIENS**

57.   In accordance with Section 363(f) of the Bankruptcy Code, a debtor in possession may sell property under Section 363 "free and clear of any interest in such property of an entity other than the estate" if one of the following conditions is satisfied:

(1)   applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)   such entity consents;

(3)   such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

20

  (4)  such interest is in bona fide dispute; or

  (5)  such entity could be compelled, in a legal or equitable proceeding to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

  58.  Because the Debtors expect they will satisfy one or more of the requirements of Section 363(f), as will be demonstrated at the Sale Approval Hearing, approval of the sale of the Debtors' assets free and clear of all interests is warranted.

  59.  To the extent that any of the Debtors' pre- or post-petition lenders assert a lien in the assets to be sold, the Debtors believe that they will obtain the consent of such parties to the sale of such assets free and clear of all liens, claims and encumbrances.  The Debtors believe that they have or will have the consent of Secured Lender Parties and CDFC to the relief sought in this Sale Motion.  If such consent is not obtained, the Debtors request that the liens, claims and encumbrances asserted against the affected assets by any creditor be transferred and attached to the net proceeds from any sale received by the Debtors, subject to the rights, claims, defenses and objections, if any, of any and all interested parties with respect thereto.

  60.  Debtors propose to use the proceeds of sale to pay Secured Lender Parties, CDFC and all other secured creditors with the balance to be subject to a plan of reorganization to be filed by the Debtors.

  61.  Accordingly, the Debtors request that the order approving the sale of the assets provide that such sale is free and clear of all liens, claims and encumbrances in accordance with Section 363(f) of the Bankruptcy Code.

  62.  In addition, Debtors request that an order approving the sale to the Stalking Horse or any other higher and better bidder include the protections as provided in section

21

363(m).   The Debtors submit, and will demonstrate at the Sale Approval Hearing, that the Stalking Horse and any such higher and better bidder does not have an interest clearly adverse to the Debtors, their estates, or their creditors.   Further, the final agreement to be approved is a product of arm's-length, good-faith negotiations.

## PROPOSED SALE PROCEDURES AND AUCTION

63.     To maximize the value of the Debtors' assets, by this Sale Motion the Debtors request authority to conduct the Auction for certain of the Debtors' business operations and related properties and assets, including the Debtors' leases of real property and executory contracts.

64.     The Debtors have determined, in the exercise of their sound business judgment, that the sale of their assets to the highest bidder at the Auction is appropriate and in the best interests of the Debtors' estate and creditors.   The sale of the assets at the Auction will afford the Debtors' estate an opportunity to attempt to capture the substantial going concern value of the Debtors' business operations and maximize the recoveries for all constituents.

65.     The Debtors believe it is in the best interests of the Debtors and their estates to conduct the Auction in accordance with the procedures described in the Sale Motion and the Bidding Procedures attached as <u>Exhibit B</u> and substantially on the terms and conditions described in the Stalking Horse APA.

66.     In conjunction with the conduct of the Auction, the Debtors will continue their efforts to generate interest in their assets.   The Debtors, through their professionals including Houlihan, will solicit each party known by the Debtors to have indicated an interest in the Acquired Assets.   The Debtors will also publish notice of the this Sale Motion, the Bidding Procedures, and the Sale Approval Hearing, the time and place of the Auction, and the deadlines

22

for filing objections in the Minneapolis Star Tribune and the Wall Street Journal.  The solicitation and notice of the Auction will provide cost effective and sufficient publicity to apprise interested parties of the Auction.  The Debtors will also continue to afford all interested parties an opportunity to conduct due diligence in respect of the assets.

67.    Upon the execution of the APA and filing of this Sale Motion, Debtors, with the assistance of Houlihan, will immediately begin the process of soliciting each party known by the Debtors to have indicated an interest in the Acquired Assets and to facilitate due diligence requirements.  Houlihan will build upon its marketing efforts leading up to negotiations with the Stalking Horse and the APA.  Through these efforts, Houlihan believes it has identified other parties who will be interested in participating in the Auction and will solicit additional parties who may have interest as described in greater detail in the Unsworn Declaration of Steven Spencer.

68.    The Debtors believe good cause exists to approve the fact of, and the terms and conditions of the Auction.  The terms and conditions of the Auction are reasonable and will enable the Debtors and their creditors to realize the maximum value for the assets.  The Debtors further believe that the bidding process will yield the highest and best bids for the assets.

69.    In the event that a party submits a Qualified Bid to the Debtors and the Debtors conduct an Auction, the Debtors request that the Court hold a hearing to approve the sale of the Assets and the assumption and assignment of the Acquired Contracts and Assumed Leases to the highest bidder or bidders under Sections 363(b), (f) and (m) and 365 of the Bankruptcy Code – the Sale Approval Hearing.

**REQUEST FOR RELIEF UNDER BANKRUPTCY RULES 6004(g) AND 6006(d)**

70.     Bankruptcy Rules 6004(h) and 6006(d) provide, in substance, that an order authorizing the sale of a debtor's property or assumption/rejection of a lease or contract is stayed for a period of 14 days after entry of the order unless the court orders otherwise.  The Debtors request that any order approving the relief requested herein be effective immediately, by providing that the 14 day stay is inapplicable.  The Debtors' need to effectuate the asset disposition transaction(s) described herein without waiting the period provided for under Bankruptcy Rules 6004(h) and 6006(d).  The failure to consummate the transactions expeditiously likely will have a significant adverse affect on the value to be realized upon the disposition of the assets at issue.  In addition, the Debtors' liquidity concerns also compel the Debtors to effectuate the transaction as expeditiously as possible so as to insure that it will have sufficient funds available to administer these cases.

**NOTICE**

71.     Debtors seek approval of notice of the Sale Notice in substantially the form attached on Exhibit C will be mailed to each entity listed on the creditor matrix maintained pursuant to Local Rule 1007-2, to the entities identified in Local Rule 9013-3(a)(2), to counterparties to executory contracts and leases, to each shareholder (either directly or through the shareholder's proxy) and to each entity identified by Houlihan as a potential purchaser.

**CONCLUSION**

72.     Pursuant to Local Rule 9013-2(a), this Sale Motion is accompanied by a memorandum of law, proposed orders, and proof of service.

73.     Pursuant to Local Rule 9013-2(c), Debtors give notice that they may, if necessary, call Mark Sheffert, Chief Restructuring Officer whose business address is at

24

Manchester Companies, 2900 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402;

Roger Cloutier, II, Chief Executive Officer, or David J. Huls, Chief Financial Officer of Genmar

Holdings, Inc., whose business addresses are 2900 IDS Center, 80 South Eighth Street,

Minneapolis, MN 55402; or Stephen Spencer or Jason Price of Houlihan Lokey Howard &

Zukin Capital, Inc., whose business addresses are 225 South Sixth Street, #4950, Minneapolis,

MN 55402, about the factual matters raised in and relevant to this Sale Motion.

WHEREFORE, the Debtors respectfully request that the Court enter its order:

A.      Authorizing, subject to a final hearing, the Debtors to sell substantially all of their

assets in accordance with the Bidding Procedures, free and clear of all liens, claims, interests and

encumbrances including, without limitation, the liens of the Secured Lender Parties and CDFC,

Textron and any other secured creditors, which liens, claims, interests and encumbrances will

attach to the proceeds of sale in the same order and priority that existed at the commencement of

the case;

B.      Authorizing, subject to a final hearing, Debtors to assume and assign or to reject

in connection with the above-described sale, those executory contracts and leases identified prior

to the Sale Approval Hearing, free and clear of all liens, claims, interests and encumbrances

including, without limitation, the liens of Secured Lender Parties, CDFC, Textron and any other

secured creditors, which liens, claims, interests and encumbrances will attach to the proceeds of

sale in the same order and priority that existed at the commencement of the case;

C.      Approving the Bidding Procedures;

D.      Approving the Notice of Sale and the parties to be served;

E.      Approving the Break-Up Fee and Expense Reimbursement;

F.      Scheduling the Sale Approval Hearing for January 13, 2010 at 9:30 a.m. at

which the sale and assignment to the Stalking Horse or to the Prevailing Bidder and to the

Back Up Bidder may be approved and at which the assumption and assignment or the

rejection of Acquired Contracts and Assumed Leases, and other relief requested in the

Sale Motion may also be approved; and

   G.  Granting such other and further relief as the Court may deem just and

equitable.


             FREDRIKSON & BYRON, P.A.

Dated:  November 27, 2009    /s/ Ryan T. Murphy
             James L. Baillie (#3980)
             Ryan T. Murphy (#311972)
             Douglas W. Kassebaum(#386802)
             200 South Sixth Street, Suite 4000
             Minneapolis, MN 55402
             Phone (612) 492-7000
             Fax (612) 492-7077
             jbaillie@fredlaw.com
             rmurphy@fredlaw.com
             dkassebaum@fredlaw.com

             ATTORNEYS FOR DEBTORS


4594000_9

## VERIFICATION

   I, David J. Huls, am the Chief Financial Officer of Genmar Holdings, Inc.  Based

upon my personal information and belief, I declare under penalty of perjury that the facts

set forth in the preceding Motion are true and correct, according to the best of my

knowledge, information and belief.


Dated:  November 27, 2009     Signed: _____
                David J. Huls
_____

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:                                                    Chapter 11

Genmar Holdings, Inc., et al.[1]                          Case No. 09-43537

                    Debtors.                              Jointly Administered

---

**MEMORANDUM OF LAW IN SUPPORT OF DEBTORS' MOTION FOR HEARINGS
AND FOR ORDERS (I) AUTHORIZING DEBTORS, TO SELL ASSETS FREE AND
CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (II) AUTHORIZING
ASSUMPTION AND ASSIGNMENT OR REJECTION OF UNEXPIRED LEASES
AND EXECUTORY CONTRACTS; (III) APPROVING BIDDING PROCEDURES
AND AUCTION; (IV) APPROVING BREAK UP FEE AND EXPENSE
REIMBURSEMENT; (V) APPROVING FORM AND MANNER OF NOTICE; AND (VI)
SCHEDULING FURTHER HEARING**

---

## <u>INTRODUCTION</u>

Debtors submit this Memorandum of Law in support of their Sale Motion.  Debtors

request that the Court enter the proposed Order (I) Authorizing Debtors to Sell Assets Free and

Clear of Liens, Claims, Interests and Encumbrances; (II) Approving Bidding Procedures and

Auction; (III) Approving Break-Up Fee and Expense Reimbursement; (IV) Approving Form and

Manner of Notice; (V) Scheduling Further Hearing; and (VI) Granting Certain Related Relief.

---

[1]   Jointly administered debtors: Genmar Holdings, Inc., Case No. 09-43537; Carver Industries, L.L.C., Case
No. 09-43538; Carver Italia, L.L.C., Case No. 09-33773; Carver Yachts International, L.L.C., Case
No. 09-33774; Genmar Florida, Inc., Case No. 09-43539; Genmar Industries, Inc., Case No. 09-43540;
Genmar IP, LLC, Case No. 09-43541; Genmar Manufacturing of Kansas, Inc., Case No. 09-43542; Genmar
Michigan, L.L.C., Case No. 09-43543; Genmar Minnesota, Inc., Case No. 09-33775; Genmar Tennessee, Inc.,
Case No. 09-43544; Genmar Transportation, Inc., Case No. 09-43545; Genmar Yacht Group, LLC, Case
No. 09-43546; Marine Media, LLC, Case No. 09-43547; Minstar, LLC, Case No. 09-43548; Triumph Boats,
Inc., Case No. 09-43550; Triumph Boat Rentals, L.L.C., Case No. 09-43551; VEC Leasing Services, L.L.C.,
Case No. 09-43552; VEC Management Co., L.L.C., Case No. 09-43553; VEC Technology, Inc., Case
No. 09-43554; Windsor Craft Yachts, L.L.C., Case No. 09-43555; Wood Manufacturing Company, Inc., Case
No. 09-43556.

## BACKGROUND

The facts in support of the relief requested are set forth in the verified Sale Motion and accompanying Declaration of Stephen Spencer.  All capitalized terms have the meaning ascribed to them in the Sale Motion.

## ARGUMENT

**I.    A GOING CONCERN SALE IS IN THE BEST INTEREST OF THE ESTATES AND THEIR CREDITORS.**

**A.    The Stalking Horse APA And Proposed Bidding Procedures Are Supported By Sound Business Justifications.**

Section 363(b)(1) of the Bankruptcy Code requires court approval, after notice and hearing, for sales outside of the ordinary course of business.  11 U.S.C. § 363(b)(1).   In interpreting section 363(b)(1), courts have held that a transaction involving property of the estate generally should be approved so long as the debtor can demonstrate "some articulated business justification for using, selling, or leasing property outside of the ordinary course of business." *In re Continental Airlines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *accord Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 567 n. 16 (8th Cir. 1997); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Crystalin LLC*, 293 B.R. 455, 463-64 (B.A.P. 8th Cir. 2003).  The court should give deference to a debtor's application of its sound business judgment in the use, sale or lease of property.  *In re Moore*, 110 B.R. 924, 928 (Bankr. C.D. Cal. 1990); *In re Canyon Partnership*, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981).

Many courts have set forth factors to consider when approving a sale outside of the ordinary course, and most courts start with the factors set forth by the Second Circuit in *In re Lionel.*  Those factors are:

2

the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.

*In re Lionel*, 722 F.2d at 1071.

Other courts have simplified the factors to include, *inter alia*, the consideration to be paid, the financial condition and needs of the debtor, the qualifications of the buyer, and whether a risk exists that the assets proposed to be sold would decline in value if left in the debtor's possession. *Equity Funding Corp. of America v. Financial Associates (In re Equity Funding Corp.)*, 492 F.2d 793, 794 (9th Cir. 1974); *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991) (setting forth four elements of a "sound business purpose" test: (1) a sound business reason, (2) accurate and reasonable notice, (3) adequate price, and (4) good faith).

In light of the plain language of 11 U.S.C. § 363(b)(1), which only requires "notice and hearing" before a sale and does not set out factors to consider, the Second Circuit in *Lionel* observed that:

A bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the code.  As Justice Holmes once said in a different context, 'Some play must be allowed for the joints of the machine . . .'.

*Lionel*, 722 F.2d at 1069 (quoting *Missouri, Kansas and Texas Ry. Company v. May*, 194 U.S. 267 (1904)); *see also Wintz v. American Freightways, Inc. (In re Wintz Cos.)*, 219 F.3d 807, 812 (8th Cir. 2000) ("[The] bankruptcy courts have wide discretion in structuring sales of assets . . . .").

3

The proposed sale process should be should be approved based on the factors set forth above. Debtors have determined, after careful evaluation of their business prospects, that the proposed Auction and Bidding Procedures will yield the greatest return. Debtors, with the assistance of Houlihan, have marketed and will continue to market the going concern sale to prospective buyers. This opportunity was already marketed for approximately three months and culminated in the APA with the Stalking Horse. The APA maximizes the value of the Debtors' estates and potential recovery of the Debtors' creditors while minimizing the estates' administrative expenses.

Generally, "the best way to determine the market value of property is to expose the property to the marketplace." *In re Mama's Original Foods, Inc.*, 234 B.R. 500, 504 (Bankr. C.D. Cal. 1999) (citing *Bank of America NT & SA v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 119 S. Ct. 1411, 1423 (1999)). Debtors have negotiated an APA with the Stalking Horse. The purchase price is $52 million less the working capital adjustment and cure costs of up to $1 million. A number of potential purchasers have expressed an interest in purchasing the business or Debtors' assets. Because of the interest shown, Bidding Procedures have been developed to encourage a competitive bidding process yielding the highest price possible for these assets at the conclusion of the Auction. The Bidding Procedures will provide an additional procedural safeguard that will test the value of the Acquired Assets and competitive bidding process and provide potentially interested parties with another opportunity to step forward and provide greater value to the Debtors. The Debtors believe that the Bidding Procedures will encourage active bidding from interested parties who possess the financial and operational capacity to purchase the Acquired Assets.

4

Furthermore, this sale is proposed in good faith. Potential purchasers were and will continue to be widely solicited from entities that have already expressed an interest as well as other potential buyers. The Bidding Procedures and Auction are being presented to all parties and designed to create an open bidding process that all parties in interest can monitor to ensure that the highest possible price is received for Debtors' assets. Indeed, the Bidding Procedures provide for the participation by the Committee, the Secured Lender Parties and CDFC. Thus, the proposed Bidding Procedures will allow the Debtors to conduct an auction in a controlled, fair and open fashion that will serve to dispel any doubt as to the best and highest offer reasonably available for the Acquired Assets.

The proposed sale process is supported by business justifications. The proposed Bidding Procedures and Auction should result in the highest price for the assets to be sold. The sale is consistent with progress towards confirmation of a plan, which may be proposed some time after completion of the sale. All aspects of this transaction have been undertaken in good faith and provide for adequate disclosure to interested parties. Accordingly, the sale should be allowed to proceed under the terms outlined in the Sale Motion and Bidding Procedures.

**B.**    **In The Event That A Going Concern Sale Is Finally Approved, The Court Should Authorize The Debtors To Assume And Assign Certain Unexpired Executory Contracts And Unexpired Leases To The Purchaser And To Reject Others.**

Bankruptcy Code section 365(a) provides that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Bankruptcy Code section 365(f)(2) provides the authority for the trustee, or debtor in possession, to assign executory contracts and leases as follows:

The trustee may assign any executory contract or unexpired lease of the debtor only if –

5

(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B) adequate assurance of future performance by the assignee of such contract or lease is provided . . . .

11 U.S.C. § 365(f)(2).

In considering whether to approve a proposed assumption and assignment of an executory contract or unexpired lease, the court uses a business judgment test. "Where the trustee's request is not manifestly unreasonable or made in bad faith, the court should normally grant approval." *Four B. Corp v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 567 n.16 (8th Cir. 1997) (quoting *Richmond Leasing Co. v. Capital Bank N.A.*, 762 F.2d 1303 (5th Cir. 1985)). It will be a condition of the sale that the purchaser pay some of the costs to cure any executory contracts or unexpired lease it wishes to assume. In addition, pursuant to Bankruptcy Code section 365(k), the estates will have no liability under the assumed and assigned contracts following the assignment to the purchasers. Having certain executory contracts and unexpired leases available is key to obtaining the highest and best price for the assets, as much of the Debtors' income arises under such contracts and leases. Therefore, assumption of certain contracts and leases will be necessary to sell the business assets. Because Debtors may do so without uncompensated detriment to the estates, the Debtors are willing to do so and request that the Court approve the assumption and assignment of the executory contracts and unexpired leases that will be assumed as part of the sale.

Whether there exists "adequate assurance of future performance" as required under Bankruptcy Code section 365(b)(1)(C) involves a factual inquiry, requiring case-by-case consideration. *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309-10 (5th Cir. 1985). In the event the other parties to unexpired executory contracts challenge the purchaser's ability to provide adequate assurance of future performance, the purchaser will provide such

6

parties and/or the Bankruptcy Court with supplemental evidence of its financial ability to perform executory contracts or unexpired leases to be assumed.

In determining whether a debtor may be permitted to reject an executory contract or unexpired lease, courts apply the "business judgment test." *In re G. Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994). Generally, absent a showing of bad faith or an abuse of business discretion, the debtor's business judgment will not be altered. *In re Bildisco*, 682 F.2d 72, 79 (3d Cir. 1982), *aff'd sub nom. N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 104 S. Ct. 1188, 79 L.Ed2d 482 (1984); *Lubrizol Enterprises v. Richmond Metal Finishers (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1048 (4th Cir. 1985); *Control Data Corporation v. Zelman (In re Minges),* 602 F.2d 38 (2d Cir. 1979). "Transposed to the bankruptcy context, the rule as applied to a bankrupt's decision to reject an executory contract because of perceived business advantage requires that the decision be accepted by courts unless it is shown that the bankrupt's decision was one taken in bad faith or in gross abuse of the bankruptcy retained business discretion." *In re Richmond Metal Finishers, Inc.,* 756 F.2d at 1047. Furthermore, "[i]t is enough if, as a matter of business judgment, rejection of the burdensome contract may benefit the estate." *In re Minges,* 602 F.2d at 43; *In re Chipwich, Inc.,* 54 B.R. 427, 431 (Bankr. S.D.N.Y. 1985).

The Debtors have determined that rejection of the executory contracts and leases at the final sale hearing represents an exercise of sound business judgment as these executory contracts and leases do not benefit the estate. In fact, as exhibited by the marketplaces rejection of their terms to be evidenced by the final asset purchase agreement, the contracts and unexpired executory contracts are a burden on the estate. Therefore, Debtors will seek an order as to rejected claims at the Sale Approval Hearing. Pursuant to Fed. R. Bankr. P. 3003(c)(3), the

7

Debtors will also seek an order setting a deadline for filing any rejection damage claims and requesting that such deadline be no more than thirty (30) days after the date of entry of the rejection order.

## II. A GOING CONCERN SALE OR GOB SALES DO NOT CONSTITUTE A *SUB ROSA* PLAN OF REORGANIZATION.

The sale proposed by Debtors is not a "creeping" or *sub rosa* plan of reorganization. The *sub rosa* doctrine only applies when proposed asset sale or other transaction dictates the terms of the plan of reorganization. Only in those cases should the sale not be approved under section 363. *Stephens Indus., Inc. v. McClury*, 789 F.2d 386, 389-90 (6th Cir. 1986); *Pension Benefit Guaranty Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 939-40 (5th Cir. 1983). Where a transaction seeks only to liquidate assets, and will not restructure rights of creditors, it is not a *sub rosa* plan and may be approved under section 363. *In re Work Recovery, Inc.*, 202 B.R. at 304 (Bankr. D. Ariz. 1996); *In re Naron & Wagner, Chartered*, 88 B.R. 85, 88 (Bankr. D. Md. 1988).

In *Braniff*, the proposed sale terms included: (1) a requirement that a significant portion of the sale proceeds be distributed in a particular way or be forfeited, (2) a requirement that the secured creditors vote a portion of their deficiency claim in favor of any future reorganization plan approved by the majority of the unsecured creditors committee, and (3) a release of claims against numerous parties. Therefore, the court in *Braniff* found a *sub rosa* plan.

Unlike *Braniff*, the method of proposed sale of the Debtors' assets does not specify any term under which a reorganization plan is to be adopted. The proposed sale procedures do not bind any parties under any future plan of reorganization. The cash received from this sale will be placed in a bank account to be distributed pursuant to the terms of later court orders. In addition, the sale of the Debtors' assets maximizes the value of the Debtors' estates including by the

8

assumption of certain liabilities. Finally, the sale does not impair or restructure existing debt of,

or equity interest in, the Debtors; impair or circumvent voting rights with respect to any future

plan proposed by the Debtors; circumvent Chapter 11 plan safeguards; or classify claims or

equity interests. Thus, the proposed sale transaction does not constitute a *sub rosa* plan of

reorganization, and should be approved under section 363.

## III.    DEBTORS CAN SELL THE BUSINESS ASSETS FREE AND CLEAR OF LIENS.

Debtors seek to sell their Assets free and clear of all liens, claims and interests of all

claimants and lienholders. Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell property under subsection (b) or (c) of this section free and
> clear of any interest in such property of an entity other than the estate, only if --

> (i)    applicable nonbankruptcy law permits sale of such property free
> and clear of such interest;

> (ii)    such entity consents;

> (iii)    such interest is a lien and the price at which such property is to be
> sold is greater than the aggregate value of such interest;

> (iv)    such interest is in bona fide dispute; or

> (v)    such entity could be compelled, in a legal or equitable proceeding,
> to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

Any one of the five conditions, including the "consent" of the lienholders, provides

authority to sell free and clear of liens. *Citicorp Homeowners Services, Inc. v. Elliot (In re

Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988). To the extent a secured creditor or lienholder that

receives notice does not file a written objection to the Sale Motion, such party should be deemed

to have consented to the sale. *In re Shary*, 152 B.R. 724, 725-26 (Bankr. N.D. Ohio 1993).

Debtors believe that each of the secured creditors with an interest in the assets to be sold

have or will consent to such a sale. In fact, the sale process was established with the input from

9

the Secured Lender Parties, CDFC and others.  Throughout this process, the Secured Lender

Parties and CDFC have encouraged the Debtors' efforts to sell substantially all of its Assets.

Thus, Debtors believe that the Secured Lender Parties and CDFC will consent to the sale.  In any

event, the sale of Debtors' assets may occur over their objections, or any other secured creditors'

objection, so long as their respective liens attached to the sale proceeds or there are sufficient

sale proceeds to pay such claims in full.

## IV.   THE COURT SHOULD APPROVE THE BREAK-UP FEE AND EXPENSE REIMBURSEMENT.

Break-up fees provisions are a normal and, in many cases, a necessary component of

significant sales conducted under section 363 of the Bankruptcy Code:

> Break-up fees are important tools to encourage bidding and to maximize the value
> of the debtor's assets . . . .  In fact, because the... corporation ha(s) a duty to
> encourage bidding, break-up fees can be <u>necessary</u> to discharge [such] duties to
> maximize values.

*Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re*

*Integrated Resources, Inc.)*, 147 B.R. 650, 659-60 (S.D.N.Y. 1992).  Specifically, "breakup fees

and other strategies may be legitimately necessary to convince a 'white knight' bidder to enter

the bidding by providing some form of compensation for the risks it is undertaking." *In re 995*

*Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (quotations omitted).  *See also*

*Integrated Resources*, 147 B.R. at 660-61 (break-up fees can prompt bidders to commence

negotiations and "ensure that a bidder does not retract its bid"); *In re Hupp Indus., Inc.*, 140 B.R.

191, 194 (Bankr. N.D. Ohio 1992) ("without such fees, bidders would be reluctant to make an

initial bid for fear that their first bid will be shopped around for a higher bid from another bidder

who would capitalize on the initial bidder's . . . due diligence").

As a consequence, courts frequently approve break-up fees provisions in connection with

proposed bankruptcy sales.  Courts considering the propriety of a proposed break-up fees

typically evaluate "(1) whether the relationship of the parties who negotiated the fee is marked by self-dealing or manipulation; (2) whether the fee hampers, rather than encourages, bidding; and (3) whether the amount of the fee is reasonable in relation to the proposed purchase price." *In re Twenver, Inc.*, 149 B.R. 954, 956 (Bankr. D. Colo. 1992); *accord*, *In re Bidermann Indus. U.S.A., Inc.*, 203 B.R. 547, 552 (Bankr. S.D.N.Y. 1997); *Integrated Resources*, 147 B.R. at 657. *Samjens Partners I v. Burlington Indus., Inc.*, 663 F. Supp. 614, 624 (S.D.N.Y. 1987); *see also* Corinne Ball, Hon. Nancy C. Dreher, Mathew Niemann and Clefton Jessup, Program on Sales Pursuant to Section 363, 76th Annual Meeting of National Conference of Bankruptcy Judges (Oct. 4, 2002); Tilton, Bankruptcy Business Acquisitions, § 16.04 (1988).

The Debtors believe that the willingness of the Stalking Horse to commit to the proposed sale transaction, subject to higher and better offers, will encourage third parties to submit higher bids and will encourage customers and vendors to support operations during this case.  Also, considering the factors traditionally considered by courts in analyzing proposed break-up fees prior to a sale (as set forth above), it is clear that the Break-Up Fee of $2.5 million proposed in these cases, which is less than 5% of the purchase price of the Stalking Horse Bid and a much smaller portion of the overall consideration that the Stalking Horse has committed to the transaction.   As such, the Break-Up Fee and Expense Reimbursement will not act as a discouragement to the bidding process.   Instead, it will preserve the opportunity to sell the Acquired Assets on a going concern basis without delay to a contractually-committed bidder at a fair and reasonable price, while providing the Debtors with the opportunity of obtaining even greater benefits for the estates through a competitive bidding process.  Finally, as described in the Unsworn Declaration of Stephen Spencer, the Break-Up Fee and Expense Reimbursement are customary in both nature and amount.  Thus, the Break-Up Fee and Expense Reimbursement

11

are appropriate and reasonable under the circumstances to compensate the Stalking Horse for the time, effort, expense, and risk that it has incurred and will incur in negotiating, documenting, and seeking to consummate the proposed sale transaction.

## **CONCLUSION**

For the foregoing reasons, Debtors respectfully request that this Court enter an order granting the relief requested in the Motion.

Dated:  November 27, 2009

FREDRIKSON & BYRON, P.A.

*/s/ Ryan T. Murphy*
James L. Baillie (#3980)
Ryan T. Murphy (#311972)
Douglas W. Kassebaum (#386802)
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402
Phone (612) 492-7000
Fax (612) 492-7077
jbaillie@fredlaw.com
rmurphy@fredlaw.com
dkassebaum@fredlaw.com

ATTORNEYS FOR DEBTORS

4606593_6

12

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:                                                              Chapter 11

Genmar Holdings, Inc., et al.[1]                          Case No. 09-43537

                    Debtors.                              Jointly Administered

---

**ORDER  (I) AUTHORIZING DEBTORS, TO SELL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES TO BUYER IN ACCORDANCE WITH ASSET PURCHASE AGREEMENT; (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OR REJECTION OF CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS; AND (III) GRANTING OTHER AND FURTHER RELIEF**

---

The Sale Motion[2] of above-referenced Debtors for Orders (I) Authorizing Debtors, to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Authorizing Assumption and Assignment or Rejection of Unexpired Leases and Executory Contracts; (III) Approving Bidding Procedures and Auction; (IV) Approving Break-Up Fee and Expense Reimbursement; (V) Approving Form and Manner of Notice; and (VI) Scheduling Further Hearing ("Sale Motion") came before the undersigned on January 13, 2010.  Appearances were noted on the record.

---

[1]    Jointly administered debtors: Genmar Holdings, Inc., Case No. 09-43537; Carver Industries, L.L.C., Case No. 09-43538; Carver Italia, L.L.C., Case No. 09-33773; Carver Yachts International, L.L.C., Case No. 09-33774; Genmar Florida, Inc., Case No. 09-43539; Genmar Industries, Inc., Case No. 09-43540; Genmar IP, LLC, Case No. 09-43541; Genmar Manufacturing of Kansas, Inc., Case No. 09-43542; Genmar Michigan, L.L.C., Case No. 09-43543; Genmar Minnesota, Inc., Case No. 09-33775; Genmar Tennessee, Inc., Case No. 09-43544; Genmar Transportation, Inc., Case No. 09-43545; Genmar Yacht Group, LLC, Case No. 09-43546; Marine Media, LLC, Case No. 09-43547; Minstar, LLC, Case No. 09-43548; Triumph Boats, Inc., Case No. 09-43550; Triumph Boat Rentals, L.L.C., Case No. 09-43551; VEC Leasing Services, L.L.C., Case No. 09-43552; VEC Management Co., L.L.C., Case No. 09-43553; VEC Technology, Inc., Case No. 09-43554; Windsor Craft Yachts, L.L.C., Case No. 09-43555; Wood Manufacturing Company, Inc., Case No. 09-43556.

[2]    All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion or the APA, as applicable.

Based on the Sale Motion, the arguments of counsel, all the files, records and proceedings herein, the Court being advised in the premises, and for those reasons stated orally and recorded in open court following the close of evidence:

**IT IS HEREBY FOUND THAT**:[3]

A.     This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334 and Local Rule 1070-1.

B.     Venue of these cases ("Chapter 11 Cases") in this district is proper pursuant to 28 U.S.C. § 1409(a).

C.     Determination of the Sale Motion is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).   The statutory predicates for the relief requested herein are sections 105(a), 363(b), (f) and (m), and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

D.     This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

E.     An initial hearing (the "Sale Procedures Hearing") on the Sale Motion was held by this Court on December 3, 2009, and, on that date, the Court entered an Order (I) Authorizing Debtors to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Approving Bidding Procedures and Auction; (III) Approving Break Up Fee and Expense

---

[3]   Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  See Bankruptcy Rule 7052.

Reimbursement; (IV) Approving Form and Manner of Notice and (V) Scheduling Further Hearing and (VI) Granting Certain Related Relief ("Sale Procedures Order"). The Debtors and the Buyer have complied with the Sale Procedures Order in all respects.

F.      Pursuant to the Sale Procedures Order, the Debtors timely received __ Qualified Bids on or before January 4, 2010, and an Auction was conducted on January 7, 2010 by the Debtors in consultation with their investment banker, Houlihan, Lokey, Howard & Zukin Capital, Inc. ("Houlihan"). The Sale Procedures Order set January 13, 2009 as the date of the hearing ("Sale Approval Hearing") for an order to approve the Sale ("Sale Approval Order").

G.      On November __, 2009, the Debtors filed the Sale Motion and served copies of the Sale Motion in compliance with Local Rule 9013-3(a)(2). On December ___, 2009, Debtors served the Notice of Sale and Bidding Procedures in compliance with the Sale Procedures Order. On _____, 2009, the Debtors served Notice Concerning Unexpired Leases and Executory Contracts on the counterparties to such leases and contracts.

H.      The Debtors published notice of the Sale Motion, the Bidding Procedures, the hearing(s) seeking approval of the Sale Motion, the time and place of the proposed Auction of the Acquired Assets, and the time for filing objections to the Sale Motion in the Minneapolis Star Tribune and Wall Street Journal Midwest Edition on [_____], 2009.

I.      Based upon the foregoing and the certificates of service and publication filed with the Court, due, proper, timely, adequate and sufficient notice of the Sale Motion, the initial hearing on the Sale Motion, the Auction, the Sale Approval Hearing, the Sale of the Acquired Assets, the proposed assumption and assignment of the Assumed Leases and Acquired Contracts and the proposed rejection of the contracts has been provided in accordance with section 102(1), section 363(b) and section 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006,

9007 and 9008 and in compliance with the Sale Procedures Order and no other or further notice of the Sale Motion, the initial hearing on the Sale Motion, the Auction, the Sale Approval Hearing, the Sale of the Acquired Assets, the proposed assumption and assignment of the Assumed Leases and Acquired Contracts, the proposed rejection of the contracts or the entry of this Sale Approval Order is required or necessary.

J.      All parties in interest, including, without limitation, all parties who claim an interest in or lien upon the Acquired Assets, all shareholders of the Debtors, all federal, state and local environmental authorities, all asbestos, silica and other tort claimants in these cases, and all U.S. or foreign federal, state and local governmental taxing authorities who have, or as a result of the Sale of Acquired Assets may have, claims, contingent or otherwise against the Debtors, have been given a reasonably opportunity to object and be heard, regarding the relief requested in the Sale Motion. All objections to the Sale Motion were resolved, withdrawn or overruled at the Sale Approval Hearing.

K.      As demonstrated by the testimony or other evidence proffered or adduced at the Sale Approval Hearing: (a) the offer from the Buyer constitutes the highest and best offer(s) for the Acquired Assets; (b) the Debtors conducted an auction process in accordance with, and have otherwise complied in all respects with, the Sale Procedures Order; (c) the auction process set forth in the Sale Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Acquired Assets; and (d) the Auction was duly noticed and conducted in a non-collusive, fair, and good faith manner and a reasonable opportunity has been given to any interested party to make a higher and better offer for the Acquired Assets.

4

L.      In accordance with the Sale Procedures Order, the APA was deemed a Qualified Bid (as defined in the Bidding Procedures) and was eligible to participate at the Auction.

M.      The APA constitutes the highest and best offer for the Acquired Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  The Debtors' determination that the APA constitutes the highest and best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment.

N.      The APA represents a fair and reasonable offer to purchase the Acquired Assets under the circumstances of the Chapter 11 Cases.  No other Person or entity or group of entities has offered to purchase the Acquired Assets for greater economic value to the Debtors' estates than the Buyer.

O.      The purchase price as set forth in the APA (the "Purchase Price") for the Acquired Assets is fair and reasonable, and constitutes reasonable consideration and reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.  Approval of the APA and the Sale of the Acquired Assets in accordance with this Order and the APA are in the best interests of the Debtors' estates, creditors and other parties in interest.  The terms of the APA were negotiated at arms'-length and are fair and reasonable.

P.      The APA was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia.  Neither the Debtors nor the Buyer is entering

5

into the transactions contemplated by the APA fraudulently for the purpose of statutory and

common law fraudulent conveyance and fraudulent transfer claims.

Q.    The Debtors have demonstrated compelling circumstances and good, sufficient

and sound business purposes for the Sale of the Acquired Assets pursuant to section 363(b) of

the Bankruptcy Code outside of a plan of reorganization and, in that, among other things:

a.    To maximize the value of the Acquired Assets, a sale must be
accomplished within the time constraints set forth in the APA, the Sale Procedures Order
and the Bidding Procedures because the value of the Acquired Assets may decrease
during the time it would otherwise take to propose and confirm a plan of reorganization,
and, in any event, a plan may not be necessary or confirmable in these Chapter 11 Cases;

b.    Claims against the Debtors' estates will be minimized as a result of the
prompt consummation of a Sale of Acquired Assets.  The Buyer will be assuming certain
Assumed Liabilities.  To the extent that the Buyer assumes the Assumed Liabilities, the
holders of such Assumed Liabilities will have no further recourse against the Debtors or
their estates and the rights of the holders of such claims to pursue the Debtors or their
estates for liability arising from such Assumed Liabilities will be extinguished; and

c.    The Sale does not constitute a de facto plan of reorganization or
liquidation or an element of such a plan for any of the Debtors, as it does not and does not
propose to:  (i) impair or restructure existing debt of, or equity interests in, the Debtors;
(ii) impair or circumvent voting rights with respect to any future plan proposed by the
Debtors; (iii) circumvent chapter 11 plan safeguards, such as those set forth in sections
1125 and 1129 of the Bankruptcy Code;  or (iv) classify claims or equity interests,
compromise controversies or extend debt maturities.

R.    Each of the Debtors, as applicable, (i) has full corporate or other power to

execute, deliver and perform its obligations under the APA and all other documents

contemplated thereby or entered into in connection therewith, and the Sale of the Acquired

Assets by the Debtors has, in each case, been duly and validly authorized by all necessary

corporate or similar action, and (ii) has taken all action necessary to authorize and approve the

APA and such other documents contemplated thereby and the consummation by them of the

transactions contemplated thereby or entered into connection therewith.    No third-party

6

approvals, other than those expressly provided for in the APA, if any, are required by the Debtors to consummate such transactions.

S.      The Debtors are authorized and directed to sell and transfer the Acquired Assets free and clear of all Claims (as that term is defined in paragraph 7 hereof) because they have satisfied the requirements of section 363(f) of the Bankruptcy Code.

T.      Except for the Assumed Liabilities and except as otherwise provided in the APA, the transfer of the Acquired Assets to the Buyer, and assumption and assignment to the Buyer of the Assumed Leases and Acquired Contracts, will not subject the Buyer to any liability whatsoever with respect to the operation of the Debtors' businesses prior to the Closing Date, including, without limitation, any liability arising from any of the following: (i) any employment or labor agreements, consulting agreements, severance arrangements, change in control agreements or other similar agreements to which any Debtor is or was a party, (ii) any pension, welfare, compensation or other employee benefit plans, agreements, practices, and programs, including without limitation, any pension plan of the Debtors, (iii) the cessation of the Debtors' operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs and any obligations with respect thereto that arise from the Employee Retirement Income Security Act of 1974, the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985 or the Worker Adjustment and Retraining Notification Act, (iv) workmen's compensation, occupational disease or unemployment or temporary disability insurance claims, (v) environmental liabilities, debts, claims or obligations which may be asserted on any basis,

7

including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act or any other environmental, health and safety requirements, (vi) any bulk sales or similar law, and (vii) any litigation by or against the Debtors.

U.    Those holders of Claims against the Debtors, their estates or any of the Acquired Assets who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code.  The Debtors have met the requirements of section 363(f)(5) with respect to all other holders of Claims as such Claim holders will have their Claims, if any, in each instance against the Debtors, their estates or any of the Acquired Assets, attach to the net cash proceeds of the Sale ultimately attributable to the Acquired Assets, in which such creditor alleges a Claim, in the same order of priority, with the same validity, force and effect that such Claims had prior to the Sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

V.    The Buyer would not have entered into the APA and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors', their estates and their creditors, if the sale of the Acquired Assets to the Buyer, the assumption of liabilities and obligations as set forth in the APA by the Buyer and the assignment of the Assumed Leases and Acquired Contracts were not free and clear of all Claims including, but not limited to, successor liability.

W.    The APA was negotiated, proposed and entered into by the parties in good faith, from arm's length bargaining positions and without collusion.  The Debtors have followed in good faith the procedures for notice and sale of the Acquired Assets as set forth in the Sale Procedures Order.  The Buyer is not an "insider" or "affiliate" of the Debtors (as each such term is defined in the Bankruptcy Code).  Neither the Debtors nor the Buyer have engaged in any

conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause

the application of section 363(n) of the Bankruptcy Code to the Sale and the transactions

contemplated by the APA.  Specifically, the Buyer has not acted in a collusive manner with any

person and the aggregate price paid by Buyer for the Acquired Assets was not controlled by any

agreement among the bidders.  The Buyer is entitled to the protections afforded under section

363(m) of the Bankruptcy Code because the Buyer is a good faith purchaser in that, *inter alia*:

(a) except as set forth in the Sale Procedures Order, the Buyer recognized that the Debtors were

free to deal with any other party interested in acquiring the Acquired Assets; (b) the Buyer

complied with the provisions in the Sale Procedures Order; (c) the Buyer agreed to subject its bid

to the competitive bidding procedures set forth in the Sale Procedures Order; (d) the Buyer in no

way induced or caused the chapter 11 filings by the Debtors; (e) all payments to be made by the

Buyer in connection with the Sale have been disclosed; (f) no common identity of directors or

controlling stockholders exists between the Buyer and any of the Debtors; and (g) the negotiation

and execution of the APA was at arms' length and in good faith.

X.     Houlihan acted as the Debtors' investment banker for the sale of the Acquired

Assets and worked with the Debtors and the Buyer to negotiate and finalize the APA and the

conveyance of the Acquired Assets to the Buyer pursuant hereto.  To the extent that Houlihan or

any other Person is entitled to any fees in connection with negotiation and consummation of the

Sale, Buyer shall not be liable in any way for such fees.  The Debtors and their estates shall be

solely liable to Houlihan or any other Person for any such fees.

Y.     In the absence of a stay pending appeal, if any, if the Closing occurs at any time

after entry of this Sale Approval Order, then, with respect to the APA, the Buyer, as a purchaser

in good faith of the Acquired Assets, shall be entitled to the protections of section 363(m) of the

9

Bankruptcy Code if this Sale Approval Order or any authorization contained herein is reversed or modified on appeal.

Z.      The Debtors are the sole and lawful owners of the Acquired Assets.  Effective as of the Closing, the transfer of the Acquired Assets is or will (i) be legal, valid and effective transfers of property of the Debtors' estates to the Buyer, as more particularly set forth in the APA, and (ii) vest the Buyer with all right, title, and interest of the Debtors and the Debtors' estates in and to the Acquired Assets free and clear of all Claims (as defined in Paragraph 7 herein) under sections 363(f) and 105 of the Bankruptcy Code.

AA.    Adequate notice and opportunity to be heard was provided to parties to executory contracts and unexpired leases to be rejected or assumed and assigned pursuant to this Sale Approval Order.  Further, parties received adequate notice and an opportunity to object to the amount of any cure owed by the Debtors' estates on account of any executory contract or unexpired lease to be assumed and assigned to the Buyer under the APA.

BB.    The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign those Assumed Leases and Acquired Contracts, as defined in the APA and described on Schedules 1.1(b) and 1.1(d) to the APA, including any amendments or modifications to such Exhibits as agreed to by the Debtors and Buyer pursuant to the APA (collectively, the "Assumed Contracts"), in connection with the consummation of the Sale of Acquired Assets, and the assumption and assignment of the Assumed Leases and Acquired Contracts is in the best interests of the Debtors, their estates, their creditors and their equityholders.   The Assumed Leases and Acquired Contracts being assigned to the Buyer as set forth in the APA are an integral part of the Debtors' businesses being purchased by the Buyer and, accordingly, such assumption and assignment of Assumed Leases and Acquired Contracts is

10

reasonable, enhances the value of the Debtors' estates, and does not constitute unfair discrimination.

CC.    All amounts which the Debtors or Buyer are required to pay in connection with the assumption and assignment of the Assumed Leases and Acquired Contracts are as follows: The Debtors have obtained a waiver or paid or will pay all amounts, if any (the "Cure Amounts"), due or owing under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code to (i) cure any defaults under the Assumed Leases and Acquired Contracts specified in this Sale Approval Order or in a separate order of even date or (ii) pay all actual or pecuniary losses that have resulted from such defaults (except with respect to those liabilities expressly assumed by Buyer pursuant to the APA). Accordingly, the Debtors have satisfied the requirements of sections 365(b)(1)(A) and (B) and section 365(f)(2)(A) of the Bankruptcy Code. The Assumed Leases and Acquired Contracts are unexpired leases or executory contracts within the meaning of the Bankruptcy Code. The promises of Buyer and the Debtors to pay the Cure Amounts and the Buyer's promise to perform the obligations under the Assumed Leases and Acquired Contracts after the closing date shall constitute adequate assurance of its future performance under the Assumed Leases and Acquired Contracts specified in this Sale Approval Order or in a separate order of even date being assigned to it within the meaning of sections 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.

DD.    The assumption and assignment of the Assumed Leases and Acquired Contracts is integral to the APA and is in the best interests of the Debtors and their estates, creditors and equityholders and represents the exercise of the Debtors' sound business judgment. Any objections to the assumption and assignment of any of the Assumed Leases and Acquired Contracts to the Buyer are hereby overruled. Any objections to the Cure Amounts associated

with such Assumed Leases and Acquired Contracts are resolved as set forth herein. To the extent that any counterparty failed to timely object to (i) the proposed assumption and assignment of the applicable Assumed Lease or Acquired Contract or (ii) the Cure Amount associated with the applicable Assumed Lease or Acquired Contract, such counterparty is deemed to have consented to such Cure Amount and the assumption and assignments of its respective Assumed Lease or Acquired Contract to the Buyer.

EE.   The Debtors have demonstrated that it is an exercise of their sound business judgment to reject the Excluded Leases and Excluded Contracts listed on Schedules 1.2(c) and 1.2(p) to the APA, including any amendments or modifications to such Exhibit as agreed to by the Debtors and Buyer pursuant to the APA (the "Rejected Contracts"), in connection with the consummation of the Sale of the Acquired Assets, and rejection of the Rejected Contracts is in the best interest of the Debtors, their estates, the creditors and the equityholders.

FF.   Unless such liabilities constitute Assumed Liabilities of the Buyer pursuant to the APA or this Sale Approval Order, the transfer of the Acquired Assets does not and will not subject the Buyer to any liability for Claims (as defined in Paragraph 7 herein) against the Debtors or their estates under the laws of the United States, any state, commonwealth, territory or possession thereof or the District of Columbia applicable to such transactions by reason of such transfer of the Acquired Assets.

GG.   Neither the Buyer nor its affiliates shall be deemed, as a result of any action taken in connection with the purchase of the Acquired Assets, to: (1) be a successor (or other such similarly situated party) to any of the Debtors (other than with respect to the Assumed Liabilities as expressly stated in the APA); (2) have, *de facto* or otherwise, merged with or into any of the Debtors; (3) be a mere continuation of the Debtors or their estates (and there is no continuity of

enterprise between the Buyer and the Debtors); or (4) be holding itself out to the public as a continuation of the Debtors. The Buyer is not acquiring or assuming any liability, warranty or other obligation of the Debtors, except as expressly set forth in the APA with respect to the Assumed Liabilities. The Debtors and their estates will release and forever discharge the Buyer and any of its affiliates, successors and assigns from any and all claims, causes of action, obligations, liabilities, demands, losses, costs and expenses of any kind, character or nature whatsoever, known or unknown, fixed or contingent, relating to the Sale, except for liabilities and obligations under the APA.

HH.   The Debtors have good, valid and marketable title to all of the Acquired Assets. The Acquired Assets are to be transferred free and clear of any and all Claims. All of the Acquired Assets are, or will on the date of Closing, be owned by the Debtors and will be transferred under the APA.

**IT IS HEREBY ORDERED:**

## General Provisions

1.   The Sale Motion is hereby granted to the extent provided herein.

2.   All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled, including all reservations of rights included therein, which are not otherwise provided for by this Sale Approval Order, are overruled on the merits.

## Approval of the APA

3.   Each and every term of the APA and all other ancillary documents is hereby approved.

4.   The Sale of the Acquired Assets to Buyer pursuant to the APA is hereby authorized under section 363(b) of the Bankruptcy Code and the entry of the Debtors into the

13

APA is hereby approved.  The proceeds from the sale of the Acquired Assets as provided in the

APA shall be paid directly to the Administrative Agent (as defined in the Sale Motion) for the

Secured Lender Parties (as defined in the Sale Motion) by wire transfer.  To the extent that such

proceeds exceed the obligations owed by the Debtors to the Secured Lender Parties, such excess

proceeds shall be paid directly to the Debtors by wire transfer.  Notwithstanding the foregoing, to

the extent the  Debtors are required to pay the Break-Up Fee to the Stalking Horse, such Break-

up Fee shall be paid to the Stalking Horse from the proceeds of the sale of the Acquired Assets

prior to the payment of any such proceeds to the Administrative Agent for the Secured Lender

Parties or to any of the Debtors' other secured or unsecured creditors, equity holders, or parties

in interest.

> 5.     The Debtors, through any corporate officer, are authorized and directed to execute

and deliver, and empowered to fully perform under, consummate, implement and close the APA,

together with all additional instruments and documents that may be reasonably necessary or

desirable to implement such agreements, including taking any actions that otherwise would

require further approval by shareholders or its board of directors (without the need of obtaining

such approvals) and to take all further actions as may be reasonably requested by the Buyer for

the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or

reducing to possession, any or all of the Acquired Assets, or as may be necessary or appropriate

to the performance of the obligations of the Debtors under the APA, including effectuating

amendments to the APA in furtherance thereof.  All Persons necessary to effect the transactions

contemplated by the APA are hereby ordered to execute any and all documents necessary to

effect such transactions.  If any Person fails to comply with the provisions of this paragraph 5

prior to the Closing Date, such Person (or Persons, as the case may be) shall nonetheless be

deemed bound to any and all documents necessary to effect the transactions contemplated under the APA.

6.      The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or any other Sale-related document.   The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Sale Approval Order.

### Transfer of the Acquired Assets

7.      Pursuant to 11 U.S.C. §§ 105(a), 363(b) and 363(f), the Acquired Assets shall be transferred to the Buyer, in accordance with the APA, and such transfer shall constitute a legal, valid, binding, and effective transfer of such Acquired Assets and shall vest Buyer with title to the Acquired Assets, free and clear of all Liens (as defined in the APA) and claims (as defined in section 101(5) of the Bankruptcy Code), including claims of equity security holders (as defined in Section 101(17) of the Bankruptcy Code), security interests, liens (as defined in section 101(37) of the Bankruptcy Code, and including but not limited to, mechanics', materialmens' and other consensual or statutory liens), obligations, mortgages, demands, guaranties, options, rights (including, but not limited to, rights of first refusal, rights of way and rights of recovery), contractual commitments, pledges, restrictions (including, but not limited to, any restriction on the use, transfer, receipt of income or other exercise of any attributes of ownership of the Acquired Assets and all debts arising in any way in connection with any acts of the Debtors), easements, encumbrances, personal injury and other tort claims (including without limitation (i) with respect to exposure to asbestos, crystalline silica or other hazardous materials or (ii) with respect to any products sold by the Debtors or their Affiliates), covenants, defects,

15

hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, conditional sale or other title retention agreements, options, contracts, offsets, recoupment, rights of recovery, judgments, orders, and decrees of any court or governmental entity, interests, successor, transferee, products liability, environmental, tax and other liabilities and claims of any kind or nature, mechanics' liens, financing statements or any claims arising under the Workers Adjustment Restraining and Notification Act, 29 U.S.C. § 2101, et seq., or any collective bargaining agreements or other applicable law, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, whether arising in connection with the transactions authorized by this Sale Approval Order, and whether imposed by agreement, understanding, law, equity or otherwise, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, disputed or undisputed, or known or unknown (the foregoing collectively referred to as "Claims" herein, *provided, however*, the term Claims shall not include Assumed Liabilities), except as otherwise set forth in the APA.  All such Claims released, terminated and discharged as to the Acquired Assets shall attach to the sale proceeds with the same validity, force and effect which they now have as against the Debtors, the estates or the Acquired Assets.  The sole and exclusive right and remedy available to purported creditors, equityholders, including, without limitation, equityholders of the Debtors, holders of Claims, and parties in interest shall be a right to assert Claims against the Debtors' estates.

8.      All persons and entities (including, but not limited to, the Debtors, creditors, equityholders, including, without limitation, employees, former employees and shareholders, administrative agencies, governmental departments, secretaries of state, federal, state and local officials) and their respective successors or assigns and any trustees thereof, shall be and are

hereby permanently and forever barred, restrained and enjoined from commencing or continuing

in any manner any action or other proceeding of any kind against the Acquired Assets or the

Buyer and its successors or assigns as alleged successor or otherwise with respect to any Claims

of any kind and nature with respect to the Acquired Assets, except for Assumed Liabilities.  If

the proposed Sale fails to close for any reason, then Claims shall continue against the Acquired

Assets unaffected by this Sale Approval Order.   The Buyer has any and all rights, claims,

defenses and offsets held by Debtors and the estates with respect to Assumed Liabilities.

9.      Except for Assumed Liabilities as set forth in the APA, the transfer of the

Acquired Assets pursuant to this Sale Approval Order shall not subject the Buyer to any liability

with respect to any obligations incurred in connection with, or in any way related to the Acquired

Assets, prior to the date of Closing or by reason of such transfer under the laws of the United

States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or

in part, directly or indirectly, on any theory of law or equity, including, without limitation, any

theory of equitable subordination or successor or transferee liability.   The sole and exclusive

right and remedy available to any Person who asserts any Claim or other liability with respect to

any obligations incurred in connection with, or in any way related to the Acquired Assets, prior

to the date of Closing or by reason of the Sale shall be a right to assert such Claim or other

liability against the Debtors' estates.

**Assumption and Assignment to Buyer of Assumed Leases and Acquired Contracts**

10.      Pursuant to 11 U.S.C. §§ 105(a) and 365, and subject to and conditioned upon the

Closing of the Sale, the Debtors' assumption and assignment to the Buyer, and the Buyer's

assumption on the terms set forth in the APA [and the Assumption Order], of the Assumed

Leases and Acquired Contracts specified in this Sale Approval Order or in a separate order of

17

even date is approved, and the requirements of 11 U.S.C. § 365(b)(1) with respect thereto are deemed satisfied.

11.     The Debtors are authorized and directed in accordance with 11 U.S.C. §§ 105(a) and 365 to (a) assume and assign to Buyer, effective upon the Closing of the Sale, the Assumed Leases and Acquired Contracts specified in this Sale Approval Order or in a separate order of even date free and clear of all Claims, other than the Assumed Liabilities, and (b) execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assumed Leases and Acquired Contracts specified in this Sale Approval Order or in a separate order of even date to the Buyer.

12.     With respect to the Assumed Leases and Acquired Contracts:  (a) each Assumed Lease and Acquired Contract, as applicable, is an unexpired lease or executory contract under section 365 of the Bankruptcy Code; (b) the Debtors may assume each of the Assumed Leases and Acquired Contracts in accordance with section 365 of the Bankruptcy Code; (c) the Debtors may assign each Assumed Lease and Acquired Contract in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Assumed Lease or Acquired Contract that prohibit or condition the assignment of such Assumed Lease or Acquired Contract or allow the party to such Assumed Lease or Acquired Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assumed Lease or Acquired Contract, constitute unenforceable anti-assignment provisions which are void and of no force and effect; (d) all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to Buyer of each Assumed Lease and Acquired Contract have been satisfied; (e) the Assumed Leases and Acquired Contracts shall be transferred and assigned to, and following the Closing

18

remain in full force and effect for the benefit of Buyer, notwithstanding any provision in any

such Assumed Lease or Acquired Contract (including those of the type described in sections

365(b)(2), (c)(1)  and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such

assignment or transfer and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall

be relieved from any further liability with respect to the Assumed Leases and Acquired Contracts

after such assignment to and assumption by Buyer; and (g) upon Closing, in accordance with

sections 363 and 365 of the Bankruptcy Code, Buyer shall be fully and irrevocably vested in all

right, title and interest of each Assumed Lease and Acquired Contract.

13.    Each of the Assumed Leases and Acquired Contracts specified in this Sale

Approval Order or in a separate order of even date shall, upon assignment to the Buyer, be

deemed to be valid and binding on the Buyer and in full force and effect and enforceable in

accordance with their terms, and following such assignment, the Debtors and the estates shall be

relieved, pursuant to section 365(k) of the Bankruptcy Code, any liability for any breach of such

Assumed Leases and Acquired Contracts occurring after such assignment.

14.    Each non-Debtors party to an Assumed Lease and Acquired Contract specified in

this Sale Approval Order or in a separate order of even date is hereby barred and enjoined from

asserting against the Buyer, the Debtors or the Debtors' estates (a) any default existing as of the

date of the Sale Hearing if such default was not raised or asserted in a timely manner prior to the

entry of the Sale Approval Order or (b) any objection to the assumption and assignment of such

non-Debtors party's Assumed Leases and Acquired Contracts or the Cure Amount, if any, of

which the non-Debtors party was given notice prior to the Sale Hearing. The assignment of each

such Assumed Leases and Acquired Contracts to the Buyer will not cause a default or otherwise

allow the non-Debtors' party thereto to terminate or adversely affect the Buyer's rights

thereunder.  Unless expressly provided in the APA, in no event shall the Buyer be liable for any

Cure Amounts or pre-Closing liabilities arising from or related to the Assumed Contracts with

the exception of the Assumed Liabilities.

15.    All defaults or other obligations of the Debtors under the Assumed Leases and

Acquired Contracts arising or accruing prior to the satisfaction of the terms and conditions of the

APA and the closing of the transactions contemplated under the APA (without giving effect to

any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of

the Bankruptcy Code) shall be cured by the Buyer or the Debtors (in accordance with the APA)

by payment of the applicable Cure Amounts (such amounts as established in accordance with the

Sale Procedures Order, a separate order of this Court, or by mutual agreement among the

Debtors, the Buyer and the non-Debtor party to such Assumed Lease or Acquired Contract) at

the closing or as soon thereafter as practicable, and the Buyer shall have no liability or obligation

with respect to defaults, breaches or other obligations incurred, arising or accruing prior to the

Closing Date, except as otherwise expressly provided herein or in the APA.  The payment of the

applicable Cure Amounts, in accordance with the APA, shall (a) effect a cure of all defaults

existing thereunder as of the date that such Assumed Lease or Acquired Contract is assumed and

(b) compensate for any actual pecuniary loss to such non-Debtor party resulting from such

default.  To the extent that any counterparty to an Assumed Lease or Acquired Contract did not

object timely to its Cure Amount in accordance with the Sale Procedures Order, such

counterparty is deemed to have consented to such Cure Amount and the assignments of its

respective Assumed Lease or Acquired Contract to the Buyer.

20

16.     There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Buyer or the Debtors as a result of the assumption, assignment and/or transfer of the Assumed Leases and Acquired Contracts.

17.     The Buyer's or its designated affiliate's promise to pay the Cure Amounts and to perform the obligations under the Assumed Leases and Acquired Contracts after the closing date shall constitute adequate assurance of its future performance under the Assumed Leases and Acquired Contracts specified in this Sale Approval Order or in a separate order of even date being assigned to it within the meaning of sections 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.

18.     Upon assignment of the Assumed Leases and Acquired Contracts to the Buyer at or subsequent to the Closing, no default shall exist under any Assumed Lease or Acquired Contract and no non-Debtor party to any Assumed Lease or Acquired Contract shall be permitted to declare a default by or against the Buyer under such Assumed Lease or Acquired Contract or otherwise take action against the Buyer as a result of any Debtor's financial condition, bankruptcy or failure to perform any of its obligations under the Assumed Lease or Acquired Contract.  Upon entry of this Order and assumption and assignment of the Assumed Leases and Acquired Contracts, the Buyer shall be deemed in compliance with all terms and provisions of the Assumed Leases and Acquired Contracts.

19.     Notwithstanding anything to the contrary in this Order, no executory contract or unexpired lease will be assumed and assigned unless and until approved by order of the Bankruptcy Court and until the Closing of the Sale.

20.     The failure of the Debtors or Buyer to enforce at any time one or more terms or conditions of any Assumed Lease or Acquired Contract shall not be a waiver of such terms or

21

conditions, or of the Debtors' and Buyer's rights to enforce every term and condition of the Assumed Leases and Acquired Contracts.

## Rejection of Rejected Contracts

21.     The Rejected Contracts shall be deemed rejected by the Debtors as of the date of Closing of the Sale pursuant to section 365 of the Bankruptcy Code.

22.     Any person or entity that asserts a Claim against the Debtors' estates arising from the rejection of any of the Rejected Contracts shall be required to file a proof of claim with the Bankruptcy Court on or before thirty (30) days following service of this Sale Approval Order, or be forever barred from asserting such a Claim.

23.     Buyer shall not have any liability or other obligation arising from the Rejected Contracts or the rejection thereof.  Any party to a Rejected Contract shall be forever and permanently enjoined, barred and estopped from asserting against the Buyer, any of its affiliates, its successors or assigns, their property or the Acquired Assets, any claim, lien or interest on account of any Rejected Contract or the rejection thereof.

## Additional Provisions

24.     The transaction contemplated by the APA is undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to the Buyer.  The Buyer is a purchaser in good faith of the Acquired Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

25.     The consideration provided by the Buyer for the Acquired Assets under the APA (i) shall be deemed to constitute reasonably equivalent value and fair consideration under the

Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and under the other laws of the United States, any state, territory, possession or the District of Columbia and (ii) is fair and reasonable and may not be avoided under section 363(n) or any other provision of the Bankruptcy Code, or otherwise.

26.     Neither the Buyer nor its affiliates shall be deemed, as a result of any action taken in connection with the purchase of the Acquired Assets, to: (1) be a successor (or other such similarly situated party) to any of the Debtors (other than with respect to the Assumed Liabilities as expressly stated in the APA); (2) have, *de facto* or otherwise, merged with or into any of the Debtors; (3) be a mere continuation of the Debtors or their estates (and there is no continuity of enterprise between the Buyer and the Debtors); or (4) be holding itself out to the public as a continuation of the Debtors.

27.     Each of the Debtors' creditors is hereby authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release such creditor's Claims in the Acquired Assets, if any, as such Claims may have been recorded or may otherwise exist.  If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing any Claims in, against or upon the Acquired Assets prior to the Closing Date of the Sale, in proper form for filing and executed by the appropriate parties, and has not executed termination statements, instruments of satisfaction, releases of all Claims which the person or entity has with respect to the Acquired Assets, then on the Closing Date, or as soon as possible thereafter, (a) the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Acquired Assets and (b) the Buyer is hereby authorized on behalf of each of the Debtors' creditors, to file, register, or otherwise record a certified copy

23

of this Sale Approval Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims in, against, or upon the Acquired Assets of any kind or nature whatsoever.

28.    All entities that are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets are hereby directed to surrender possession of the Acquired Assets to the Buyer on the Closing Date, or as otherwise directed by Buyer, with the Claims of such entity to be satisfied solely from the proceeds of the Sale.

29.    The Buyer is not a successor to the Debtors or any of their affiliates or the estates by reason of any theory of law or equity.  The Buyer shall have no liability or responsibility for any liability or other obligation of the Debtors or the estates arising under or related to the Acquired Assets or other assets, operations, activities, or businesses of Debtors or their Affiliates other than for the Assumed Liabilities.  Without limiting the generality of the foregoing, and except as otherwise specifically provided for herein and in the APA, the Buyer shall not be liable for any Claims, including any theory of successor or vicarious liability, of any kind or character whether known or unknown as of the date of Closing, now existing or hereafter arising, whether fixed or contingent, with respect to the Sale, the Debtors or the estates or any obligations of the Debtors or their Affiliates or the estates arising prior to the date of Closing, including but not limited to, liabilities arising, accruing, or payable under, out of, in connection with, or in any way relating to the Acquired Assets or the Acquired Business or the other assets, operations, activities, or businesses of the Debtors or their Affiliates.

30.    Subject to the APA, this Sale Approval Order (a) is and shall be effective as a determination that, at Closing, all Claims (except Assumed Liabilities) existing as to the Acquired Assets prior to the date of the Closing have been and hereby are unconditionally

24

released, discharged and terminated as to the Acquired Assets, and that the conveyance described in this Sale Approval Order has been effected, (b) is and shall be effective to cause all Claims (except Assumed Liabilities) to attach to and be perfected in the proceeds of the Sale of the Acquired Assets, in the order of their priority, with the same validity, force and effect which they now have as against the Acquired Assets, without the need to file any financing statements or other evidence of perfection, and (c) is and shall be binding upon and govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Acquired Assets.

31.    The Debtors or the Buyer and any agent or representative of either of them, are each hereby authorized and empowered to serve upon all filing and recording officers a notice when filing or recording any instruments of transfer (including, without limitation. deeds, leases, and assignments, modifications and terminations of leases) in accordance with this Sale Approval Order and the APA to evidence and implement this paragraph of the Sale Approval Order.   All filing and recording officers are hereby directed to accept, file and record all instruments of transfer including, without limitation, deeds, leases, and assignments, modifications and terminations of leases (if any) to be filed and recorded pursuant to and in accordance with this Sale Approval Order or the APA and the various documents related thereto, without the payment of taxes associated with the transfer of the Acquired Assets to the Buyer.

25

32.     This Court retains exclusive jurisdiction to (i) enforce and implement the terms
and provisions of the APA, all amendments thereto, any waivers and consents thereunder, and
each of the agreements executed in connection therewith, (ii) compel delivery of the Acquired
Assets to the Buyer, (iii) resolve any disputes arising under or related to the APA and related
agreements, except as otherwise provided therein, (iv) enjoin and adjudicate the assertion of any
Claims against the Buyer or the Acquired Assets, and (v) interpret, implement and enforce the
provisions of this Sale Approval Order.

33.     As of the Closing, all agreements and all orders of this Court entered prior to the
date hereof shall be deemed amended or modified solely to the extent required to permit the
consummation of the transactions contemplated by this Sale Approval Order and the APA.

34.     Nothing contained (i) in any plan of reorganization (or liquidation) confirmed in
the Chapter 11 Cases, (ii) the order of confirmation confirming any plan of reorganization (or
liquidation), (iii) any order dismissing the Chapter 11 Cases or converting it to a chapter 7
liquidation or (iv) any order appointing an examiner or trustee in the case shall conflict with or
derogate from the provisions of the APA or the terms of this Sale Approval Order and no such
plan or order shall discharge the obligations of the Debtors under this Sale Approval Order or the
APA or any documents or agreements delivered in connection therewith.

35.     The terms and provisions of the APA, together with the terms and provisions of
this Sale Approval Order, shall be binding in all respects upon, and inure to the benefit of, the
Buyer, the Debtors, the Debtors' estates, any of Debtors' affiliates, successors and assigns, the
Debtors' creditors, equityholders, including, without limitation, minority equityholders of the
Debtors, and third parties, including, but not limited to persons asserting a Claim against or
interest in the Debtors' estates or any of the Acquired Assets to be sold to the Buyer pursuant to

26

the APA or any persons that are party to any Assumed Leases and Acquired Contracts specified in this Sale Approval Order or in a separate order of even date, and their respective successors and assigns.  If a trustee or examiner is subsequently appointed in this Case, such trustee or examiner shall likewise be bound, in all respects, to the terms and provisions of this Sale Approval Order.  The Order and the APA shall not be subject to rejection pursuant to section 365 of the Bankruptcy Code or otherwise.

36.    The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court, provided that any such modification, amendment or supplement is either not material or is not less favorable to the Debtors.  In the event a modification is material and less favorable to the Debtors, the Debtors shall file and serve a notice of such material modification.  If no party-in-interest objects within five (5) business days, the modification shall be deemed approved and the Court may enter any such further order as may be necessary.

37.    The failure specifically to include any particular provisions of the APA in this Sale Approval Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

38.    Upon Closing, the Debtors and their estates shall be deemed without further action or order of the Court to have released and discharged the Buyer and its affiliates, and their respective officers, directors, representative, agents, attorneys, investment bankers, and professionals, of and from any causes of action, legal or equitable, suits, debts, covenants, contracts, agreements, judgments, executions, claims, and demands whatsoever whether known

27

or unknown, including in connection with the APA and the Sale of the Acquired Assets, except for obligations arising hereunder or under the APA.

39.    The provisions of Bankruptcy Rule 6004(h) and 6006(d) staying the effectiveness of this Order for ten (10) days are hereby waived, and this Order shall be effective immediately upon entry thereof.

40.    To the extent that this Order is inconsistent with any prior Order or pleading with respect to the Sale Motion in these Chapter 11 Cases, the terms of this Order shall govern.


Dated: _____              _____
                                         Dennis D. O'Brien
                                         United States Bankruptcy Judge


4606696_8.DOC

28

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

In re:                                                          Chapter 11

Genmar Holdings, Inc., et al.[1]                               Case No. 09-43537

                    Debtors.                                   Jointly Administered

---

### CERTIFICATE OF SERVICE

---

Douglas W. Kassebaum, under penalty of perjury, states that on November 27, 2009, he caused to be served the following:

1.  Notice of Motion and Motion for Orders (I) Authorizing Debtors, To Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Authorizing Assumption and Assignment or Rejection of Unexpired Leases and Executory Contracts; (III) Approving Bidding Procedures and Auction; (IV) Approving Break-Up Fee and Expense Reimbursement; (V) Approving Form and Manner of Notice; and (VI) Scheduling Further Hearing;

2.  Memorandum of Law in Support of Debtors' Motion for Hearings and for Orders (I) Authorizing Debtors, To Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Authorizing Assumption and Assignment or Rejection of Unexpired Leases and Executory Contracts; (III) Approving Bidding Procedures and Auction; (IV) Approving Break-Up Fee and Expense Reimbursement; (V) Approving Form and Manner of Notice; and (VI) Scheduling Further Hearing;

3.  Unsworn Declaration of Stephen Spencer in Support of Debtors' Sale Motion;

4.  Order  (I) Authorizing Debtors, To Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances to Buyer in Accordance with Asset Purchase Agreement; (II) Approving the Assumption and Assignment or Rejection of Certain Unexpired Leases and Executory Contracts; and (III) Granting Other and Further Relief;

---

[1]  Jointly administered debtors: Genmar Holdings, Inc., Case No. 09-43537; Carver Industries, L.L.C., Case No. 09-43538; Carver Italia, L.L.C., Case No. 09-33773; Carver Yachts International, L.L.C., Case No. 09-33774; Genmar Florida, Inc., Case No. 09-43539; Genmar Industries, Inc., Case No. 09-43540; Genmar IP, L.L.C., Case No. 09-43541; Genmar Manufacturing of Kansas, Inc., Case No. 09-43542; Genmar Michigan, L.L.C., Case No. 09-43543; Genmar Minnesota, Inc., Case No. 09-33775; Genmar Tennessee, Inc., Case No. 09-43544; Genmar Transportation, Inc., Case No. 09-43545; Genmar Yacht Group, LLC, Case No. 09-43546; Marine Media, L.L.C., Case No. 09-43547; Minstar, L.L.C., Case No. 09-43548; Triumph Boats, Inc., Case No. 09-43550; Triumph Boat Rentals, L.L.C., Case No. 09-43551; VEC Leasing Services, L.L.C., Case No. 09-43552; VEC Management Co. L.L.C., Case No. 09-43553; VEC Technology, Inc., Case No. 09-43554; Windsor Craft Yachts, L.L.C., Case No. 09-43555; Wood Manufacturing Company, Inc., Case No. 09-43556.

5.    Order (I) Authorizing Debtors to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Approving Bidding Procedures and Auction; (III) Approving Break-Up Fee and Expense Reimbursement; (IV) Approving Form and Manner of Notice; (V) Scheduling Further Hearing; and (VI) Granting Certain Related Relief; and

6.    Certificate of Service

by sending true and correct copies to all parties on the attached Service List as indicated therein.

Dated: November 27, 2009                    /s/ *Douglas W. Kassebaum*
                                            Douglas W. Kassebaum

4655150_1.DOC

Genmar Holdings, Inc. and Related Debtors
MASTER SERVICE LIST
Bky No. 09-43537
NOTE:  Served via Express Mail except those parties whose contact information includes an e-mail address were served
      via e-mail

### *US Trustee and Other Required Parties*

U.S. Trustee's Office
1015 US Courthouse
300 S Fourth St
Minneapolis MN 55415
ustpregion12.mn.ecf@usdoj.gov

U.S. Trustee's Office
1015 US Courthouse
300 South Fourth Street
Minneapolis MN 55415
Sarah.J.Wencil@usdoj.gov

IRS District Counsel
380 Jackson St, Ste 650
St Paul MN 55101-4804

Internal Revenue Service
Wells Fargo Place
30 E 7th St, Mail Stop 5700
St Paul MN 55101

MN Department of Revenue
Collection Enforcement
551 Bankruptcy Section
600 North Robert Street
PO Box 64447
St Paul MN 55101-2228

US Attorney
600 US Courthouse
300 S Fourth St
Minneapolis MN 55415

Minnesota Department of Economic
Security
332 Minnesota St, Ste E200
St. Paul MN 55101-1351

### *Debtors*

Genmar Holdings, Inc. and other Debtors
Genmar Holdings, Inc.
Attention: David Huls
2900 IDS Center
80 South Eighth Street
Minneapolis MN 55402-2100
612-337-1930 (fax)
david.huls@genmar.com

### *Major Secured Creditors*

#### *Wells Fargo Bank, NA*
Michael R. Stewart
Lyle Ward
Sara Bruggeman
Faegre & Benson LLP
2200 Wells Fargo Center
90 South Seventh St
Minneapolis MN 55402-3901
mstewart@faegre.com
LWard@faegre.com
sbruggeman@faegre.com

#### *Fifth Third Bank*
James Markus
Markus Williams Young & Zimmerman
1700 Lincoln St, Ste 4000
Denver CO 80203
jmarkus@markuswilliams.com

#### *GE Commercial*
#### *Distribution Finance Corporation*
Thomas J. Lallier
Jeffrey D. Klobucar
Nathan J. Kavlie
Foley & Mansfield, PLLP
250 Marquette Ave, Ste 1200
Minneapolis MN 55401
tlallier@foleymansfield.com
jklobucar@foleymansfield.com
nkavlie@foleymansfield.com

#### *GE Commercial Distribution Finance*
Michael C. Rupe
Heath D. Rosenblat
King & Spalding LLP
1185 Avenue of the Americas
New York NY 10036
mrupe@kslaw.com
hrosenblat@kslaw.com

Twin Lakes Community Bank
PO Box 1229
301 South 1st St
Flippin AR 72634

#### *Textron Financial Corporation*
Paul L. Ratelle
Fabyanske Westra Hart & Thomson PA
800 LaSalle Ave S, Ste 1900
Minneapolis MN 55402
612-359-7600 (telephone)
612-359-7602 (fax)
pratelle@fwhtlaw.com

### *Textron Financial Corporation*
### *Textron Financial Canada, Ltd.*
Steven E. Fox
Paul Traub
Brett J. Nizzo
Maura I. Russell
Epstein Becker & Green PC
250 Park Ave
New York NY 10177-1211
sfox@ebglaw.com
ptraub@ebglaw.com
bnizzo@ebglaw.com
mrussell@ebglaw.com

#### *Yamaha Motor Corporation USA*
Timothy D. Moratzka, Esq.
1400 AT&T Tower
901 Marquette Ave
Minneapolis MN 55402
612-305-1414 (fax)
tdm@mcmlaw.com

### *Committee of Unsecured Creditors*

Phillip Bohl
William J. Fisher
Henry Wang
Jessica A. Mitchell
Gray Plant Mooty Mooty & Bennett PA
500 IDS Ctr, 80 S 8th St
Minneapolis MN 55402
612-632-3000 (telephone)
612-632-4444 (fax)
phillip.bohl@gpmlaw.com
William.fisher@gpmlaw.com
henry.wang@gpmlaw.com
Jessica.mitchell@gpmlaw.com

### *Special Counsel*
### *Committee of Unsecured Creditors*

Matthew A. Swanson
Leonard Street and Deinard
150 S 5th St, Ste 2300
Minneapolis MN 55402
612-335-1500 (telephone)
612-335-1657 (fax)
matthew.swanson@leonard.com

### *Requests for Notice*

Terry Lange
Hagemeyer NA
Financial Service Center
11680 Great Oaks Way
Alpharetta GA 30022

Genmar Holdings, Inc. and Related Debtors
MASTER SERVICE LIST
Bky No. 09-43537
NOTE:  Served via Express Mail except those parties whose contact information includes an e-mail address were served
via e-mail

---

*Hagemeyer NA*
Cynthia J. Lowery
Moore & Van Allen PLLC
40 Calhoun St, Ste 300
PO Box 22828
Charleston SC 29413-2828
cynthialowery@mvalaw.com

*Hagemeyer NA/Navico, Inc.*
Larry B. Ricke
Spence Ricke & Sweeney PA
325 Cedar St, Ste 600
St Paul MN 55101
651-223-8000 (telephone)
651-223-8003 (fax)
rickel@srsg.net

*Bombardier Recreational Products*
Kevin D. Hofman
Halleland Lewis Nilan & Johnson PA
600 US Bank Plaza South
220 S Sixth St
Minneapolis MN 55402
612-338-7858 (fax)
khofman@halleland.com

*Bombardier Recreational Products*
Aaron Davis
Bryan Cave LLP
161 N Clark St, Ste 4300
Chicago IL 60601
312-602-5135 (telephone)
312-698-7535 (fax)
aaron.davis@bryancave.com

*Inland American Office Management and*
*MB Minneapolis 8th St LLC*
Kevin M. Newman
Menter Rudin & Trivelpiece PC
308 Maltbie St, Ste 200
Syracuse NY 13204-1498
315-474-4040 (fax)
knewman@menterlaw.com

*Volvo Penta of the Americas Inc./*
*Volvo Financial Service North America/*
*VFS Leasing Co.*
Cass S. Weil
John K. Rossman
Sarah E. Doerr
Moss & Barnett PA
4800 Wells Fargo Center, 90 S 7th St
Minneapolis MN 55402-4129
weilc@moss-barnett.com
rossmanj@moss-barnett.com
doerrsarah@moss-barnett.com

---

*Lindy Lazar*
Gregory M. Luyt
Bowerman Bowden Ford Clulo & Luyt
620-A Woodmere
Traverse City MI 49686
231-941-8192 (fax)
luyt@traverselaw.com
patty@traverselaw.com

*Llebroc Industries*
Aaron Z. Tobin
Anderson & Jones PLLC
One Galleria Tower
13355 Noel Rd, Ste 1900
Dallas TX 75240
972-789-1160 (telephone)
aaront@andersonjoneslaw.com

*Llebroc Industries*
Davis A. Kessler
Gregerson Rosow Johnson & Nilan Ltd
650 Third Ave S, Ste 1600
Minneapolis MN 55402
dkessler@grjn.com

*Kubota Credit Corp.*
Joe M. Lozano, Jr.
National Bankruptcy Services.com LLC
F#2390-N-2696
9441 LBJ Freeway, Ste 350
Dallas TX 75243
972-643-6600 (telephone)
972-643-6698 (fax)
notice@bkcylaw.com

*MB Minneapolis 8th St LLC*
Jane S. Welch
Michael T. Berger
Morrison Fenske & Sund PA
5125 Cty Rd 101, Ste 202
Minnetonka MN 55345
952-975-0050 (telephone)
952-975-0058 (fax)
jwelch@morrisonfenske.com
mberger@morrisonfenske.com

Linda Boyle
TW Telecom, Inc.
10475 Park Meadows Dr, #400
Littleton CO 80124
303-566-1284 (telephone)
303-566-1010 (fax)

---

Nancy Adelmann
Vice President, Finance
Normark Corporation d/b/a Rapala
10395 Yellow Circle Drive
Hopkins MN 55343-9101
952-939-4361 (telephone)
952-933-7329 (fax)
nadelmann@rapalausa.com

*Vicem Yachts, Inc./Vicem Yat Saniyi ve*
*Ticaret AS*
Ralph V. Mitchell
Lapp Libra Thomson Stoebner & Pusch
One Financial Plaza, Ste 2500
120 S 6th St
Minneapolis MN 55402
612-338-5815 (telephone)
612-338-6651 (fax)
rmitchell@lapplibra.com

*Vicem Yachts, Inc./Vicem Yat Saniyi ve*
*Ticaret AS*
Steven J. Cohen
Wachtel & Masyr LLP
110 E 59th St
New York NY 10022
212-909-9500 (telephone)
cohen@wmllp.com

*North American Composites Co./*
*Interplastic Corp.*
Ivan M. Levy
Interplastic Corporation & Subsidiaries
1225 Willow Lake Blvd
St Paul MN 55110-5145
651-481-6871 (telephone)
651-481-9836 (fax)
ilevy@interplastic.com

*Dometic Corporation*
Lester Turchin
2000 N Andrews Ave
Pompano Beach FL 33069
954-633-3158 (telephone)
954-979-4414 (fax)

*Constellation NewEnergy, Inc.*
Bruce J. Ruzinsky
D. Elaine Conway
Jackson Walker LLP
1400 McKinney St, Ste 1900
Houston TX 77010
713-752-4200 (telephone)
713-752-4221 (fax)
bruzinsky@jw.com
econway@jw.com

---

4565297_4.doc

Genmar Holdings, Inc. and Related Debtors
MASTER SERVICE LIST
Bky No. 09-43537
NOTE:  Served via Express Mail except those parties whose contact information includes an e-mail address were served
     via e-mail

*Constellation NewEnergy, Inc.*
Heather M. Forrest
Jackson Walker LLP
901 Main St, Ste 6000
Dallas TX  75202
214-953-6000 (telephone)
214-953-5822 (fax)
hforrest@jw.com

*Florida Self-Insurers Guaranty Assn.*
James E. Sorenson
Williams Gautier Gwynn DeLoach &
     Sorenson PA
PO Box 4128
Tallahassee FL 32315-4128
850-386-3300 (telephone)
850-205-4755 (fax)

Beverly H. Shideler
IBM Corporation
Two Lincoln Centre
Oakbrook Terrace IL 60181
877-876-7781 (phone)
845-491-3275

*Rodney & Barbara Voisine*
Leonard J. Koenick
Kivitz & Liptz LLC
5454 Wisconsin Ave, Ste 650
Chevy Chase MD 20815
301-951-3400 (telephone)
301-951-3646 (fax)
kivitzliptz2@earthlink.net

Michael L. Murawski
5 Hickory Ln
Plumsted NJ 08533
mlmurawski@comcast.net

Andy Gravina
Special Handling Group
IBM Credit LLC
4111 Northside Pky
Atlanta GA 30327

*Financial Protection Corp./*
*Lyndon Property Co.*
David E. Runck
Fafinski Mark & Johnson PA
400 Flagship Corporate Center
775 Prairie Center Dr
Eden Prairie MN 55344
952-995-9500 (telephone)
952-995-9577 (fax)
David.Runck@fmjlaw.com

*Taylor Made Group, Inc.*
Jeffrey A. Cooper
Carella Byrne Bain Gilfillan, et al.
5 Becker Farm Rd
Roseland NJ 07068
973-422-5573 (telephone)
jcooper@carellabyrne.com

*Veada Industries, Inc.*
Michael F. DeBoni
130 N Main St
PO Box 575
Goshen IN 46527-0575
574-533-1171 (telephone)
574-534-4174 (fax)
mdeboni@yaub.com

*Mahar Tool Supply Co.*
Susan M. Cook
Keith A. Schofner
Lambert Leser Isackson Cook & Giunta
916 Washington Ave, Ste 309
Bay City MI 48708
989-893-3518 (telephone)
scook@lambertleser.com
kschofner@lambertleser.com

*WPS Health Plan, Inc. d/b/a Arise*
*Health Plan*
Catherine J. Furay
Murphy Desmond S.C.
33 E. Main St, Ste 500
PO Box 2038
Madison WI 53701-2038
608-268-5614 (telephone)
608-257-4333 (fax)
cfuray@murphydesmond.com

*DC Capital Advisors Ltd.*
Lawrence P. Vonckx
Baker & McKenzie LLP
One Prudential Plaza
130 E. Randolph Dr, Ste 3600
Chicago IL 60601
312-861-8803 (telephone)
Lawrence.p.vonckx@bakernet.com

*IKON Financial Services*
Seprina-Renee Thomas
Bankruptcy Administration
IKON Financial Services
1738 Bass Rd
PO Box 13708
Macon GA 31208-3708
800-480-6513 (telephone)

Missouri Department of Revenue
Bankruptcy Unit
PO Box 475
Jefferson City MO 65105-0475
Attn: Steven A. Ginther
753-751-5531 (telephone)
753-751-7232 (fax)
mn@dor.mo.gov

*Squiggle Tool Company LLC*
Mark F. Uphus
Uphus Law Office
310 E Main St
PO Box 158
Melrose MN 56352
320-256-7491 (telephone)
mark@uphuslaw.com

*Scott and Lambia Heilman*
David H. Stein
Jay B. Feldman
Wilentz, Goldman & Spitzer PA
90 Woodbridge Ctr Dr, Ste 900, Box 10
Woodbridge NJ 07095
dstein@wilentz.com
jfeldman@wilentz.com

*March First d/b/a Gainesville Marina*
Daniel W. Fram
Peterson Fram & Bergmann PA
55 E 5th St, Ste 800
St Paul MN 55101
651-291-8955 (telephone)
651-228-1753 (fax)
wfram@pfb-pa.com

*Manatee County Tax Collector*
Susan D. Profant
819 US 301 Blvd W
Bradenton FL 34205
941-741-4832 (telephone)
941-741-4865 (fax)
susanp@taxcollector.com

*Eldon E. Fox*
Lisa P. Sumner
Poyner Spruill LLP
PO Box 1801
Raleigh NC 27602
919-783-6400 (telephone)
919-783-1075 (fax)
lsumner@poyners.com

Genmar Holdings, Inc. and Related Debtors
MASTER SERVICE LIST
Bky No. 09-43537
NOTE:  Served via Express Mail except those parties whose contact information includes an e-mail address were served
via e-mail

---

*IKON Office Solutions, Inc.*
Katrina A. Rumph
Bankruptcy Specialist
IKON Office Solutions, Inc.
3920 Arkwright Rd, Ste 400
Recovery & Bankruptcy Group
Macon GA 31210
krumph@ikon.com

*Brunswick Corporation*
Larry J. Nyhan
Bojan Guzina
Alison Leff
Sidley Austin LLP
One South Dearborn
Chicago IL 60603
lnyhan@sidley.com
bguzina@sidley.com
aleff@sidley.com

Carolyn Gold Aberman
Brunswick Corporation
1 N Field Ct
Lake Forest IL 60045
Carolyn.Aberman@brunswick.com

John D. Lundberg
Fifth Third Bank
Structured Finance Group
1225 17th St, Ste 1825
Denver CO 80202
johnd.lundberg@53.com

*Allied Marine Group, Inc. (North/South)*
*Richard Bertram Yachts, Inc. (No./So.)*
Richard Gurbst
Squire Sanders & Dempsey LLP
127 Public Square
4900 Key Tower
Cleveland OH 44114
216-479-8500 (telephone)
rgurbst@ssd.com

*HJ Oldenkamp Company*
Joseph A. Ahern
Ahern Fleury
430 N Old Woodward, 2nd Fl
Birmingham MI 48009
jahern@ahernfleury.com

*Tennessee Department of Revenue*
c/o Tennessee Attorney General's Office
Bankruptcy Division
PO Box 20207
Nashville TN 37202-0207

---

*R & R Design, Inc.*
Patrick J. Schurr
Scheef & Stone LLP
2601 Network Blvd, Ste 102
Frisco TX 75034
Patrick.schurr@solidcounsel.com

*Operation Bass, Inc. d/b/a FLW Outdoors*
[New Counsel – Not Yet Noticed]

*Buffalo Insurance Company*
David C. Christian, II
Seyfarth Shaw LLP
131 S Dearborn St, Ste 2400
Chicago IL 60603-5577
dchristian@seyfarth.com

*Nuvolari-Lenard*
Michael Dove
Gislason & Hunter LLP
2700 S Broadway
PO Box 458
New Ulm MN 56073
MDove@gislason.com

---

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Chapter 11 |
| Genmar Holdings, Inc., et al.[1] | Case No. 09-43537 |
| Debtors. | Jointly Administered |

**ORDER (I) AUTHORIZING DEBTORS TO SELL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (II) APPROVING BIDDING PROCEDURES AND AUCTION; (III) APPROVING BREAK UP FEE AND EXPENSE REIMBURSEMENT; (IV) APPROVING FORM AND MANNER OF NOTICE; (V) SCHEDULING FURTHER HEARING; AND (VI) GRANTING CERTAIN RELATED RELIEF**

The Sale Motion[2] of the above-referenced Debtors for Orders (I) Authorizing Debtors to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Authorizing Assumption and Assignment or Rejection of Unexpired Leases and Executory Contracts; (III) Approving Bidding Procedures and Auction; (IV) Approving Break-Up Fee and Expense Reimbursement; (V) Approving Form and Manner of Notice; and (VI) Scheduling Further Hearing ("Sale Motion") came before the undersigned on December 8, 2009. Appearances were noted on the record.

---

[1]   Jointly administered debtors: Genmar Holdings, Inc., Case No. 09-43537; Carver Industries, L.L.C., Case No. 09-43538; Carver Italia, L.L.C., Case No. 09-33773; Carver Yachts International, L.L.C., Case No. 09-33774; Genmar Florida, Inc., Case No. 09-43539; Genmar Industries, Inc., Case No. 09-43540; Genmar IP, LLC, Case No. 09-43541; Genmar Manufacturing of Kansas, Inc., Case No. 09-43542; Genmar Michigan, L.L.C., Case No. 09-43543; Genmar Minnesota, Inc., Case No. 09-33775; Genmar Tennessee, Inc., Case No. 09-43544; Genmar Transportation, Inc., Case No. 09-43545; Genmar Yacht Group, LLC, Case No. 09-43546; Marine Media, LLC, Case No. 09-43547; Minstar, LLC, Case No. 09-43548; Triumph Boats, Inc., Case No. 09-43550; Triumph Boat Rentals, L.L.C., Case No. 09-43551; VEC Leasing Services, L.L.C., Case No. 09-43552; VEC Management Co., L.L.C., Case No. 09-43553; VEC Technology, Inc., Case No. 09-43554; Windsor Craft Yachts, L.L.C., Case No. 09-43555; Wood Manufacturing Company, Inc., Case No. 09-43556.

[2]   All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion or the APA, as applicable.

1

Based on the Sale Motion, the arguments of counsel, all the files, records and proceedings herein, the Court being advised in the premises, and for those reasons stated orally and recorded in open court following the close of evidence:

**IT IS HEREBY FOUND AND DETERMINED THAT**:[3]

A.      The Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      The Debtors have articulated good and sufficient reasons for approving the Sale Motion.

C.      Due and proper notice of the Sale Motion was provided and no other or further notice need be provided.

D.      The process for selection of the Stalking Horse (as defined herein) was fair and appropriate under the circumstances and is in the best interests of the Debtors' estates.

E.      The Debtors have demonstrated a compelling and sound business justification for authorizing the payment of the Break-Up Fee and the Expense Reimbursement, each as set forth in the APA.

F.      The Break-Up Fee and Expense Reimbursement are fair and reasonable and provide a benefit to the Debtors' estates and parties in interest in these cases.

G.      The Debtors' obligation to the Stalking Horse (under the conditions and as set forth in the APA) for the Break-Up Fee and Expense Reimbursement (a) is the result of arm's length negotiations among the parties that were not tainted by self-dealing or manipulation, (b) is reasonably tailored to encourage, rather than hamper, bidding for the Debtors' assets, (c) is an actual

---

[3]     Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  See Fed. R. Bankr. 7052.

2

and necessary cost and expense of preserving the Debtors' assets, within the meaning of section 503(b) of the Bankruptcy Code, (d) is of substantial and commensurate benefit to the Debtors' estates, (e) is reasonable and appropriate, in light of the size and nature of the transaction and the substantial efforts that have been and will be expended by the Stalking Horse and the benefits the Stalking Horse is providing to the Debtors' estates, creditors and all parties in interest, (f) is necessary to ensure that the Stalking Horse will continue to pursue its proposed acquisition of the Acquired Assets, (g) is necessary to establish a bid standard and minimum bid for other bidders and attract additional bidders, and (h) correlates with a maximization of value to the Debtors' estates. The Break-Up Fee and Expense Reimbursement and the circumstances under which they become payable under the APA were material inducements for and conditions of, the Stalking Horse's entry into the APA.

H.    The Bidding Procedures, substantially in the form attached as <u>Exhibit B</u> to the Sale Motion are fair, reasonable and appropriate and represent the best method for maximizing the value of the Debtors' assets.

I.    The entry of this Order is in the best interests of the Debtors and their estates, creditors and interest holders and all other parties in interest herein.

IT IS HEREBY ORDERED:

1.    The Sale Motion is granted to the extent set forth herein.

2.    The transaction contemplated by that certain Asset Purchase Agreement Pursuant, dated as of November 27, 2009, attached to the Sale Motion as <u>Exhibit A</u> among Genmar Holdings, Inc., certain of its affiliates named therein as Sellers and Project Boat Holdings, LLC (together with any of its affiliates or designees for purposes of consummation of the Asset Purchase Agreement, the "Stalking Horse") is designated as the Stalking Horse Bid.

3

3.      All objections filed in response to the Sale Motion are resolved as set forth herein and to the extent not resolved, are hereby overruled.

4.      The Debtors are authorized to conduct an Auction for the sale of all or substantially all of their assets free and clear of all liens, claims, interests and encumbrances, with all such liens, claims, interests and encumbrances to attach to the sale proceeds in the same order and priority as existed at the commencement of the case, subject to a further hearing and final court approval following the Auction (the "Sale").

5.      The Debtors are hereby authorized to offer the assignment of unexpired leases and executory contracts and to determine Cure Amounts in connection with the Sale authorized above, subject to further hearing and final court approval of the assignment or assignments (the "Assignment") and to give notice of proposed rejections of unexpired leases and executory contracts.

6.      The Bidding Procedures, substantially in the form attached as <u>Exhibit B</u> to the Sale Motion, are hereby incorporated herein and approved in their entirety;

7.      The Notice of Sale, substantially in the form attached as <u>Exhibit C</u> to the Sale Motion, is hereby approved and the Debtors are authorized and directed to serve said Notice of Sale in the manner and upon the parties specified in the Sale Motion.

8.      Pursuant to sections 105, 363, 503 and 507 of the Bankruptcy Code, the Debtors are hereby authorized, empowered and directed to pay an amount equal to the Break-Up Fee or the Expense Reimbursement, as applicable, to the Stalking Horse Bidder in accordance with the terms of the APA and without further order of this Court.  The dollar amount of the Break-Up Fee and Expense Reimbursement and the circumstances under which the Break-Up Fee or Expense Reimbursement are payable, as set forth in <u>Section 8.3</u> of the APA are approved.  The Break-Up

4

Fee and Expense Reimbursement shall be allowed as administrative expense claims in each of the

Debtors' Chapter 11 Cases pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code,

without further order of the Court. In addition, the right of the Stalking Horse Bidder to receive

payment of the Break-Up Fee or Expense Reimbursement, as applicable, to the extent payable

under the APA, shall be senior to any and all liens, claims, encumbrances, interests and

administrative expenses of any of the Debtors' prepetition and postpetition secured lenders (the

"Secured Lenders"), including, without limitation, Wells Fargo Bank N.A. and Fifth Third Bank

N.A. in their capacities as lenders under that certain Amended and Restated Credit and Security

Agreement dated as of November 1, 2007 (as amended, restated, supplemented or otherwise

modified from time to time), up to the Carve-Out Amount, or in the case of the consummation of

an Alternative Transaction, up to the amount of the Break-Up Fee.

9.      To the extent payable under the APA, the Sellers' obligation to pay the Break-Up

Fee or Expense Reimbursement, as applicable, shall survive termination of the APA and shall be

payable out of the Debtors' cash or other collateral securing Debtors' obligations to the Secured

Lenders, prior to any recovery by such Secured Lenders, up to the Carve-Out Amount, or in the

case of the consummation of an Alternative Transaction, up to the amount of the Break-Up Fee.

10.     If the Debtors are required pursuant to the terms of the APA to pay the Break-Up

Fee or Expense Reimbursement, the Debtors are hereby authorized, empowered and directed (x) to

pay such applicable amount (i) from the proceeds of any Alternative Transaction giving rise to the

Debtors' obligation to pay the Break-Up Fee, prior to payment of such proceeds to any and all of the

Debtors' Secured Lenders, unsecured creditors, claim holders, equity holders and other parties in

interest or (ii) from the Debtors' available cash or proceeds of the Debtors' assets free and clear of

all liens, claims, interests, encumbrances and administrative expenses of any and all of the Debtors'

5

Secured Lenders or otherwise, up to the Carve-Out Amount, and (y) to make such payments in accordance with the time frames and other terms and conditions set forth in the APA.   The Debtors' obligation to pay the Break-Up Fee or Expense Reimbursement, as applicable, shall be joint and several, absolute and unconditional and not subject to any defense, claim, counterclaim, offset, recoupment or reduction of any kind whatsoever and shall not be amended, discharged, expunged or released in any respect pursuant to any plan of reorganization for the Debtors.   Notwithstanding the Debtors' obligations to pay the Break-Up Fee or Expense Reimbursement, as applicable, prior to payment of amounts otherwise due to the Secured Lenders, the Debtors shall remain fully obligated to repay all obligations to the Secured Lenders, without limitation or reduction of any kind, and all such obligations (and all liens and documents related thereto) shall remain in full force and effect and fully enforceable by the Secured Lenders.

11.    This Court will hold a hearing on or after 9:30 a.m. January 13, 2009 to consider final approval of the Sale and Assignment.   The Sale Approval Hearing may be adjourned, from time to time, without further notice to creditors or other parties in interest other than by announcement of said adjournment before this Court or on this Court's calendar on the date scheduled for said hearing.

12.    Objections, if any, to the Sale Motion must be served and filed in accordance with Local Rule 9006-1(c).

13.    The procedures for determining Cure Amounts through the Closing Date of the Sale of the Acquired Assets in accordance with the APA (including amounts of compensation for actual pecuniary loss) and the deadline for objections to the assumption and/or assignment of the Acquired Contracts and Assumed Leases set forth herein are approved.

4606724_12

14.     At least twenty (20) days prior to the Sale Approval Hearing, the Debtors shall distribute to non-Debtor parties to any Acquired Contracts, Assumed Leases, Excluded Contracts or Excluded Leases, the Initial Contract and Lease Notice, setting forth a list of executory contracts and unexpired leases the Debtors intend to reject or assume and assign to the Stalking Horse in connection with the Sale including, as to the latter, any Cure Amount necessary to compensate such non-Debtor parties for actual pecuniary loss associated with such Acquired Contract or Assumed Lease.

15.     In the event Debtors' proposal regarding rejection or assumption and assignment of leases or contracts changes, whether due to change by the Stalking Horse or a Prevailing Bidder or Back-Up Bidder or for any other reason, Debtors shall promptly give notice of such change to the affected counter-party to the contract or leases (the "Notice of Change").  The Debtors' Notice of Change shall be given at least three days (including weekends and holidays) prior to the date set for any hearing on the Sale Motion or any subsequent hearing.  In the event of any change in the identity of the assignee after the Auction, such notice shall be given as promptly as possible after the Auction.  If the Debtors are unable to give such notice prior to the Sale Approval Hearing, then Debtors shall request at the Sale Approval Hearing that the Court set a hearing to consider any objections to the assumption and assignment or rejection proposed in the Notice of Change, so as to give affected counter-parties such notice.

16.     The non-Debtor parties to the Acquired Contracts or Assumed Leases set forth on the Initial Contract and Lease Notice shall have until three days before the Sale Approval Hearing at 4:00 p.m. prevailing Central Time (the "Contract Objection Deadline"), which deadline may be extended by the Debtors, with written consent of Stalking Horse or the Prevailing Bidder, to object to (i) the proposed assumption and assignment of such Acquired

7

Contracts or Assumed Leases in connection with the Sale and/or (ii) the proposed Cure Amounts set forth on the Initial Contract and Lease Notice; provided, however, if the Debtors otherwise provide a Notice of Change to a non-Debtor party to an Acquired Contract or Assume Lease, except where such proposed change in treatment was upon mutual agreement of the parties, the non-Debtor party shall have an additional ten (10) days after service of such notice (the "Amended Contract Objection Deadline").

17.     Any party objecting to (i) the proposed assumption and assignment of an Acquired Contract or Assumed Lease to which it is a non-Debtor counterparty and/or (ii) the proposed Cure Amounts set forth on the Initial Contract and Lease Notice shall be required to file and serve such objection (each, a "Contract Objection"), in writing, setting forth with specificity any and all cure obligations that the objecting party assets must be cured or satisfied in respect of the applicable Acquired Contract or Assumed Lease and/or all objections to the potential assumption and assignment of such agreements, together with all documentation supporting such cure claim or objection, so that the objection is received no later than 4:00 p.m. prevailing Central Time on the Contract Objection Deadline or the Amended Contract Objection Deadline, as applicable.  If such objection is timely filed, the Bankruptcy Court shall hear any such objection and determine the amount of any disputed Cure Amount or objection to assumption and assignment not settled by the parties at the Sale Hearing or such later date as the Court may deem appropriate.

18.     Notwithstanding the inclusion of an executory contract or unexpired lease on any list of Acquired Contracts and Assumed Leases, the Stalking Horse or Prevailing Bidder, as applicable, shall have authority, in its sole discretion, to remove any contract or lease from the list of Acquired Contracts and Assumed Leases either (i) at any time prior to the Court's entry of

8

4606724_12

an order approving assumption and assignment of such executory contract or unexpired lease, or (ii) within five (5) business days after the Bankruptcy Court sustains, in whole or in part, such non-Debtor party's objection to either the assumption and assignment or the proposed cure amount; in either such case, the Debtor shall not assume and assign such executory contract or unexpired lease to the party who removed such contract or lease from such list.

19.     In the event that no Contract Objection is timely filed with respect to an Acquired Contract or Assumed Lease, the applicable non-Debtor party shall be deemed to consent to the Cure Amount proposed by the Debtors and shall be forever enjoined and barred from seeking an additional amount on account of the Debtors' cure obligations under section 365 of the Bankruptcy Code or otherwise from the Debtors, their estates or the Prevailing Bidder on account of the assumption and assignment of such executory contract or unexpired lease and shall be deemed to have consented to the proposed assignment and assumption.  In addition, if no timely Contract Objection is filed, the Prevailing Bidder shall enjoy all the rights and benefits under all Acquired Contracts and Assumed Leases, as applicable, without the necessity of obtaining any party's written consent to the Debtors' assumption and assignment of such rights and benefits, and each such party shall be deemed to have waived any right to object to, contest, condition or otherwise restrict any such assumption and assignment.

20.     The Stalking Horse shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to terminate or otherwise enforce any of its rights under the APA in accordance with the terms of the APA.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Order.

9

4606724_12

21.     The Debtors are authorized and empowered to take such steps, expend such sums of money and do such other things as may be necessary to implement and effect the terms and requirements established under this Order.

22.     The Stalking Horse and/or the Prevailing Bidder are hereby deemed to be parties-in-interest under 11 U.S.C. § 1109(b) for purposes of this Sale Motion, the Bidding Procedures, the Auction, the Sale Approval Hearing, any Contract Objection, and any other hearing or matters arising in connection with the APA and the Sale.

23.     This Order shall be binding upon and inure to the benefit of the Stalking Horse, Prevailing Bidder and its affiliates, successors and assigns, and the Debtors, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the estates of the Debtors, whether in these cases or subsequent bankruptcy cases or upon dismissal of any of these cases.

24.     As provided by Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon its entry.

25.     This Court shall retain jurisdiction over any matters related to or arising from the implementation of this Order, including, but not limited to, any matter, claim or dispute arising from or relating to the Break-Up Fee, the Expense Reimbursement, the Bidding Procedures and the implementation of this Order.

Dated: _____, 2009          _____
                                            Dennis D. O'Brien
                                            United States Bankruptcy Judge

10

4606724_12