**Execution Copy**

---

## ASSET PURCHASE AGREEMENT

by and among

GENMAR HOLDINGS, INC., GENMAR INDUSTRIES, INC., GENMAR IP, L.L.C.,
GENMAR MICHIGAN, L.L.C., GENMAR MINNESOTA, INC., GENMAR TENNESSEE,
INC., GENMAR TRANSPORTATION, INC., WOOD MANUFACTURING COMPANY, INC.

and

Project Boat Holdings, LLC

Dated as of November 27, 2009

---

# TABLE OF CONTENTS

Page

ARTICLE 1 PURCHASE AND SALE OF THE ACQUIRED ASSETS ..................................... 2
    SECTION 1.1    Transfer of Acquired Assets. ..................................................... 2
    SECTION 1.2    Excluded Assets. ..................................................................... 4
    SECTION 1.3    Assumption of Liabilities. ........................................................ 6
    SECTION 1.4    Excluded Liabilities. ............................................................... 7
    SECTION 1.5    Identification of Additional and Excluded Contracts; Cure Costs.............. 9

ARTICLE 2 PURCHASE PRICE ....................................................................................... 11
    SECTION 2.1    Purchase Price. ...................................................................... 11
    SECTION 2.2    Deposit. ................................................................................. 12
    SECTION 2.3    Purchase Price Adjustment. ..................................................... 12

ARTICLE 3 CLOSING AND DELIVERIES ....................................................................... 15
    SECTION 3.1    Closing. ................................................................................. 15
    SECTION 3.2    Sellers' Deliveries. ................................................................. 15
    SECTION 3.3    Buyer's Deliveries. ................................................................. 16

ARTICLE 4 REPRESENTATIONS AND WARRANTIES..................................................... 17
    SECTION 4.1    Representations and Warranties of Sellers. ................................ 17
    SECTION 4.2    Representations and Warranties of Buyer.................................. 28
    SECTION 4.3    "AS IS" Transaction. .............................................................. 29

ARTICLE 5 COVENANTS AND OTHER AGREEMENTS.................................................... 30
    SECTION 5.1    Pre-Closing Covenants of Sellers. ............................................ 30
    SECTION 5.2    Pre-Closing Covenants of Buyer. ............................................. 33
    SECTION 5.3    Other Covenants of Sellers and Buyer....................................... 33
    SECTION 5.4    Employment Covenants and Other Undertaking. ....................... 34
    SECTION 5.5    Ownership of Genmar Name and Acquired Intellectual Property........... 36
    SECTION 5.6    Non-Assignment of Assigned Contracts..................................... 36
    SECTION 5.7    Bankruptcy Actions. ............................................................... 37
    SECTION 5.8    Use of Names. ....................................................................... 39
    SECTION 5.9    Lenders' Acknowledgment........................................................ 40
    SECTION 5.10   Title Insurance. ...................................................................... 40
    SECTION 5.11   Surveys. ................................................................................ 41
    SECTION 5.12   Post-Closing Access to Insurance. ............................................ 41
    SECTION 5.13   Sarasota PHASE II Provisions.................................................. 41
    SECTION 5.14   COBRA Reduction. ................................................................ 42

ARTICLE 6 TAXES......................................................................................................... 43
    SECTION 6.1    Taxes Related to Purchase of Acquired Assets........................... 43
    SECTION 6.2    Cooperation on Tax Matters. .................................................... 43
    SECTION 6.3    Allocation of Purchase Price..................................................... 45

ARTICLE 7 CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES .................... 45

i

SECTION 7.1     Conditions Precedent to Performance by Sellers. .................................... 45
SECTION 7.2     Conditions Precedent to the Performance by Buyer. ............................... 46

ARTICLE 8 TERMINATION ................................................................................................ 48
SECTION 8.1     Conditions of Termination ......................................................................... 48
SECTION 8.2     Effect of Termination. ................................................................................ 50
SECTION 8.3     Break-Up Fee and Expense Reimbursement. ............................................ 50

ARTICLE 9 SURVIVAL ........................................................................................................ 52
SECTION 9.1     Survival. ...................................................................................................... 52
SECTION 9.2     Covenant Not to Sue. .................................................................................. 52

ARTICLE 10 MISCELLANEOUS .......................................................................................... 53
SECTION 10.1    Joint Drafting. ............................................................................................. 53
SECTION 10.2    Further Assurances; Records. ..................................................................... 53
SECTION 10.3    Successors and Assigns ............................................................................... 53
SECTION 10.4    Governing Law; Jurisdiction; Waiver of Trial by Jury ............................. 54
SECTION 10.5    Expenses. ..................................................................................................... 54
SECTION 10.6    Severability. ................................................................................................ 54
SECTION 10.7    Notices. ....................................................................................................... 54
SECTION 10.8    Amendments; Waivers. ................................................................................ 56
SECTION 10.9    Public Announcements. ............................................................................... 56
SECTION 10.10   Entire Agreement. ....................................................................................... 56
SECTION 10.11   No Third Party Beneficiaries. ..................................................................... 56
SECTION 10.12   Headings. .................................................................................................... 57
SECTION 10.13   Counterparts. ............................................................................................... 57
SECTION 10.14   Construction. ............................................................................................... 57
SECTION 10.15   Sellers' Representative ................................................................................ 57

ARTICLE 11 DEFINITIONS .................................................................................................. 58

DC\1250585.16

## SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) | Real Property |
| Schedule 1.1(b) | Leased Property |
| Schedule 1.1(c) | Owned Machinery and Equipment |
| Schedule 1.1(d) | Acquired Contracts |
| Schedule 1.1(f) | Inventory Locations |
| Schedule 1.1(g) | Acquired Intellectual Property |
| Schedule 1.1(m) | Insurance Policies |
| Schedule 1.2(c) | Excluded Contracts |
| Schedule 1.2(e) | Miscellaneous Excluded Assets |
| Schedule 1.2(f) | Claims for Refunds |
| Schedule 1.2(h) | Avoidance Action Persons |
| Schedule 1.2(i) | Excluded Causes of Action |
| Schedule 1.2(p) | Excluded Leases |
| Schedule 1.2(q) | Excluded Inventory |
| Schedule 1.3(d) | Miscellaneous Assumed Liabilities |
| Schedule 1.5(a) | Cure Costs |
| Schedule 2.3(a) | Adjusted Net Working Capital Definitions |
| Schedule 2.3(b) | Adjusted Net Working Capital Principles |
| Schedule 4.1(e) | Consents |
| Schedule 4.1(f) | Litigation |
| Schedule 4.1(g)(ii) | Sufficiency of Assets |
| Schedule 4.1(h)(i)(a) | Valid use and ownership of Intellectual Property |
| Schedule 4.1(h)(i)(b) | Overdue Fees in respect of Acquired Intellectual Property |
| Schedule 4.1(h)(i)(c) | Rights to Acquired Intellectual Property |
| Schedule 4.1(h)(ii)(a) | Non-Compliance with Acquired Intellectual Property |
| Schedule 4.1(h)(ii)(b) | Unauthorized Use of Acquired Intellectual Property |
| Schedule 4.1(h)(ii)(c) | Conflicts Related to Acquired Intellectual Property |
| Schedule 4.1(h)(ii)(d) | Claims Related to Acquired Intellectual Property |
| Schedule 4.1(h)(ii)(e) | Notices Related to Acquired Intellectual Property |
| Schedule 4.1(h)(iii) | Licenses Granted by Sellers |
| Schedule 4.1(i) | Information Technology |
| Schedule 4.1(j) | Permits |
| Schedule 4.1(k) | Environmental Compliance |
| Schedule 4.1(l) | Insurance |
| Schedule 4.1(m) | Certain Matters Regarding Real Estate Leases |
| Schedule 4.1(p) | Financial Statements |
| Schedule 4.1(r) | Material Contracts |
| Schedule 4.1(s) | Compliance with Laws |
| Schedule 4.1(t) | Customers, Distributors and Suppliers |
| Schedule 4.1(u) | Affiliate Transactions |
| Schedule 4.1(v) | Applicable Claims |
| Schedule 4.1(y) | Labor Unions |
| Schedule 5.1(b) | Conduct of Business Pre-Closing |
| Schedule 5.1(e) | Subject Internet Domain Names |
| Schedule 5.4 | Employees |

Schedule 7.2(f)        Closing Consents
Schedule 11(a)         Knowledge
Schedule 11(b)         Lease Deposit Amounts

iv

## EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Escrow Agreement |
| Exhibit B | Form of Instruments of Assignment of Intellectual Property |
| Exhibit C | Form of Assumption and Assignment Agreement |
| Exhibit D | Form of Little Falls License Agreement |
| Exhibit E | Form of Bill of Sale |
| Exhibit F | Form of Sale Motion |
| Exhibit G | Form of Sale Procedures Order |
| Exhibit H | Form of Sale Approval Order |
| Exhibit J | Form of Transition Services Agreement |
| Exhibit K | Form of VEC License |
| Exhibit L | Form of Website, Software and Data Transfer Agreement |

DC\1250585.16

<u>ASSET PURCHASE AGREEMENT</u>

THIS ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>"), dated as of November 27, 2009 (the "<u>Execution Date</u>"), is made by and among GENMAR HOLDINGS, INC., a Delaware corporation ("<u>GHI</u>"), GENMAR INDUSTRIES, INC., a Delaware corporation ("<u>Genmar Industries</u>"), GENMAR IP, L.L.C., a Delaware limited liability company ("<u>Genmar IP</u>"), GENMAR MICHIGAN, L.L.C., a Delaware limited liability company ("<u>Genmar Michigan</u>"), GENMAR MINNESOTA, INC., a Delaware corporation ("<u>Genmar Minnesota</u>"), GENMAR TENNESSEE, INC., a Delaware corporation ("<u>Genmar Tennessee</u>"), GENMAR TRANSPORTATION, INC., a Delaware corporation ("<u>Genmar Transport</u>"), WOOD MANUFACTURING COMPANY, INC., an Arkansas corporation ("<u>Wood</u>"; and, together with GHI, Genmar Industries, Genmar IP, Genmar Michigan, Genmar Minnesota, Genmar Tennessee, and Genmar Transport, the "<u>Sellers</u>" and each, individually, a "<u>Seller</u>"), and Project Boat Holdings, LLC, a Delaware limited liability company ("<u>Buyer</u>").  Capitalized terms used in this Agreement are defined or cross-referenced in <u>Article 11</u>.

RECITALS

WHEREAS, each of the Sellers other than GHI is a direct or indirect wholly-owned subsidiary of GHI;

WHEREAS, GHI and each of the other Sellers is a debtor-in-possession under Title 11 of the United States Code, 11 U.S.C. §101 et seq. (the "<u>Bankruptcy Code</u>") and each has filed a voluntary petition for relief (the "<u>Petition for Relief</u>," and the date on which such Petition for Relief is filed being referred to as the "<u>Petition Date</u>") under Chapter 11 of the Bankruptcy Code on June 1, 2009 in the United States Bankruptcy Court for the District of Minnesota (the "<u>Bankruptcy Court</u>," the bankruptcy cases initiated by Sellers as described in this Recital, which are being jointly administered under Case No. 09-43537, shall collectively be referred to as the "<u>Bankruptcy Case</u>");

WHEREAS, Sellers design, manufacture and sell recreational power boats and fishing boats under the following brands or brand names: Ranger, Stratos, Champion, Wellcraft, Four Winns, Glastron and Larson;

WHEREAS, Buyer desires to purchase the Acquired Assets and assume the Assumed Liabilities from Sellers, and Sellers desire to sell, convey, assign and transfer to Buyer the Acquired Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and in accordance with Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code; and

WHEREAS, the Acquired Assets and Assumed Liabilities shall be purchased and assumed by Buyer pursuant to the Sale Approval Order approving such sale, free and clear of all Liens (other than Permitted Liens), Claims and Encumbrances, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, which order will include the authorization for the assumption by Buyer and assignment to Buyer of the Assigned Contracts and the liabilities thereunder in accordance with Section 365 of the Bankruptcy Code, all in the manner and subject to the terms and conditions

1

set forth in this Agreement and the Sale Approval Order and in accordance with other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the Local Rules for the United States Bankruptcy Court for the District of Minnesota (together, the "<u>Bankruptcy Rules</u>").

STATEMENT OF AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged Sellers and Buyer hereby agree as follows:

ARTICLE 1

PURCHASE AND SALE OF THE ACQUIRED ASSETS

SECTION 1.1     <u>Transfer of Acquired Assets</u>.

At the Closing, and upon the terms and subject to the conditions herein set forth, Sellers shall sell, assign, transfer, convey and deliver to Buyer (or at the request of Buyer, Buyer's designated Affiliate or Affiliates), and Buyer shall (or shall cause its designated Affiliate or Affiliates to) acquire from Sellers, free and clear of all Encumbrances (other than Permitted Liens of which the Sale Approval Order does not provide for the Acquired Assets to be sold free and clear), all right, title and interest of Sellers as of the Closing Date in, to and under the Acquired Assets.  As used herein, the term "<u>Acquired Assets</u>" shall mean (i) subject to <u>Section 5.13</u>, the real property located in Sarasota, Florida and described on <u>Schedule 1.1(a)</u> and the Improvements located thereon, and (ii) all of those properties, assets and rights, tangible and intangible, of whatever kind or nature, related to, or at any time used or held for use in connection with, the conduct of the Acquired Business (excluding the Excluded Assets), owned, leased or licensed by Sellers as of the Closing Date, including, without limitation:

(a)     that certain real property described on <u>Schedule 1.1(a)</u> (collectively, the "<u>Real Property</u>") and all Improvements, easements, licenses and appurtenances located thereon or benefiting such property, to the extent any Seller has any interest therein;

(b)     all real property and personal property leases listed on <u>Schedule 1.1(b)</u>, as such Schedule may be amended (the "<u>Assumed Leases</u>"), other than the Excluded Leases, under which any Seller is a lessee of real property or personal property (the "<u>Leased Property</u>") and any Lease Deposit Amounts made pursuant to any Assumed Lease;

(c)     all (i) equipment, machinery, furniture, fixtures and improvements, tooling and spare parts owned by Sellers relating to or used or held for use in connection with the Acquired Business (the "<u>Owned Machinery and Equipment</u>"), including, without limitation, the Owned Machinery and Equipment listed on <u>Schedule 1.1(c)</u>, and (ii) rights of Sellers to the warranties and licenses received from manufacturers and sellers of the Owned Machinery and Equipment;

2

(d)    all Contracts listed on Schedule 1.1(d), as such Schedule may be amended, other than such Contracts that are Excluded Contracts (collectively, the "Acquired Contracts"), and all deposits made under any Acquired Contract;

(e)    to the extent related to the Acquired Business, all accounts receivable and notes receivable of Sellers with Persons that are not Affiliates of Sellers (the "Accounts Receivable");

(f)    all (i) Inventory of Sellers relating to the Acquired Business, including, without limitation, all (A) Inventory at the locations listed on Schedule 1.1(f), (B) Inventory held by third parties on a consignment basis, and (C) Inventory held by third-party suppliers or manufacturers that has been paid for by Sellers prior to the Closing Date, in each case other than Excluded Inventory, and (ii) to the extent transferable, rights of Sellers to the warranties received from suppliers with respect to such Inventory;

(g)    all Intellectual Property owned by Sellers, or licensed to Sellers pursuant to an Acquired Contract (collectively, the "Acquired Intellectual Property"), that is related to or used or held for use in connection with the Acquired Business, including without limitation, all rights to trade names, trademarks and service marks owned by Sellers or licensed to Sellers relating to or used or held for use in connection with the Acquired Business, the Transferred Internet Domain Names to be transferred to Sellers in accordance with Section 5.1(e), and the Intellectual Property listed on Schedule 1.1(g);

(h)    to the fullest extent transferable under applicable Law, all permits, authorizations and licenses relating to or used or held for use in connection with the Acquired Business or the Acquired Assets (collectively, the "Permits") issued to Sellers by any Government Authority and all pending applications therefor, including, without limitation, those Permits set forth on Schedule 4.1(j);

(i)    all books, files, documents and records owned by or in the control, custody or possession of Sellers or their respective Affiliates and relating to the Acquired Business or the Acquired Assets (in whatever format they exist, whether in hard copy or electronic format), including, without limitation, customer lists, historical customer files, accounting records, test results, product specifications, plans, data, studies, drawings, diagrams, training manuals, engineering data, safety and environmental reports and documents, maintenance schedules and operating and production records, inventory records, business plans, credit records of customers, and marketing materials, but excluding corporate books and records, board minutes and organizational documents of Sellers (collectively, "Records); provided that, with respect to Records that primarily relate to Excluded Assets or businesses operated by Sellers that are not included in the Acquired Business (the "Excluded Business"), the Acquired Assets shall include copies of such Records;

(j)    to the extent related to an Acquired Asset or Assumed Liability, all prepaid expenses, deposits and advances made by or on behalf of Sellers and all credits due to Sellers;

3

(k)     all goodwill, payment intangibles and general intangible assets and rights of Sellers related to the Acquired Business;

(l)     to the extent permitted by applicable Law, all books, files and records owned by, or in the control, custody or possession of, Sellers or their respective Affiliates that relate to employees of Sellers who are hired by Buyer or its designated Affiliates on the Closing Date, including, without limitation, books, files and records that are related to the evaluation, appraisal or performance of such employees;

(m)     all rights to and under insurance policies, including to proceeds under insurance policies relating to the Acquired Business or the Acquired Assets, including policies set forth on Schedule 1.1(m) (except to the extent of proceeds specifically relating to (i) any Excluded Asset or (ii) asbestos litigation);

(n)     Causes of Action, other than the Causes of Action that are identified or described as Excluded Assets;

(o)     all advertising, marketing and promotional materials, studies, reports and all other printed or written materials to the extent relating to or used or held for use in connection with the Acquired Business; and

(p)     all other or additional assets, properties, privileges, rights (including prepaid expenses) and interests of Sellers related to, used or held for use in connection with the Acquired Business, including, without limitation, memorabilia, artwork and other similar assets associated with the brands of the Acquired Business, whether or not specifically referred to in this Agreement other than the Excluded Assets;

provided, however, none of the parties hereto intends that Buyer, or any of its Affiliates, shall be deemed to be a successor to Sellers with respect to all or any portion of the Acquired Business or the Acquired Assets or any other business or assets of Sellers.

SECTION 1.2     Excluded Assets.

Notwithstanding anything to the contrary in this Agreement, Sellers shall retain all right, title and interest to, in and under only the properties, rights, interests and assets of Sellers set forth below (all such properties, rights, interests and assets being herein referred to as the "Excluded Assets"):

(a)     any asset of a Seller that otherwise would constitute an Acquired Asset but for the fact that it is sold or otherwise disposed of, in the Ordinary Course of Business of the relevant Seller and in compliance with this Agreement, during the time from the Execution Date until the Closing Date;

(b)     all of Sellers' Cash and all of Sellers' right, title and interest in and to all deposit or similar accounts in which Sellers deposit Cash, other than any Lease Deposit Amounts or deposits made under any Acquired Contract;

4

(c)        all Contracts listed on Schedule 1.2(c), as such Schedule may be amended, and any Contract terminated, expired or rejected prior to the Closing Date (i) in accordance with its terms or in the Ordinary Course of Business, or (ii) consistent with Sections 1.5 and 5.1 (collectively, the "Excluded Contracts");

(d)        all Employee Benefit Plans currently or previously sponsored or maintained by Sellers or any of Sellers' ERISA Affiliates (together with Sellers, the "Seller Controlled Group") or their respective predecessors or with respect to which the Seller Controlled Group or their respective predecessors has made or is required to make payments, transfers or contributions, or has any obligation, in respect of any present or former employees, directors, officers, shareholders, consultants or independent contractors of Sellers or any of Sellers' ERISA Affiliates or their respective predecessors (collectively, the "Seller Benefit Plans"), and all insurance policies, fiduciary liability policies, benefit administration contracts, actuarial contracts, trusts, escrows, surety bonds, letters of credit and other contracts primarily relating to any Seller Benefit Plan;

(e)        all of the assets set forth on Schedule 1.2(e);

(f)        [Reserved.]

(g)        all rights of Sellers in respect of the overpayment or rebates of Taxes paid by Sellers;

(h)        all Avoidance Actions that Sellers or any of their Affiliates may have against any Person and all proceeds thereof, other than against any Person identified on Schedule 1.2(h) (provided that all Avoidance Actions contemplated by Section 1.2(i) and/or Section 1.2(j) shall be Excluded Assets for all purposes);

(i)        all rights of action of Sellers in respect of Causes of Action identified on Schedule 1.2(i) and all proceeds thereof;

(j)        all Causes of Action (solely to the extent arising prior to the Closing Date, and excluding any Causes of Action (x) for payments of accounts receivable or other amounts owed to Sellers in the ordinary course of the Acquired Business or (y) with respect to which any current asset was included on the Adjustment Balance Sheet and taken into account in determining the Final Adjusted Net Working Capital, as finally determined in accordance with Section 2.3) against any holder of any Claim (other than any Claim that could be an Assumed Liability) against any Sellers which Cause of Action would reasonably be expected to succeed as a defense, counterclaim, or a right of recoupment or setoff in response to such Claim;

(k)        except as specified in Section 1.1(m), all of Sellers' rights under any insurance policy or similar contract of insurance under which a Seller is an insured (including, without limitation, all rights to proceeds thereunder), named as an additional insured or is otherwise a beneficiary, and all proceeds realized in connection therewith;

(l)        all amounts due, including in respect of accounts receivable and notes receivable, to Sellers from any Affiliate of Sellers;

5

(m)     all outstanding shares of capital stock or equity or other ownership interest held by a Seller in any Person, including without limitation, Affiliates of Sellers;

(n)     all Tax records and information ("Tax Records") and all corporate books and records, board minutes, organizational documents of Sellers;

(o)     all Sellers' rights under this Agreement and all cash and non-cash consideration payable or deliverable to Sellers pursuant to the terms and provisions hereof;

(p)     all leases that are not Assumed Leases relating to Leased Property of Sellers, including those listed on Schedule 1.2(p), as such Schedule may be amended (the "Excluded Leases");

(q)     all Inventory of Sellers listed on Schedule 1.2(q) (the "Excluded Inventory"), including rights of Sellers to the warranties received from suppliers with respect to such Inventory; and

(r)     any and all information not relating to or used or held for use in connection with the Acquired Business that is stored on any Sellers' or Sellers' Affiliates' computer systems, data network or servers.

SECTION 1.3     Assumption of Liabilities.

Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer shall (or shall cause its designated Affiliate or Affiliates to) assume, and thereafter pay, perform and discharge when due (in accordance with their respective terms and subject to the respective conditions thereof), only the following liabilities of Sellers (the "Assumed Liabilities") and no others:

(a)     all Cure Costs in respect of the Assigned Contracts;

(b)     fifty percent (50%) of all Transfer Taxes;

(c)     except, in each case in this Section 1.3(c), for liabilities described in clauses (a)-(s) of Section 1.4, to the extent recorded or accrued as a current liability on the Adjustment Balance Sheet and taken into account in determining the Final Adjusted Net Working Capital, as finally determined in accordance with Section 2.3, (i) all current liabilities arising in the Ordinary Course of Business or the Pre-Petition Ordinary Course of Business (A) in respect of express, standard warranties issued or provided in respect of products sold in connection with the Acquired Business, (B) for amounts arising either (1) under any Acquired Contract or (2) after the filing of Petition for Relief to be paid to dealers of the Acquired Business in respect of products sold in connection with the conduct of the Acquired Business, including without limitation, under any dealer agreement, published program or other arrangement or (C) liabilities for payroll or accrued vacation with respect to Transferred Employees, (ii) all accounts payable and accrued expenses arising in the Ordinary Course of Business from and after the filing of the Petition for Relief out of the conduct of the Acquired Business in the Ordinary Course of Business, including without limitation, for commissions payable to Sales Agents, but excluding all liabilities (A) for Indebtedness of any Person or (B)

6

described in Section 1.4(c) or otherwise arising in connection with the Bankruptcy Case or the transactions contemplated hereby (including all expenses incurred in connection with the Bankruptcy Case or the transactions contemplated hereby) or the related sale process, (iii) liabilities in respect of certificates issued after the filing of the Petition for Relief by the Acquired Business that are exchangeable or redeemable for products or services of the Acquired Business, and (iv) liabilities with respect to rent under operating leases, utility payments, real property taxes, assessments, common area payments, leasing costs and commissions or other customarily prorated real estate items, in each case in this clause (iv), relating to any Real Property and attributable to periods beginning before and ending after the Closing Date; and

        (d)     all other liabilities set forth on Schedule 1.3(d).

     Buyer acknowledges that Buyer or its designated Affiliates, as applicable, will be responsible for liabilities arising from its or their operation of the Acquired Business after the Closing.

        SECTION 1.4    Excluded Liabilities.

     Buyer and its designated Affiliate or Affiliates are assuming only the Assumed Liabilities and neither Buyer nor any of its Affiliates is assuming any other liability or obligation of Sellers of whatever nature, whether presently in existence or arising hereafter. All such other liabilities and obligations shall be retained by, and remain liabilities and obligations of, Sellers (all such liabilities are, collectively, the "Excluded Liabilities"). The Excluded Liabilities include, but are not limited to, the following liabilities and obligations:

        (a)     all liabilities and obligations of Sellers relating to Excluded Assets;

        (b)     except for the liabilities specified in Section 1.3(c)(i)(C) solely in respect of Transferred Employees, all liabilities and obligations of Sellers or the Seller Controlled Group to all current and former employees, directors, officers, shareholders, consultants and independent contractors of Sellers or of the Seller Controlled Group or their respective predecessors (and their respective spouses and dependents);

        (c)     all liabilities and obligations of Sellers or their respective Affiliates for: (i) payments made to or fees and expenses accrued with respect to professionals retained or employed by Sellers' Chapter 11 estate or any official committee of creditors appointed in the Sellers' Bankruptcy Case, (ii) reclamation Claims, (iii) any prepetition, priority or other tax Claims and (iv) any other Claims accrued and unpaid by Sellers during the pendency of their Bankruptcy Case;

        (d)     any liability of Sellers or their Affiliates or their respective directors, officers, stockholders or agents, arising out of, or relating to, this Agreement or the transactions contemplated by this Agreement, whether incurred prior to, at or subsequent to the Closing Date, including, without limitation, all finder's or broker's fees and expenses and any and all fees and expenses of any representatives of Sellers;

        (e)     other than as specifically identified as an Assumed Liability, any liability relating to (x) events or conditions occurring or existing in connection with, or arising out of, the

7

Acquired Business as operated prior to the Closing, or (y) the ownership, possession, use, operation or sale or other disposition prior to the Closing of any Acquired Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing, with the Acquired Business);

(f)    any liability to any Person at any time employed by Sellers or their Affiliates or their respective predecessors-in-interest at any time or to any such Person's spouse, children, other dependents or beneficiaries, with respect to incidents, events, exposures or circumstances occurring at any time during the period or periods of any such Person's employment by Sellers or their Affiliates or their respective predecessors-in-interest, whenever such claims mature or are asserted, including, without limitation, all Liabilities arising (i) under the Seller Benefit Plans, and any other employment, change in control, termination, severance or similar agreement, (ii) under any employment, wage and hour law or restriction, equal opportunity, discrimination, plant closing or immigration and naturalization laws, or any other applicable laws related to employment or termination thereof, or with respect to eligibility for and payment of overtime, worker classification (including the proper classification of independent contractors and consultants), collective bargaining, workers' compensation or mass layoffs, (iii) under any collective bargaining laws, agreements or arrangements or (iv) in connection with any workers' compensation or any other employee health, accident, disability or safety claims;

(g)    any liability of Sellers or the Seller Controlled Group under Title IV of ERISA;

(h)    any liability of Sellers or their Affiliates under COBRA;

(i)    any incentive (including equity or equity-like) compensation, bonus, change in control, severance, pension or retirement liability of Sellers or their Affiliates to their current or former employees whether or not accrued as of the Closing Date, whether or not under any Seller Benefit Plan;

(j)    any liability or obligation of any Seller, or any member of any consolidated, affiliated, combined or unitary group of which any Seller is or has been a member, for Taxes, other than the fifty percent (50%) Transfer Taxes included as an Assumed Liability;

(k)    any liability incurred by (i) Sellers or (ii) their or their Affiliates' respective directors, officers, stockholders, agents or employees after the Closing Date (except, with respect to liabilities incurred after the Closing by any Transferred Employee, to the extent such liability arises with respect to services performed on behalf of Buyer or its Affiliates following the Closing Date);

(l)    any liability of Sellers to any Person on account of any Proceeding, including those Proceedings set forth on Schedule 4.1(f);

(m)    any liability relating to or arising out of the ownership or operation of an Excluded Asset;

8

(n)        any liability or obligation arising out of the conduct of the Acquired Business through the Closing, including, without limitation, (i) the liabilities relating to the employment by Sellers or any of their Affiliates or any current or former employees, whether before, on or after the Closing Date and whether or not such employees become Transferred Employees, except in each case for any such liabilities or obligations that are Assumed Liabilities; and (ii) any liability under the WARN Act or similar foreign, state or local law;

(o)        fees or expenses of Sellers incurred with respect to the transactions contemplated herein;

(p)        any liability or obligation under any Acquired Contract or Assumed Lease arising prior to the Closing, other than the Cure Costs;

(q)        any liability of Sellers or their respective Affiliates (i) arising out of or relating to any violation of Law, or (ii) claimed to have arisen through the use or handling of, contact with or exposure to any product or component part thereof or related to the process of manufacturing such product or part, including without limitation any claim arising from exposure to any Hazardous Materials including asbestos, crystalline or silica (or products containing asbestos, crystalline or silica);

(r)        except for the Assumed Liabilities described in clause (i)(A) of Section 1.3(c), any liability arising out of or relating to services, products or product or service warranties of Seller or any Affiliate of any Seller or any of their respective predecessors to the extent provided, developed, designed, manufactured, marketed, sold or distributed on or prior to the Closing Date; and

(s)        any liability (including any investigatory, corrective or remedial obligation) relating to or arising from Environmental Laws and (i) Sellers or any predecessor or Affiliate of any Seller, (ii) the operation of the Acquired Business prior to the Closing, (iii) any Excluded Asset, (iv) the ownership or operation of any Acquired Asset, or (v) any operations, events, conditions, or circumstances occurring or existing on or prior to the Closing Date, including, without limitation, any release, treatment, storage, disposal, or arrangement for disposal of or any exposure of any Person to any Hazardous Materials occurring or existing on or prior to the Closing Date, including, without limitation, liabilities with respect to the matters set forth in the Phase I environmental assessment reports prepared by Buyer's environmental consultants, the contents of which have been communicated to representatives of Sellers.

SECTION 1.5        Identification of Additional and Excluded Contracts; Cure Costs.

(a)        Prior to the date hereof, Sellers have delivered Schedule 1.5(a) to Buyer, which schedule contains:  (i) a list of Contracts entered into in connection with or related to the Acquired Business, which Sellers have rejected pursuant to an order of the Bankruptcy Court prior to the date hereof (the "Rejected Contracts"); (ii) a list of Contracts entered into in connection with or related to the Acquired Business, which Sellers have assumed pursuant to an order of the Bankruptcy Court prior to the date hereof; and (iii) with respect to each Contract that is listed, as of the date of this Agreement, as (I) an Acquired Contract on Schedule 1.1(d), (II) an

9

Excluded Contract on <u>Schedule 1.2(c)</u>, (III) an Assumed Lease on <u>Schedule 1.1(b)</u>, or (IV) an Excluded Lease on <u>Schedule 1.2(p)</u>, (A) Sellers' good faith estimate of (x) the Cure Costs in respect of such Contract that arose prior to the Petition Date, and (y) the Cure Costs in respect of such Contract that arose on or after the Petition Date, and (B) whether such Contract was entered into on or following the Petition Date.

(b)      No later than the date (the "<u>Designation Deadline</u>") that is 25 days prior to the Sale Hearing, Buyer shall provide Sellers with a list of Contracts (as amended, the "<u>Assigned Contracts List</u>") entered into in connection with or related to the Acquired Business to be assumed, if applicable, by Sellers and assigned (as Acquired Contracts or Assumed Leases) by Sellers to Buyer (Contracts listed on the Assigned Contracts List, as amended, the "<u>Assigned Contracts</u>") and, to the extent that (x) any Contract listed on <u>Schedule 1.1(d)</u> or <u>Schedule 1.1(b)</u> is not listed as an Assigned Contract on the Assigned Contracts List or (y) any Contract listed on <u>Schedule 1.2(c)</u> or <u>Schedule 1.2(p)</u> is listed as an Assigned Contract on the Assigned Contracts List, such Schedules shall be amended accordingly in accordance with the Assigned Contracts List.  As promptly as practicable following the determination of the Assigned Contracts by Buyer and in any event no later than 20 days prior to the Sale Hearing, Sellers shall commence appropriate proceedings before the Bankruptcy Court and otherwise take all necessary actions in order to determine Cure Costs with respect to any Assigned Contract entered into prior to the Petition Date. Notwithstanding anything to the contrary in this Agreement, (x) prior to the Closing or (y) in the case of Disputed Contracts, at any time on or prior to the fifth Business Day after the Cure Costs for such Contract are finally determined, Buyer may identify any Assigned Contract as one that Buyer no longer desires to have assigned to it and such Contract shall for all purposes of this Agreement be deemed to be an Excluded Asset and an Excluded Contract or Excluded Lease, as applicable, and the Assigned Contract List and the applicable Schedules shall be amended accordingly.  Sellers shall, or shall cause their Affiliates to, as the case may be, take all necessary actions and, if necessary, promptly commence appropriate proceedings before the Bankruptcy Court in order to effect the assumption of any Assigned Contract by Sellers, if applicable, and the assignment of such Contract to Buyer or its designated Affiliate at the Closing pursuant to the Sale Motion.

(c)      (i)      Any motion, application or other court document filed with, and the proposed orders submitted to, the Bankruptcy Court seeking authorization to assume and assign or reject or terminate any Contracts shall be provided to Buyer in advance of filing (with a reasonable opportunity to review and comment on same) and be in form and substance satisfactory to Buyer in its reasonable discretion.

(ii)      Sellers shall use their commercially reasonable efforts to make available to Buyer as promptly as practicable after the date hereof (or, in the case of Contracts entered into after the date hereof, as promptly thereafter as practicable) true and complete copies of each of the Contracts and of each of the Contracts listed, or required to be listed, in <u>Schedule 1.1(d)</u>, <u>Schedule 1.1(b)</u>, <u>Schedule 1.2(c)</u> or <u>Schedule 1.2(p)</u>, and true and complete summaries of the terms of any such oral Contracts; it being understood that, in any event, such copies and summaries shall be made available in respect of the Contracts listed on the list delivered pursuant to the first sentence of <u>Section 1.5(a)</u> no later than 35 days prior to the Sale Hearing.

10

(iii)     With respect to each Assigned Contract, Buyer agrees to cooperate with Sellers in connection with furnishing information pertaining to the satisfaction of the requirement of adequate assurances of future performance as required under Section 365(f)(2)(B) of the Bankruptcy Code.

(d)     On or before the Closing, with respect to Cure Costs for Assigned Contracts that have been finally determined by the Bankruptcy Court (any such Cure Cost, a "Determined Cure Cost") at or prior to the Closing Date, (i) Buyer shall, or shall cause one or more of its designated Affiliates to, pay all Determined Cure Costs.  With respect to each Assigned Contract for which the Cure Cost is not a Determined Cure Cost prior to the Closing Date (each, a "Disputed Contract"), Buyer may, prior to the Closing, by written notice to Sellers, elect to (x) require Sellers, in consultation with Buyer, to use commercially reasonable efforts to cause such Cure Costs for any Disputed Contract to be finally determined after the Closing Date (whether by Order of the Bankruptcy Court or agreement among Buyer, Sellers and the applicable counterparty thereto), or (y) require such Disputed Contract to be removed from the Assigned Contracts List, in which case Schedule 1.1(d), Schedule 1.1(b), Schedule 1.2(c) or Schedule 1.2(p), as applicable, shall be amended accordingly.  If Buyer elects the option described in clause (x) above, (i) at any time after the Closing, Buyer may instruct Sellers to remove any Disputed Contract from the list of Assigned Contracts (and the Assigned Contracts List and the applicable Schedules shall be amended accordingly) and (ii) with respect to any particular Disputed Contract, if Buyer does not so instruct Sellers on or prior to the fifth Business Day after the determination of the Cure Costs for such Disputed Contract, the Cure Costs for such Disputed Contract shall be an Assumed Liability.  In the event that an amendment required to be effectuated pursuant to this Section 1.5 has not been promptly executed and delivered, Sellers are authorized to deliver such amendment without further approval from the Bankruptcy Court and such amendment shall be deemed effected in accordance with this Agreement.  With respect to any Disputed Contract not assigned at the Closing, Sellers, to the maximum extent permitted by applicable Law and the Disputed Contract, shall act as Buyer's agent in order to obtain for Buyer the benefits thereunder and shall cooperate, to the maximum extent permitted by applicable law and the Disputed Contract, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer (including, without limitation, by entering into an equivalent arrangement enforcing at Buyer's request, or allowing Buyer to enforce, any rights of Sellers under such instrument or other Acquired Asset); provided, however, that after Closing, Buyer shall be responsible for all payment and other obligations under, and for all costs of obtaining such rights under such Disputed Contract.

## ARTICLE 2

## PURCHASE PRICE

SECTION 2.1     Purchase Price.

(a)     The aggregate consideration and purchase price (the "Purchase Price") for the sale, transfer, assignment and conveyance of the Acquired Assets will be (a) the Estimated Aggregate Cash Consideration, subject to adjustment in accordance with Section 2.3 (the "Aggregate Cash Consideration"), and (b) the assumption by Buyer (or its designated Affiliate or Affiliates) of the Assumed Liabilities.

11

(b)     At the Closing, Buyer (or its designated Affiliate or Affiliates) shall pay to Sellers in accordance with Section 2.1(c), an amount in cash equal to (i) the Estimated Aggregate Cash Consideration, *less* (ii) the Escrow Amount, *less* (iii) the Deposit Amount (excluding any interest earned thereon) *less* (iv) the COBRA Escrow Amount, if any (collectively, the "Closing Date Payment").

(c)     The Closing Date Payment shall be paid by Buyer to Sellers in accordance with the Sellers' Representative's written instructions, which shall be delivered in writing to Buyer no less than two (2) Business Days prior to the Closing Date.

SECTION 2.2     Deposit.

Prior to the close of business on December 3, 2009, Buyer shall pay an earnest money deposit (the "Deposit") in the amount of $3,000,000.00 (the "Deposit Amount") to U.S. Bank, National Association (the "Escrow Agent"), pursuant to an escrow agreement in the form attached as Exhibit A hereto to be entered into on December 3, 2009 by and among Sellers, Buyer and the Escrow Agent (the "Escrow Agreement").  If this Agreement shall be validly terminated by the applicable party pursuant to Section 8.1 (other than Section 8.1(e)), then the Escrow Agent shall return the Deposit (together with any interest earned thereon) to Buyer.  If this Agreement shall be validly terminated by Sellers pursuant to, and in accordance with, Section 8.1(e) hereof, then the Escrow Agent shall deliver $1,750,000.00 from the Deposit Amount to Sellers (the "Buyer Termination Fee") in accordance with Sellers' Representative's written instructions, and the Escrow Agent shall deliver the remainder of the Deposit and any interest earned on the Deposit to the Buyer.  If this Agreement is not earlier terminated, the Deposit (excluding any interest thereon which shall be returned to Buyer in accordance with the Escrow Agreement) shall be paid to Sellers by the Escrow Agent on the Closing Date, and Buyer shall not be required to include such amount in the Closing Date Payment in accordance with Section 2.1(b) above.

SECTION 2.3     Purchase Price Adjustment.

(a)     Within ten (10) Business Days prior to the Closing Date, and in no event less than five (5) Business Days before the Closing Date, Sellers shall prepare (in consultation and cooperation with Buyer) and deliver to Buyer a certificate signed by the chief executive officer and chief financial officer of GHI (the "Closing Date Calculation Certificate") setting forth Sellers' best estimate, based on the standards of preparation of the Adjustment Balance Sheet set forth in Section 2.3(b), of the Adjusted Net Working Capital (the "Estimated Adjusted Net Working Capital"), together with a worksheet showing in reasonable detail the components of such estimate.  The Benchmark Adjusted Net Working Capital shall have the meaning set forth in Schedule 2.3(a).  The "Estimated Aggregate Cash Consideration" shall mean (i) $55,000,000.00 minus (ii) the lesser of (A) the Maximum Estimated Reduction Amount and (B) the excess, if any, of the Benchmark Adjusted Net Working Capital over the Estimated Adjusted Net Working Capital minus (iii) the COBRA Reduction, if any.  Sellers shall, concurrently with their delivery of the Closing Date Calculation Certificate, provide Buyer with copies of all materials used by Sellers and their representatives in the determination of the Estimated Adjusted Net Working Capital, and shall promptly provide Buyer with such other financial information requested by Buyer.  In the event that Buyer notifies Sellers, prior to the Closing, that it disputes

12

the amount of the Estimated Adjusted Net Working Capital (such notice being referred to as an "Objection Notice"), Buyer and Sellers shall cooperate in good faith to resolve any such dispute as promptly as practicable.  If, prior to the Closing, Buyer and Sellers agree in writing to any changes to the Estimated Adjusted Net Working Capital, then the Estimated Adjusted Net Working Capital, as the case may be, shall be modified as so agreed.  If as of 12:00 noon Minneapolis time on the Business Day prior to the Closing Date, Buyer and Sellers have not agreed in writing to the amount of the Estimated Adjusted Net Working Capital, then, prior to the Closing, Buyer may deliver to Sellers its good faith estimate of the Estimated Adjusted Net Working Capital (the "Buyer Estimated Adjusted Net Working Capital").

(b)    On or before the date that is sixty (60) calendar days following the Closing Date, Buyer shall cause to be prepared and delivered to the Sellers' Representative and Buyer (i) an unaudited balance sheet of the Acquired Business as of 11:59 p.m. on the Closing Date (the "Adjustment Balance Sheet") and (ii) a calculation of the Adjusted Net Working Capital, based on the Adjustment Balance Sheet and the definition of Adjusted Net Working Capital.  Buyer and Sellers have prepared and agreed upon a pro forma Adjustment Balance Sheet using financial information as of October 25, 2009 and agree that the Estimated Adjusted Net Working Capital and the Adjustment Balance Sheet shall be prepared in accordance with GAAP in a manner consistent with the preparation of such pro forma Adjustment Balance Sheet as of October 25, 2009 (provided that, to the extent such pro forma Adjustment Balance Sheet as of October 25, 2009 was not prepared consistently with GAAP, the Adjustment Balance Sheet shall be prepared in accordance with GAAP, and not in accordance with such pro forma Adjustment Balance Sheet as of October 25, 2009); provided, however, that (i) the liabilities described in clauses (i)-(iii) of Section 1.3(c) shall be reflected on the Adjustment Balance Sheet without regard to the effects of the Bankruptcy Case on such liabilities, (ii) Acquired Assets shall not be considered to be current assets solely based on their being held for sale, (iii) the Adjustment Balance Sheet shall not give effect to the impact of any purchase accounting, and (iv) the Adjustment Balance Sheet shall (except to the extent there is any conflict with clauses (i)-(iii) of this proviso, which clause (i)-(iii) shall control) be prepared in accordance with the accounting practices, principles and methodologies set forth on Schedule 2.3(b), including with respect to the accounts and the adjustments set forth on such Schedule.

(c)    Sellers shall cooperate with Buyer in connection with Buyer's preparation of the Adjustment Balance Sheet and calculation of Adjusted Net Working Capital.  Without limiting the foregoing, Sellers shall (i) provide, and shall cause any officers or directors of Sellers to provide, customary representation letters and other customary documents and instruments and (ii) provide Buyer and its accountants with access to books and records for periods on or prior to the Closing Date and personnel of Sellers and their respective subsidiaries, in each case as reasonably requested by Buyer or its accountants in connection therewith.

(d)    Upon delivery of the Adjustment Balance Sheet, Buyer shall cause the Sellers' Representative (and its representatives) to be provided with access to the books and records of Buyer and its subsidiaries to the extent related to its preparation of the Adjustment Balance Sheet or the calculation of the Adjusted Net Working Capital.  The Sellers' Representative may dispute the calculation of the Adjusted Net Working Capital, or any element of the Adjustment Balance Sheet relevant to the calculation of the Adjusted Net Working Capital, by notifying Buyer of such disagreement in writing, setting forth in reasonable detail the

13

particulars of such disagreement, within thirty (30) days after its receipt of the Adjustment Balance Sheet; provided that the basis of any such dispute shall be limited to the failure of the Adjusted Net Working Capital to have been determined in accordance with the standards set forth in Section 2.3(b) and the definition of Adjusted Net Working Capital.  In the event that the Sellers' Representative does not provide such a notice of disagreement with respect to the Adjustment Balance Sheet within such thirty (30)-day period, the Sellers' Representative shall be deemed to have accepted the accuracy of the Adjustment Balance Sheet and the calculation of the Adjusted Net Working Capital, which shall then be final, binding and conclusive for all purposes hereunder and on all Parties hereto.  In the event any such notice of disagreement is timely provided by the Sellers' Representative, Buyer and the Sellers' Representative shall use their commercially reasonable efforts for a period of thirty (30) days (or such longer period as they may mutually agree) to resolve any disagreements with respect to calculation of the Adjusted Net Working Capital.  If Buyer and the Sellers' Representative are unable to resolve such disagreements then, at any time thereafter, either the Sellers' Representative or the Buyer may require that, with respect to the Adjusted Net Working Capital, Deloitte LLP (or such other independent accounting firm of recognized national standing as may be mutually selected by Buyer and the Sellers' Representative) (the "Auditor") shall resolve any remaining disagreements.  The Auditor shall determine as promptly as practicable whether the Adjustment Balance Sheet was prepared in accordance with the standards set forth in Section 2.3(b), and (only with respect to the remaining disagreements submitted to the Auditor) whether and to what extent (if any) the Adjusted Net Working Capital requires adjustment.  The fees and expenses of the Auditor incurred will be equitably apportioned by such Auditor based on the extent to which Buyer, on the one hand, or the Sellers' Representative, on the other hand, is determined by the Auditor to be the prevailing party in the resolution of each such disputed matter. Any fees and expenses determined by the Auditor to be owed by the Sellers in accordance with the foregoing shall be paid out of the Escrow Funds.  The determination of the Auditor shall be final, conclusive and binding on the Parties.  The first date on which the Adjusted Net Working Capital has been finally determined in accordance with this Section 2.3(d) is hereinafter referred as to the "Determination Date."

        (e)     The "Price Adjustment Amount" shall be an amount equal to (A) the lesser of (1) the Maximum Reduction Amount, and (2) (x) if the Adjusted Net Working Capital as finally determined in accordance with Section 2.3(d) (the "Final Adjusted Net Working Capital") equals or exceeds the Benchmark Adjusted Net Working Capital, zero and (y) if the Benchmark Adjusted Net Working Capital exceeds the Final Adjusted Net Working Capital, the amount of such excess minus (B) the lesser of (1) the Maximum Estimated Reduction Amount, and (2) (x) if Estimated Adjusted Net Working Capital equals or exceeds the Benchmark Adjusted Net Working Capital, zero and (y) if the Benchmark Adjusted Net Working Capital exceeds the Estimated Adjusted Net Working Capital, the amount of such excess.  If the Price Adjustment Amount is a negative number (the absolute value of such amount, the "Increase Amount") then, within five (5) Business Days after the Determination Date, (i) the Escrow Agent shall pay out of the Escrow Funds to the Sellers' Representative, for the account of Sellers, an amount in cash equal to the amount of the Escrow Funds, and (ii) Buyer shall, or shall cause its designated Affiliate or Affiliates to, pay to the Sellers' Representative, for the account of Sellers, an amount in cash equal to the Increase Amount (plus interest accrued thereon from the Closing Date to the date of payment calculated at the Applicable Rate. If the Price Adjustment Amount is a positive number (such amount, the "Deficit Amount"), then within five (5) Business

14

Days after the Determination Date, the Escrow Agent shall pay out of the Escrow Funds (x) to Buyer, an amount in cash equal to the lesser of (1) the Deficit Amount (plus interest accrued thereon from the Closing Date to the date of payment calculated at the Applicable Rate) and (2) the amount of the Escrow Funds, and (y) to the Sellers' Representative, for the account of Sellers, an amount in cash equal to the amount of the Escrow Funds, if any, remaining after disbursement to Buyer of funds pursuant to clause (x) above.  If the Price Adjustment Amount is zero the Escrow Agent shall pay out of the Escrow Funds to the Sellers' Representative, for the account of Sellers, an amount in cash equal to the amount of the Escrow Funds.

(f)     Upon determination of the Price Adjustment Amount in accordance with this Section 2.3, the Sellers' Representative and Buyer shall each execute joint instructions to the Escrow Agent instructing the Escrow Agent to disburse the Escrow Funds in accordance with this Section 2.3.  The Aggregate Cash Consideration shall be deemed to be decreased by the amount of payments (excluding interest) required to be made to Buyer by Sellers (by the Escrow Agent out of the Escrow Funds) pursuant to this Section 2.3 and shall be deemed to be increased by the amount of payments (excluding interest) required to be made by Buyer to the Sellers' Representative, for the account of Sellers, pursuant to this Section 2.3.

ARTICLE 3

CLOSING AND DELIVERIES

SECTION 3.1     Closing.

Upon the terms and subject to the conditions hereof, the consummation of the transactions contemplated hereby (the "Closing") shall take place at the offices of Fredrikson & Byron, P.A., 200 South Sixth Street, Suite 4000, Minneapolis, Minnesota 55402 at 10:00 a.m., Minneapolis time, no later than the fifth Business Day following the satisfaction or waiver by the appropriate party of all the conditions contained in Article 7 (other than those conditions which are to be satisfied on the Closing Date) or on such other date or at such other place and time as may be mutually agreed to by the parties (the "Closing Date").  All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered in accordance with this Agreement.  Subject to the satisfaction or waiver of the conditions set forth in Article 7, the parties shall use their commercially reasonable efforts to consummate the transactions contemplated hereby within eight (8) calendar days after the Bankruptcy Court enters the Sale Approval Order approving the sale to Buyer.

SECTION 3.2     Sellers' Deliveries.

At or prior to the Closing, Sellers shall deliver to the Buyer:

(a)     the Bill of Sale and Assumption and Assignment Agreement and each other Ancillary Agreement to which any Seller is a party, duly executed by such Sellers;

(b)     instruments of assignment of all of the Acquired Intellectual Property (the "IP Assignments"), duly executed by Sellers, in form for recordation with the appropriate

15

Government Authority, substantially in the form of <u>Exhibit B</u> hereto, and any other assignments or instruments with respect to the Acquired Intellectual Property for which an assignment or instrument is required to assign, transfer or convey such assets to Buyer or its designated Affiliate or Affiliates;

        (c)      evidence of receipt of Consents identified on <u>Schedule 7.2(f)</u> to the extent such consents are not provided for or satisfied by the Sale Approval Order;

        (d)      a certified copy of the Sale Approval Order;

        (e)      the officer's certificate required to be delivered pursuant to <u>Section 7.2(a)</u>, <u>(b)</u> and <u>(g)</u>;

        (f)      a real estate License Agreement substantially in the form of <u>Exhibit D</u> attached hereto (the "<u>Little Falls License Agreement</u>"), duly executed by Genmar Minnesota;

        (g)      all instruments and documents necessary to release any and all Liens (other than Permitted Liens of which the Sale Approval Order does not provide for the Acquired Assets to be sold free and clear), Claims and Encumbrances (other than Permitted Liens of which the Sale Approval Order does not provide for the Acquired Assets to be sold free and clear);

        (h)      a properly executed statement in accordance with the requirements of Treasury Regulation Section 1.897-2(h)(2) and in a form reasonably acceptable to Buyer for purposes of satisfying Sellers' obligations under Treasury Regulation Section 1.1445-2(c)(3);

        (i)      a Transition Services Agreement substantially in the form of <u>Exhibit J</u> attached hereto (the "<u>Transition Services Agreement</u>"), executed by Jacobs Management Corporation;

        (j)      a license agreement substantially in the form of <u>Exhibit K</u> (the "<u>VEC License</u>"), duly executed by VEC Technology, L.L.C., a Delaware limited liability company, and VEC Industries, L.L.C., a Delaware limited liability company;

        (k)      with respect to each parcel of Real Property, (i) a statutory form of generally warranty deed, properly executed in proper form for recording so as to convey the title required by this Agreement, and (ii) to the extent they are then in Sellers' possession and not posted at the Real Property, certificates, licenses, permits, authorizations and approvals issued for or with respect to the Real Property by Governmental Authorities having jurisdiction; and

        (l)      such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer or its designated Affiliate or Affiliates all the right, title and interest of Sellers in, to or under any or all the Acquired Assets.

SECTION 3.3    <u>Buyer's Deliveries</u>.

At the Closing, Buyer shall (or shall cause its designated Affiliate or Affiliates to) deliver (x) to the Escrow Agent the Escrow Amount to be held in escrow in accordance with the Escrow

16

Agreement, (y) to the Escrow Agent, or such other escrow agent mutually designated by Buyer and Sellers' Representative, the COBRA Escrow Amount, if any, and (z) to Sellers' Representative, for the account of Sellers, (i) the Closing Date Payment, and (ii) all of the following:

(a)    the Assumption and Assignment Agreement, the Assumption and Assignment of Leases, the VEC License, the Transition Services Agreement, the Little Falls License Agreement and each other Ancillary Agreement to which Buyer or any of its designated Affiliates is a party, duly executed by Buyer or each such designated Affiliate, as applicable;

(b)    the certificates required to be delivered by Section 7.1(a) and (b); and

(c)    such other assignments and other good and sufficient instruments of assumption and transfer, in form reasonably satisfactory to Sellers, as Sellers may reasonably request to transfer and assign the Assumed Liabilities to Buyer.

ARTICLE 4

REPRESENTATIONS AND WARRANTIES

SECTION 4.1    Representations and Warranties of Sellers.

Each Seller, jointly and severally, hereby represents to Buyer as set forth in this Article 4.

(a)    Organization.  Each Seller is duly organized, validly existing and in good standing under the laws of the State of Delaware, except Wood, which is duly organized, validly existing and in good standing under the laws of the State of Arkansas. Subject to the applicable provisions of bankruptcy law, each Seller has all requisite corporate or limited liability company (or other) power and authority to own, operate or lease its properties and assets and to conduct its businesses as now conducted.

(b)    Qualification to Conduct Business.  Each Seller is duly qualified or licensed to do business and is in good standing in every jurisdiction in which the character of the properties owned or leased by it or the nature of the businesses conducted by it makes such qualification or license necessary except where the failure to be so qualified or licensed would not, individually or in the aggregate, result in a Material Adverse Effect.

(c)    Authorization and Validity.  Each Seller has all requisite corporate or limited liability company power and authority to enter into this Agreement and any Ancillary Agreements to which each such Seller is or will become a party and, subject to the Bankruptcy Court's entry of the Orders, the execution and delivery of this Agreement and each Ancillary Agreement to which each such Seller is or will become a party, the performance of each such Seller's obligations hereunder and thereunder and the consummation of transactions contemplated hereby and thereby, have been, or, in the case of the Ancillary Agreements to be executed at the Closing, on the Closing Date will be, duly authorized by all necessary corporate or limited liability company action of each such Seller, and no other corporate or limited liability company proceedings on the part of any Seller are necessary to authorize such execution, delivery and performance.  This Agreement and each Ancillary Agreement to which each Seller

17

is or will become a party have been, or, in the case of the Ancillary Agreements to be executed at the Closing, on the Closing Date will be, duly executed by each such Seller, and, subject to the Bankruptcy Court's entry of the Orders, constitute, or in the case of the Ancillary Agreements to be executed at the Closing, will when executed and delivered constitute, each such Seller's valid and binding obligation, enforceable against each such Seller in accordance with their respective terms. The boards of directors or boards of managers (as applicable) of each Seller has resolved to request that the Bankruptcy Court approve this Agreement and each Ancillary Agreement and the transactions contemplated hereby and thereby.

(d)     No Conflict or Violation. Subject to the (i) receipt of all Consents and (ii) the Bankruptcy Court's entry of the Orders, the execution, delivery and performance by each Seller of this Agreement and each Ancillary Agreement to which any of them is or will become a party and the consummation of transactions contemplated hereby and thereby does not and will not (A) violate or conflict with any provision of the organizational documents (i.e., certificate of incorporation, certificate of formation, by-laws or operating agreement) of any Seller, (B) violate any provision of law, or any order, judgment or decree of any Government Authority applicable to any Seller or any of the Acquired Assets, (C) result in or require the creation or imposition of any Liens (other than Permitted Liens), Claims and Encumbrances (other than Permitted Liens) on any of the Acquired Assets or any of the assets or properties used or held for use in the conduct of the Acquired Business or (D) violate or result in a breach of or constitute (with or without notice or lapse of time or both) a default under, or result in or give to others any rights of termination, amendment, acceleration or cancellation of, any material Acquired Contract entered into by any Seller or by which any Seller is bound or to which the assets of Sellers are subject.

(e)     Consents and Approvals. Schedule 4.1(e) sets forth a true and complete list of each material consent, waiver, authorization or approval of any Person and each material declaration or notification to, order or permit of or filing or registration with any Government Authority that is required to be obtained by Sellers in connection with the execution and delivery by Sellers of this Agreement and their respective Ancillary Agreements, the performance by them of their obligations hereunder or thereunder or the consummation of transactions contemplated hereby and thereby, including, without limitation, any and all material consents and approvals that are required to be obtained, or rights of first refusal, first offer or other similar preferential rights to purchase that are required to be complied with, in connection with the assignment or transfer of any Acquired Assets to Buyer in accordance with the terms of this Agreement (collectively, the "Consents").

(f)     Litigation. Except as set forth on Schedule 4.1(f), (i) there are no Claims, actions, suits, proceedings, orders or investigations ("Actions") with respect to the Acquired Business involving any Seller or any of the Acquired Assets pending or, to the Knowledge of Sellers, threatened before any Government Authority, other than such Actions where the only relief sought is monetary damages and the amount in controversy does not exceed $50,000 in any one Action or $200,000 in the aggregate, (ii) no Seller nor any of the Acquired Assets are subject to any order entered by or with any Government Authority, nor has any Seller received notice of an intention to issue any such order, and (iii) to the Knowledge of Sellers, no Seller is, or during the two (2) years prior to the execution of this Agreement has been, the subject of any pending or threatened investigation by any Government Authority.

18

(g)    Title to Acquired Assets; Sufficiency and Condition of Acquired Assets.

(i)    Sellers have good and valid title to, or, in the case of property leased or licensed by Sellers, a valid and subsisting leasehold interest in or a legal, valid and enforceable licensed interest in or right to use, all of the Acquired Assets free and clear of all Liens (other than Permitted Liens of which the Sale Approval Order does not provide for the Acquired Assets to be sold free and clear), Claims and Encumbrances (other than Permitted Liens of which the Sale Approval Order does not provide for the Acquired Assets to be sold free and clear).  On the Closing Date, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 3.2, and subject to the terms of the Sale Approval Order, Sellers will thereby transfer to Buyer all of Sellers' right, title and interest in and to all of the Acquired Assets, free and clear of all Liens (other than Permitted Liens of which the Sale Approval Order does not provide for the Acquired Assets to be sold free and clear), Claims and Encumbrances (other than Permitted Liens of which the Sale Approval Order does not provide for the Acquired Assets to be sold free and clear), except for the Assumed Liabilities.

(ii)    The Sellers' right, title and interest in, to and under the Acquired Assets, together with the benefit that will be provided to Buyer and its designated Affiliates pursuant to this Agreement and the Ancillary Agreements, constitute in all material respects all assets necessary for Buyer and its designated Affiliates to operate the Acquired Business in the manner in which it is currently conducted and in which it has been conducted by them since December 31, 2008, provided, however, Buyer acknowledges that the level and volume of such assets, including without limitation, with respect to working capital, inventory, raw materials, finished goods, work in process, component parts, packaging materials and supplies, has fluctuated during such period in accordance with the fluctuation of working capital as reflected in the applicable general ledgers of the Acquired Business.  Except as set forth on Schedule 4.1(g)(ii), to the Knowledge of Sellers, the machinery, equipment, furniture, fixtures and improvements, tooling and spare parts, and other tangible personal property, included in the Acquired Assets are in all material respects in good repair and operating condition (subject to normal wear and tear).

(h)    Intellectual Property.

(i)    Except as set forth on Schedule 4.1(h)(i)(a), Sellers own all right, title and interest in and to, or have valid and enforceable licenses to use, all the Intellectual Property owned, used, issued to or held by them in connection with the conduct and operation of the Acquired Business as now conducted, including all Intellectual Property set forth in Schedule 1.1(g).  Such Schedule accurately lists patents, patent applications, trademark registrations, trademark applications, copyright registrations, copyright applications, and vessel hull design registration and applications included in the Acquired Intellectual Property (including, without limitation, domain names held in the name of a Seller) owned by any Seller (it being understood that, as of the date hereof (but not as of the Closing), the Transferred Internet Domain Names are not owned by any Seller) and any separately identifiable proprietary software owned by Sellers, and the current owner of such Acquired Intellectual Property.  Except as set forth on Schedule 4.1(h)(i)(b), no renewal and maintenance fees, annuities or other similar fees due and payable in respect of the registered Acquired Intellectual Property owned by any Seller required by this Section 4.1(h)(i) to be listed on Schedule 1.1(g) are overdue.  Except as set forth on Schedule 4.1(h)(i)(c), to the Knowledge of Sellers, no present or former employee, officer, director or other

19

Affiliate of any Seller, or agent or outside contractor including Jacobs Management Corporation or any division or Affiliate thereof ("Jacobs") of any Seller, holds any right, title or interest, directly or indirectly, in whole or in part, in or to any Acquired Intellectual Property.

(ii)     Except as set forth on Schedule 4.1(h)(ii)(a), Sellers are in compliance in all material respects with all contractual obligations relating to the Acquired Intellectual Property.  To the Knowledge of Sellers, except as set forth on Schedule 4.1(h)(ii)(b), there is no unauthorized use, disclosure, infringement or misappropriation of any Acquired Intellectual Property owned by any Seller by any third party, including by any employee or former employee of any of Sellers.  To the Knowledge of Sellers, except as set forth on Schedule 4.1(h)(ii)(c), neither the operation of the Acquired Business, the Acquired Intellectual Property owned by any Seller nor the use, manufacture, marketing, sale or the intended use of any product or service as currently utilized, manufactured, marketed or sold by any Seller (including, without limitation, the transmission, reproduction, use, display or modification (including framing and linking of web site content) of any websites operated by any Seller) (a) violates or conflicts with any license or other agreement between Sellers, on the one hand, and any other Person, on the other hand, or (b) infringes, misappropriates or otherwise violates any proprietary right of any other Person, including the rights of privacy or publicity of any Person.  Except as set forth on Schedule 4.1(h)(ii)(d), there is no pending or, to the Knowledge of Sellers, threatened, claim or litigation contesting the validity, enforceability or ownership of the Acquired Intellectual Property owned by any Seller or the right of any Seller to exercise any rights in the Acquired Intellectual Property, nor, to the Knowledge of Sellers, is there any legitimate basis for any such claim.  Except as set forth on Schedule 4.1(h)(ii)(e), no Seller has received any written notice asserting that the operation of the Acquired Business, any Acquired Intellectual Property, or the proposed use, sale, license or disposition thereof, infringes, misappropriates or otherwise violates or will infringe, misappropriates or otherwise violate the rights of any other Person.

(iii)     Schedule 4.1(h)(iii) sets forth a complete list of (a) all material licenses, sublicenses and other agreements pursuant to which any Seller has granted to any Person the right to use any of the Acquired Intellectual Property owned by any Seller; and (b) all consents, indemnifications, forbearances to sue, settlement agreements and material licensing or material cross-licensing arrangements to which any Seller is a party relating to the Acquired Intellectual Property owned by any Seller or the Intellectual Property or other proprietary rights of any third party.

(i)     Information Technology.  Schedule 4.1(i) includes a true and complete list of all material Contracts to which any Seller is a party relating to the current use of hardware, software, databases, computer equipment and other information technology, owned, leased or licensed by any Seller (collectively, the "Information Technology").  Schedule 4.1(i) also lists the information technology services currently being provided to one or more Sellers by Jacobs.

(j)     Permits.  Schedule 4.1(j) sets forth a true and complete list of all material Permits, and all pending applications therefor held by Sellers.  Except as set forth on Schedule 4.1(j), each such Permit has been duly obtained, is valid and in full force and effect, and is not subject to any pending or, to the Knowledge of Sellers, threatened administrative or judicial proceeding to revoke, cancel, suspend or declare such Permit invalid in any respect.

(k)    Environmental Matters.  Sellers have provided or made available to Buyer true and complete copies of all information in the possession, custody or control of Sellers relating to the presence, release or migration of Hazardous Materials on, in or under the Real Property or the Leased Property, including true and correct copies of all environmental assessment reports (such as Phase I or Phase II reports) and any other environmental studies, and the compliance with, and potential liability under, Environmental Laws applicable to the Acquired Business or the Acquired Assets.  Except as set forth on Schedule 4.1(k) and except as would not be material, with respect to the Acquired Business (i) each Seller and each of the Acquired Assets is and at all times during the past five (5) years has been in compliance with, and has no known liability under, any and all applicable Environmental Laws, (ii) each Seller and each of the Acquired Assets is in material compliance with all of their licenses and Permits issued under applicable Environmental Laws, (iii) all instances of material past non-compliance by any Seller or any Acquired Asset with applicable Environmental Laws have been cured, settled and resolved in all material respects, (iv) there are no orders relating to Environmental Laws issued by any Governmental Authority to which any Seller is a party or to which any Acquired Asset is subject, that are outstanding, (v) there are no actions, suits, claims, charges, prosecutions, proceedings or investigations to which any Seller is a party, or to which any of the Acquired Assets are subject, that are pending or, to the Knowledge of Sellers, threatened relating to the compliance of any Seller or Acquired Asset with, or the liability of any Seller under, any Environmental Laws, including without limitation any liability relating to alleged injury to Persons or damage to property associated with exposure to Hazardous Materials, and (vii) no Seller is party to any Contract pursuant to which it is obligated to indemnify any other person with respect to, or be responsible for any liability pursuant to, or violation of, any Environmental Law.  To the Knowledge of Sellers, there are no circumstances which exist which could reasonably be expected to result in any such writs, injunctions, decrees, orders (including court and administrative orders), judgments, charges, prosecutions, actions, suits, claims, proceedings or investigations (pursuant to Environmental Laws), except as set forth on Schedule 4.1(k).  Except as set forth on Schedule 4.1(k), there are no material fines or penalties that have been imposed (pursuant to Environmental Laws) against any Seller, or to which any Acquired Asset is subject, and all such fines, penalties, judgments, and charges have been paid in full.

(l)    Insurance.  Schedule 4.1(l) sets forth a correct and complete list of all current insurance policies covering the Acquired Business or the Acquired Assets.  Except as set forth on Schedule 4.1(l), all premiums required to be paid under each insurance policy required to be set forth on Schedule 4.1(l) have been paid when due, and all such policies are in full force and effect.

(m)    Real Property.  Schedule 1.1(a) sets forth a true, correct and complete list of all real property owned by Sellers that is used or held for use in connection with the conduct of the Acquired Business.  Schedule 4.1(m)(i) sets forth a true, correct and complete list of all Contracts and instruments (the "Real Property Leases") by which Seller is entitled to the use and/or possession of the real property not owned by Sellers that is used or held for use in connection with the Acquired Business.  True, complete and accurate copies of each Real Property Lease have been delivered or made available to Buyer.  Each of the Real Property Leases is in full force and effect.  No Seller has assigned its interest under any Real Property Lease to which it is a party, or subleased, licensed, encumbered or pledged all or any portion of its leasehold interest in any Real Property Lease, to any third party.  No option has been

21

exercised under any Real Property Lease, except options whose exercise has been evidenced by a written document delivered to Buyer. Except as set forth on Schedule 4.1(m)(ii), no Seller is in default under any Real Property Lease and, to the Knowledge of Seller, no controversy, claim, dispute or disagreement exists between the parties to any Real Property Lease and, to the Knowledge of Seller, no event has occurred which with the passage of time or giving of notice, or both, would constitute a default thereunder. All brokerage commissions and other similar compensation and fees payable in connection with the Real Property Leases have been paid in full and no additional brokerage commissions or other similar compensation and fees may be due in the future. There are no guarantees (from any Seller or from any other Person) in favor of the lessors under any of the Real Property Leases.

(n)    Brokerage and Finder's Fees.  No Seller, and none of Sellers' Affiliates or any of the officers or directors of any Seller or any Affiliate of any Seller, has any liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the transactions contemplated by this Agreement, with the exception of Houlihan, Lokey, Howard & Zukin.

(o)    Limitation of Liability.  Sellers shall not be liable in contract or in tort for any special, incidental, liquidated, punitive or consequential damages relating to any claim made by Buyer based upon, or arising from, this Agreement. Buyer acknowledges and agrees that any consequences arising from Sellers' filing of the Bankruptcy Case in accordance with this Agreement shall not be deemed a breach of any of the representations or warranties set forth in this Agreement.

(p)    Financial Statements.  Attached as Schedule 4.1(p) are true and complete copies of (i) the audited consolidated balance sheet of GHI and its Subsidiaries as of June 30, 2007 and the related audited statements of operations, cash flows and changes in stockholder's equity for the twelve-month period then ended, together with the notes thereto and the report of GHI's independent auditors thereon (collectively, the "Audited Financial Statements") and (ii) the unaudited, consolidated balance sheet of GHI and its Subsidiaries as of September 26, 2009 (the "Interim Balance Sheet"), June 30, 2009 and June 30, 2008, and the related unaudited consolidated statements of operations, cash flows and changes in stockholders' equity of GHI and its consolidated Subsidiaries for the twelve-month periods (or, in the case of the September 26, 2009 financial statements, the three-month period) then ended. Except as set forth in the notes thereto or as disclosed in Schedule 4.1(p), all such financial statements (including the footnotes thereto) were prepared in accordance with GAAP, applied on a consistent basis for the periods involved and fairly present in all material respects the consolidated financial condition, results of operations, cash flows and changes in stockholder's equity of GHI and its Subsidiaries as of the respective dates thereof and for the respective periods covered thereby, subject to, in the case of the financial statements as of, and for the three-month period ended, September 26, 2009, the absence of footnotes.

(q)    Absence of Certain Changes or Events.  Since the Petition Date, except as disclosed in Schedule 4.1(q), with respect to the Acquired Assets, the Assumed Liabilities and the Acquired Business, there has been:

(i)       (A) except for normal periodic increases in the Ordinary Course of Business, no increase in the compensation payable or to become payable by any Seller or to any of their respective employees, officers, directors or independent contractors ("Personnel"), (B) no bonus, incentive compensation, service award or other like benefit granted, made or accrued, contingently or otherwise, for or to the credit of any of their Personnel, except in the Ordinary Course of Business, (C) no welfare, pension, retirement, profit-sharing, incentive compensation or similar plan, program, payment or arrangement adopted, made or agreed to by any Seller for any of their Personnel except pursuant to the existing Employee Benefit Plans described in Schedule 4.1(q)(i), or (D) no new employment, severance or change of control agreement to which any Seller is a party, which provides for payments exceeding $50,000 per year;

(ii)       (A) no sale, assignment or transfer of any material Acquired Assets other than sales of finished goods inventory, obsolete assets or assets replaced in the Ordinary Course of Business, or (B) no sale, assignment or transfer of any Acquired Assets to any Affiliates of Sellers;

(iii)       no settlement or compromise of any Action (whether or not commenced prior to the date of this Agreement) other than settlements or compromises of Actions where the amount paid in settlement or compromise does not exceed $50,000, individually, or $200,000 in the aggregate for all such Actions and does not involve any other obligation of any Seller other than a customary release with respect to such Action;

(iv)       no change in sales practices or collections of accounts receivables, in each case other than in the Ordinary Course of Business, by any Seller; and

(v)       no agreement by any Seller to do any of the foregoing.

(r)       Material Contracts.  Schedule 4.1(r) set forth the Contracts to which any Seller is a party with respect to the Acquired Business or by which any of them or their assets may be bound in connection with the Acquired Business (each such Contract required to be disclosed in Schedule 4.1(r), including each such Contract entered into after the date of this Agreement, a "Material Contract"):

(i)       any Contract (other than purchase orders with suppliers or customers entered into in the Ordinary Course of Business) that Sellers reasonably anticipate will involve aggregate payments by or to Sellers of more than $50,000;

(ii)       any Contract for the lease of real or personal property in which the amount of payments which the Acquired Business is required to make, or is entitled to receive, on an annual basis exceeds $50,000;

(iii)       any material distribution, franchise, license, sales, commission, consulting agency or advertising Contract which (A) involves annual payments in excess of $50,000 or (B) is not cancellable on thirty (30) calendar days' notice without payment or penalty;

(iv)       any Contract relating to or instrument evidencing, any Assumed Liabilities;

23

(v)      any Contract entered into during the last five (5) years (or under which there are continuing material obligations) relating to the sale or disposition of material assets (other than the sale of inventory or obsolete or worn-out assets or assets replaced in the Ordinary Course of Business);

(vi)     any license agreement or other Contract relating to Intellectual Property that is necessary or otherwise material to the operation of the Acquired Business;

(vii)    any joint venture Contract, partnership agreement, or limited liability company agreement or other Contract (however named) involving a sharing of profits, losses, costs, or liabilities by any Seller with any other Person;

(viii)   any Contract providing for capital expenditures after the date hereof in an amount in excess of $100,000 individually or in the aggregate;

(ix)     any written warranty, guaranty or other similar undertaking with respect to contractual performance extended by any Seller other than in the Ordinary Course of Business;

(x)      any written employment or collective bargaining agreement or Contract with any labor union or any labor organization applicable to employees, or Contract with any director, officer, employee or consultant, other than those (1) that are terminable at-will by the applicable Seller on no more than thirty (30) days' notice without liability or financial obligation or (2) that provide for payments of less than $50,000 per year;

(xi)     any Contracts entered into during the last five (5) years (or under which there are continuing material obligations) relating to the purchase or sale of any business, corporation or Person (or all or any substantial portion of the assets of any business, business unit, facility or Person) for aggregate consideration by or to Sellers of greater than $500,000;

(xii)    any Contract with "take or pay" provisions, or "requirements" provisions committing a Person to provide the quantity of goods or services required by another Person which Sellers reasonably anticipate will involve aggregate payments by or to Sellers of more than $50,000;

(xiii)   any Contract with any dealer of the Acquired Business, provided that no such Contract described in this clause (xiii) shall be required under the following paragraph to be delivered or made available to Buyer if it is in all material respects in the form of the U.S. Model Year 2010 Dealer Agreement provided to Buyer (provided, further, that such Contracts shall still be listed in Schedule 4.1(r)); and

(xiv)    any Contract with any Sales Agents with respect to sales outside the Unites States and Canada.

In addition to the Contracts described in clauses (i) – (xiv) above, the defined term "Material Contract" shall also include all unfulfilled purchase orders (or any series of related purchase orders) involving the purchase or sale of products or services by the Sellers having an aggregate value with any one supplier or customer equal to or greater than $500,000,

24

which purchase orders shall not be required to be described or listed in Schedule 4.1(r). Sellers have delivered or made available to Buyer true, correct and complete copies of all of the Material Contracts, including all amendments and supplements thereto.

(s)      Compliance with Laws. Except as set forth in Schedule 4.1(s), each Seller is, and at all times during the past five (5) years has been, in compliance in all material respects with all applicable Laws (other than Environmental Laws, which are addressed exclusively in Section 4.1(k)) related to the Acquired Business and Acquired Assets. No Seller has received any notice, charge, claim or assertion to the effect that any Seller is not in compliance in any material respect with any such Law applicable to any Seller or its operations or assets related to the Acquired Business or Acquired Assets. No Seller has, during the past five (5) years, conducted any internal investigation in connection with which any Seller retained outside legal counsel for the purpose of conducting or assisting with such investigation with respect to any actual, potential or alleged material violation of any Law by any Seller or any of its Personnel related to the Acquired Business or Acquired Assets.

(t)      Affiliate Transactions. Except as set forth in Schedule 4.1(t), no officer, director, member, stockholder or Affiliate of any Seller or any Immediate Family Member of any such Person or any entity in which any such Person owns a greater than 10% beneficial interest, is, or since June 30, 2007 has been, a party to any agreement, contract, commitment or transaction that is material to the Acquired Business or has an interest in any assets used by the Acquired Business that are material to the Acquired Business. Except as set forth in Schedule 4.1(u), no Seller, at any time since June 30, 2007, has guaranteed or assumed (or had any obligation under any previous guarantee of) any obligations of their respective officers, directors, members, stockholders or Affiliates or any of their Immediate Family Members.

(u)      Asbestos and Silica Claims. Except for operations of AMF, Inc. and its former subsidiaries, in each case, occurring prior to the ownership of AMF, Inc. by any Seller, and which operations were not in any respect related to the Acquired Business or the Acquired Assets or any assets or business owned or operated directly by any Seller, Sellers and their Affiliates have not engaged in the manufacture, marketing, sale or distribution of any product containing asbestos, silica or asbestos- or silica-containing materials (an "Applicable Product"). Schedule 4.1(u) sets forth the following facts:

(i)      (A) a list of any claim, suit, allegation or proceeding to which any Seller or (in connection with the Acquired Business) any of its Affiliates has ever been a party or of which any Seller or (in connection with the Acquired Business) any of its Affiliates have received written notice, pursuant to which any Person has alleged any loss or damages related to actual or alleged exposure by any Person to any Applicable Product manufactured, marketed, distributed or sold by any Seller or (in connection with the Acquired Business) any of their respective Affiliates (the "Applicable Claims"), and (B) a list of any Applicable Claim that has, to the Knowledge of Sellers, been threatened against any Seller (in connection with the Acquired Business) or any of its Affiliates;

(ii)      a list of any settlement or compromise or offer to settle or compromise, or judgment or verdict occurring in the three (3) year period prior to the date hereof which was adverse to any Seller or any of its Affiliates, with respect to the Applicable Claims; and

25

(iii)     the total out-of-pocket costs and expenses incurred by Sellers and their Affiliates relating to such Applicable Claims in the three (3) year period prior to the date hereof.

(v)     <u>Accounts Receivable</u>.  All accounts receivable, and other debts due or recorded in the records and books of account of the Company as being due to the Company and included in the Acquired Assets (i) represent valid obligations arising from sales actually made or services actually performed in the Ordinary Course of Business, and (ii) have been valued in accordance with GAAP.  Since December 31, 2008, the Company has not made any change in its credit policies, nor has it materially deviated therefrom.

(w)     <u>Inventory</u>.  All Inventory included in the Acquired Assets (i) to the Knowledge of Sellers, free of manufacturing defect and of good, usable and merchantable quality in all material respects, except for those items whose value has been reduced or written off on the books and records of the Acquired Business, or where Sellers have recorded on the books and records of the Acquired Business an appropriate set-off claim against the applicable vendor with respect to any defect, (ii) to the knowledge of Sellers, had a book value as reflected in the financial statements of Sellers equal to the lesser of the Company's actual cost for such item of Inventory and the fair market value for such item of Inventory, net of applicable reserves, as of the date of such financial statements and (iii) has been valued in accordance with GAAP.

(x)     <u>Employment and Employee Benefits</u>.

(i)     Each Employee Benefit Plan is in writing and Sellers have furnished Buyer with a true and complete copy of each Employee Benefit Plan (or a written summary where Employee Benefit Plan is not in writing) and a true and complete copy of each material document, if any, prepared in connection with each such Employee Benefit Plan, including, without limitation (i) any summary plan description and summary of material modifications and (ii) the most recently received Internal Revenue Service determination letter for each Employee Benefit Plan intended to qualify under ERISA or the Code.  No Seller has any express or implied commitment, whether legally enforceable or not (x) to create, incur liability with respect to, or cause to exist, any other employee benefit plan, program or arrangement, (y) to enter into any contract or agreement to provide compensation or benefits to any individual or (z) to modify, change or terminate any Employee Benefit Plan, other than with respect to a modification, change or termination required by ERISA or the Code.

(ii)     None of Employee Benefit Plans is a multi-employer plan (within the meaning of Section 3(37) or 4001(a)(3) of ERISA) or a "multiple employer plan" within the meaning of Section 413(c) of the Code for which any Seller or Buyer could incur liability under Section 4063 or 4064 of ERISA.

(iii)     None of Employee Benefit Plans provide for the payment of separation, severance, termination or similar benefits to any person or obligates either any Seller or Buyer to pay separation, severance, termination or similar-type benefits solely or partially as a result of any transaction contemplated by this Agreement or as a result of a "change in ownership or control," within the meaning of such term under Section 280G of the Code.  Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated

26

hereby, either alone or together with another event, will (i) result in any payment (including, without limitation, severance, unemployment compensation, golden parachute, forgiveness of indebtedness or otherwise) becoming due under any Employee Benefit Plan, whether or not such payment is contingent, (ii) increase any benefits otherwise payable under any Employee Benefit Plan or other arrangement, (iii) result in the acceleration of the time of payment, vesting or funding of any benefits including, but not limited to, the acceleration of the vesting and exercisability of any equity, whether or not contingent, or (iv) affect in any material respects any Employee Benefit Plan's current treatment under any Laws including any Tax or social contribution Law.

(iv)     No Employee Benefit Plan provides, or reflects or represents any liability to provide, retiree health, disability, or life insurance benefits to any person for any reason, except as may be required by COBRA or other applicable statute, and no Seller has ever represented, promised or contracted (whether in oral or written form) to any employee (either individually or to employees as a group) or any other person that such employee or other person would be provided with retiree health, disability, or life insurance benefits, except to the extent required by statute.

(v)     Each Employee Benefit Plan is currently being operated in all material respects in accordance with its terms and the requirements of all applicable Laws, regulations and rules promulgated thereunder including, without limitation, ERISA and the Code. Each Seller has performed all material obligations required to be performed by it under, is not in any respect in default under or in violation of, and has no knowledge of any default or violation by any party to, any Employee Benefit Plan.

(vi)     Each Employee Benefit Plan intended to qualify under Section 401(a) or Section 401(k) of the Code and each trust intended to qualify under Section 501(a) of the Code has received a favorable determination, opinion, notification or advisory letter from the Internal Revenue Service with respect to each such Employee Benefit Plan as to its qualified status under the Code, including all amendments to the Code effected by the Tax Reform Act of 1986 and subsequent legislation, and, to the Knowledge of Sellers, no fact or event has occurred since the date of such determination letter or letters from the Internal Revenue Service to adversely affect the qualified status of any such Employee Benefit Plan or the exempt status of any such trust.

(vii)     All contributions, premiums or payments required to be made or accrued with respect to any Employee Benefit Plan have been made on or before their due dates. All such contributions have been fully deducted for income tax purposes and no such deduction has been challenged or disallowed by any Governmental Entity and, to the Knowledge of Sellers,  no fact or event exists which could give rise to any such challenge or disallowance.  To the extent required by applicable Law, all such Employee Benefit Plans are fully funded and, to the Knowledge of Sellers,  there exists no event or condition that has or will subject Buyer to any material liability under the terms of such Employee Benefit Plans, ERISA, the Code, or any other applicable Law.

(viii)     No Business Employee is a party to any collective bargaining agreement or other labor union contract, and there are no, and have not been any, organizational campaigns, petitions or other unionization activities seeking recognition of a collective bargaining unit with respect to Business Employees.  There are no controversies, strikes, slowdowns or work

27

stoppages pending or to the best knowledge of any Seller after due inquiry, threatened between any Seller and any Business Employee, and no Seller has experienced any such controversy, strike, slowdown or work stoppage within the past three years with respect to Business Employees. Sellers have not engaged in any unfair labor practice, and there are no unfair labor practice complaints pending against Sellers before the National Labor Relations Board or any other Government Authority or any current union representation questions involving employees of Sellers.

(ix)     Schedule 4.1(x) sets forth those former employees (including their "qualified beneficiaries" within the meaning of COBRA) whose employment was associated with the Acquired Assets and who (A) are currently receiving COBRA continuation coverage from Sellers or one of their Subsidiaries or (B) are currently eligible to elect COBRA continuation coverage from Sellers or one of their Subsidiaries.

SECTION 4.2     Representations and Warranties of Buyer.

Buyer hereby represents and warrants to Sellers as follows:

(a)     Corporate Organization.  Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite limited liability company power and authority to own its properties and assets and to conduct its businesses as now conducted.

(b)     Authorization and Validity.  Buyer has all requisite limited liability company power and authority to enter into this Agreement and any Ancillary Agreement to which Buyer is or will become a party and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and any Ancillary Agreement to which Buyer is or will become a party and the performance of Buyer's obligations hereunder and thereunder have been duly authorized by all necessary action by the manager of Buyer, and no other limited liability company proceedings on the part of Buyer are necessary to authorize such execution, delivery and performance.  This Agreement and each Ancillary Agreement to which Buyer is or will become a party have been, or, in the case of those Ancillary Agreements to be executed at Closing, on the Closing Date will be, duly executed by Buyer and constitute, or will constitute, when executed and delivered, Buyer's valid and binding obligations, enforceable against it in accordance with their respective terms except as may be limited by bankruptcy or other laws affecting creditors' rights and by equitable principles.

(c)     No Conflict or Violation.  The execution, delivery and performance by Buyer of this Agreement and any Ancillary Agreement to which Buyer is or will become a party and the consummation of transactions contemplated hereby and thereby do not and will not (i) violate or conflict with any provision of the certificate of incorporation or bylaws of Buyer, (ii) violate any provision of law, or any order, judgment or decree of any court or Government Authority applicable to Buyer or (iii) violate or result in a breach of or constitute (with or without notice or lapse of time or both) a default under any Contract to which Buyer is party or by which Buyer is bound or to which any of Buyer's properties or assets is subject.

28

(d)   <u>Consents and Approvals</u>.  No consent, waiver, authorization or approval of any Person and no material declaration or notification to, order or permit of, or filing or registration with any Government Authority is required in connection with the execution and delivery by Buyer of this Agreement and each Ancillary Agreement to which Buyer is or will become a party or the performance by Buyer of its obligations hereunder or thereunder or the consummation of transactions contemplated hereby and thereby.

(e)   <u>Adequate Assurances Regarding Acquired Contracts</u>.  Buyer is (or, after the Closing, will be) capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Acquired Contracts.

(f)   <u>Brokerage and Finder's Fees</u>.  Neither Buyer, its Affiliates nor or any of their officers or directors will be responsible for any liability or obligation to pay any fees or commissions for which Sellers are or will become liable to any broker, finder or agent engaged by such parties with respect to the transactions contemplated by this Agreement.

(g)   <u>Buyer's Financing</u>.  Buyer (i) has sufficient cash to pay the Purchase Price and other amounts required by <u>Sections 2.1</u> and <u>2.2</u> and other provisions of this Agreement, or (ii) will have at Closing an amount of cash sufficient to fund the Closing Date Payment and to pay costs or expenses payable by Buyer under this Agreement.

(h)   <u>Disclaimer of Other Representations and Warranties</u>.  Except as expressly set forth in this <u>Section 4.2</u> or any document delivered in accordance with this Agreement, Buyer makes no representation or warranty, express or implied, at law or in equity, in respect of Buyer, its Affiliates, or their respective assets, liabilities or operations.  Buyer shall not be liable in contract or in tort for any special, incidental, liquidated, punitive or consequential damages relating to claim made by a Seller based upon, or arising from, this Agreement.

SECTION 4.3   <u>"AS IS" Transaction</u>.

BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN <u>SECTION 4.1</u> ABOVE, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE ACQUIRED ASSETS, INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE ACQUIRED ASSETS, THE PHYSICAL CONDITION OF ANY PERSONAL PROPERTY COMPRISING A PART OF THE ACQUIRED ASSETS OR WHICH IS THE SUBJECT OF ANY OTHER LEASE OR CONTRACT TO BE ASSUMED BY BUYER AT THE CLOSING, THE ZONING OF ANY SUCH REAL PROPERTY OR IMPROVEMENTS, THE VALUE OF THE ACQUIRED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF ACQUIRED ASSETS, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE TITLE OF THE ACQUIRED ASSETS (OR ANY PORTION THEREOF), THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE ACQUIRED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE ACQUIRED ASSETS OR ANY PORTION THEREOF. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIM

29

ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE ACQUIRED ASSETS. BUYER FURTHER ACKNOWLEDGES THAT BUYER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE ACQUIRED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ACQUIRED ASSETS AS BUYER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE ACQUIRED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN <u>SECTION 4.1</u>, BUYER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS.  ACCORDINGLY, SUBJECT TO THE TERMS AND CONDITIONS OF THIS AGREEMENT, BUYER WILL ACCEPT THE ACQUIRED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

ARTICLE 5

COVENANTS AND OTHER AGREEMENTS

SECTION 5.1    <u>Pre-Closing Covenants of Sellers</u>.

Sellers covenant to Buyer that, during the period from the Execution Date through and including the Closing Date or the earlier termination of this Agreement:

(a)    <u>General</u>.  Sellers will use reasonable efforts to take all action and to do all things necessary in order to consummate and make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the Closing conditions set forth in <u>Article 7</u> herein).  Subject to the Sellers' obligations to comply with court orders and to take actions contemplated by, and consistent with, the Bidding Procedures, Sellers, in consultation and cooperation with Buyer, shall take all actions as may be reasonably necessary to obtain the Bankruptcy Court's entry of the Orders and any other order of the Bankruptcy Court reasonably necessary to consummate the transactions contemplated by this Agreement.  Subject to applicable laws, Sellers shall use commercially reasonable efforts to transfer to Buyer any Permit required to own or operate the Acquired Assets under applicable laws.  In addition, and without limiting Sellers' obligations under <u>Sections 5.5</u> and <u>10.2</u>, Sellers shall use commercially reasonable efforts, prior to Closing, to cure defects in Sellers' title, including defects in the registration thereof, with respect to Acquired Intellectual Property to the extent reasonably requested by Buyer from time to time.

(b)    <u>Operation of Business</u>.  Subject to any restrictions and obligations imposed by the Bankruptcy Court and applicable law, Sellers will (i) produce inventory at a rate reasonably designed to fulfill, on a reasonably timely basis, purchase orders placed for products of the Acquired Business, (ii) pay all commissions payable to Sales Agents in the Pre-Petition Ordinary Course of Business, (iii) update the websites related to the Acquired Business to reflect current information with respect to the Acquired Business, including without limitation, information with respect to 2010 model year products of the Acquired Business, (iv) distribute at boat shows appropriate collateral materials and other advertising, marketing and promotional materials with respect to the Acquired Business, and (v) except as expressly required by this

30

Agreement, conduct the Acquired Business in all material respects with the approved budget included in Sellers' 13-week cash flow statement, amendment 2, for the week ending November 13, 2009.  In particular, except (A) with the express written approval of Buyer, (B) as expressly provided in this Agreement, including in connection with the Auction, and (C) as set forth on Schedule 5.1(b)(C), Sellers shall be prohibited from doing any of the following:  (1) disposing of, encumbering, pledging or allowing any Lien to be placed on, or transferring any Acquired Asset, except for the sale of Inventory in the Ordinary Course of Business, (2) amending, terminating or modifying (or waiving any right under) any of the Acquired Contracts or Assumed Leases, (3) making any change in the compensation payable or to become payable to, or benefits provided to, or vesting any benefits provided to, the employees of Sellers (except as may be required pursuant to any Acquired Contract or any Employee Benefit Plan in effect on the date hereof), adopting any new Employee Benefit Plan, or entering into any collective bargaining agreement or other new employment Contract, (4) rejecting any Assigned Contract, (5) amending their organizational documents, (6) failing to maintain the Acquired Assets in all material respects in their present condition, reasonable wear and tear excepted, (7) filing any reorganization plan or agreement of complete or partial liquidation, dissolution or restructuring that prevents the consummation of the transactions contemplated by this Agreement, (8) making any change in any accounting policies, principles or practices, other than as required by GAAP, (9) except for the payment of any deductible under an existing insurance policy with respect to a Claim that is being settled by such insurance company, or otherwise in the Ordinary Course of Business, settle, pay, compromise or discharge, any Claim, (10) selling material products or other inventory of the Acquired Business at prices that are lower in any material respect than the past practices of the Acquired Business, or (11) agreeing or committing to do any of the foregoing.

(c)  Access to Records and Properties.  Subject to Section 5.1(f), Buyer shall be entitled, and Sellers shall permit Buyer and its representatives, to conduct such investigation of the condition (financial or otherwise), businesses, assets, Assumed Liabilities, properties or operations of Sellers as Buyer shall reasonably deem appropriate.  Buyer will treat and hold any Confidential Information it receives from Sellers, including, without limitation, any confidential information it received prior to the Execution Date in accordance with the Confidentiality Agreement.  Sellers shall, from time to time, promptly furnish or make available to Buyer and its representatives any financial and operating data and other material information of the Acquired Business in the possession, custody or control of Sellers as Buyer or its representatives may reasonably request, including without limitation weekly reports with respect to cash expenditures and cash receipts prepared for management of the Acquired Business.

(d)  Notice of Certain Events.  Sellers' Representative shall promptly notify Buyer of, and furnish Buyer any information it may reasonably request with respect to, the occurrence of any event or condition or the existence of any fact that would reasonably be expected to cause any of the conditions to Buyer's obligations to consummate the transaction(s) contemplated by this Agreement or by any Ancillary Agreement not to be fulfilled.  It is acknowledged and understood that no notice given pursuant to this Section 5.1(d) shall have any effect on the representations, warranties, covenants or agreements contained in this Agreement for purposes of determining satisfaction of the conditions contained herein.

(e)     <u>Assignment of Transferred Internet Domain Names</u>.  Sellers shall cause their Affiliates who are the registered holders of the Transferred Internet Domain Names to assign and transfer to Sellers, prior to the Closing, all of such Transferred Internet Domain Names, other than those set forth on <u>Schedule 5.1(e)</u> (the "<u>Subject Internet Domain Names</u>"), pursuant to an agreement substantially in the form of the Website, Software and Data Transfer Agreement attached hereto as <u>Exhibit L</u>, which agreement, notwithstanding anything to the contrary in this Agreement, shall be included as an Acquired Contract (other than to the extent it relates to the Excluded Assets), unless Buyer expressly designates such agreement as an Excluded Contract the Closing.  Sellers and Buyer shall cooperate to split such agreement, one of which will relate to the Acquired Assets and be included as an Acquired Contract, and the other of which will relate to the Excluded Assets and be an Excluded Contract.  The Transferred Internet Domain Names (other than the Subject Internet Domain Names), shall be transferred to Buyer at the Closing pursuant to <u>Section 1.1</u> hereof.  The assignment and transfer to Sellers, at or prior to Closing, of the Transferred Internet Domain Names (other than the Subject Internet Domain Names) shall be a condition precedent to the Closing pursuant to <u>Section 7.2(f)</u>.

(f)     <u>Contact with Customers, Vendors and Employees</u>.  Neither Buyer nor anyone acting on its behalf shall contact any employee, consultant, customer, supplier, vendor or distributor of the Acquired Business between the date hereof and the Closing Date for purposes of discussing (and neither Buyer nor anyone acting on its behalf shall discuss with any such Person) the Acquired Business, the Acquired Assets or the transactions contemplated hereby except (i) as expressly permitted by this <u>Section 5.1(f)</u> or (ii) with the Sellers' Representative's written consent, such consent not to be unreasonably withheld, conditioned or delayed.  Subject to clause (ii) of the first sentence of this <u>Section 5.1(f)</u>, prior to the Closing Date, Sellers shall use their commercially reasonable efforts to facilitate Buyer's (and all of its agents and representatives, and any of its employees, consultants, directors and officers) contact and communication with the employees, consultants, customers, suppliers, vendors and distributors of the Acquired Business, it being understood that (i) so long as Sellers provide Buyer with reasonably prompt and otherwise reasonable access to such contact and communication, Sellers shall be entitled to coordinate the timing of any such contact and communication (and with the Sellers' Representative's written consent, not to be unreasonably withheld, Buyer shall be permitted to make such contact or communication without the participation or attendance of Sellers) and (ii) any inquiries made by Buyer with any of the foregoing Persons shall be made in such a manner as not to interfere unreasonably with the Acquired Business.

(g)     <u>Third Party Consents</u>.  Sellers shall, at their sole cost and expense, use their reasonable best efforts to obtain the Consents set forth on <u>Schedule 7.2(f)</u> to the extent such consents are not provided for or satisfied by the Sale Approval Order and to consummate the transfer to Buyer or its designated Affiliate or Affiliates of any Permit required to own or operate the Acquired Assets or Acquired Business under applicable Law; <u>provided</u>, <u>however</u>, that Sellers shall not be required to expend material funds to obtain the Consents.

(h)     <u>Insurance</u>.  Until the Closing, Sellers shall maintain (including necessary renewals thereof) insurance policies against risk and liabilities to the extent and in the manner and at the levels maintained by Sellers as of the date hereof with respect to the Acquired Business and the Acquired Assets.

SECTION 5.2        Pre-Closing Covenants of Buyer.

Buyer covenants to Sellers that, during the period from the Execution Date through and including the Closing Date or the earlier termination of this Agreement:

(a)        General.  Buyer will use reasonable efforts to take all action and to do all things necessary in order to consummate and make effective the transactions contemplated by this Agreement (including satisfaction, but not waiver, of the Closing conditions set forth in Article 7 herein).  Buyer shall take such actions as may be reasonably requested by Sellers to assist Sellers in obtaining the Bankruptcy Court's entry of the Orders and any other order of the Bankruptcy Court reasonably necessary to consummate the transactions contemplated by this Agreement.

(b)        Permits.  Subject to applicable laws, Buyer shall use commercially reasonable efforts to promptly obtain or assist Sellers to consummate the transfer to Buyer of any Permit required to own or operate the Acquired Assets under applicable laws.

(c)        Notice of Certain Events.  Buyer shall promptly notify Sellers' Representative of, and furnish Sellers' Representative any information it may reasonably request with respect to, the occurrence of any event or condition or the existence of any fact that would reasonably be expected to cause any of the conditions to Seller's obligations to consummate the transactions contemplated by this Agreement or by any Ancillary Agreement not to be fulfilled. It is acknowledged and understood that no notice given pursuant to this Section 5.2(c) shall have any effect on the representations, warranties, covenants or agreements contained in this Agreement for purposes of determining satisfaction of the conditions contained herein.

SECTION 5.3        Other Covenants of Sellers and Buyer.

(a)        Filings.  During the period from the Execution Date through and including the Closing Date or the earlier termination of this Agreement, Sellers and Buyer shall reasonably cooperate with one another in obtaining all authorizations, consents, and approvals of Government Authorities that may be or become necessary in connection with the consummation of the transactions contemplated by this Agreement, and to take all reasonable actions to avoid the entry of any order or decree by Government Authorities prohibiting the consummation of the transactions contemplated hereby, and shall furnish to the other all such information in its possession as may be necessary for the completion of the notifications to be filed by the other. Without limiting the foregoing, Sellers and Buyer will, if required, (i) take all actions necessary to make the filings required of them or their Affiliates under the HSR Act with respect to the transactions contemplated by this Agreement as promptly as practicable following the Execution Date, (ii) comply with any request for additional information received from the Federal Trade Commission or the Antitrust Division of the Department of Justice pursuant to the HSR Act, (iii) cooperate with each other in connection with filings under the HSR Act and (iv) request early termination of the applicable waiting period; provided, however, notwithstanding anything in this Agreement to the contrary, neither Buyer nor any of its Affiliates shall be required to divest any assets or properties held by Buyer or its Affiliates or to hold any such assets or properties.

33

(b)     Improper Receipt of Payment.  From and after the Closing Date, (i) Sellers shall (A) deem held in trust any and all payments received by Sellers from customers or any other Persons (including in connection with Section 5.6) that constitute part of the Acquired Assets and (B) promptly forward, or instruct any bank receiving such payments on behalf of any Seller to forward, to Buyer any such payments and (ii) Buyer shall promptly forward to Sellers any and all payments received by Buyer from customers or any other Persons that constitute part of the Excluded Assets.

(c)     Disclosure Schedule Supplements.  Sellers' Representative, on the one hand, shall notify Buyer of, and Buyer, on the other hand, shall notify Sellers' Representative of, and shall supplement or amend the Schedules to this Agreement with respect to, any matter that (i) may arise after the delivery of the Schedules hereunder and that, if existing or occurring at or prior to such delivery of the Schedules, would have been required to be set forth or described in the Schedules to this Agreement or (ii) makes it necessary to correct any information in the Schedules to this Agreement or in any representation and warranty of Sellers or Buyer, as applicable, that has been rendered inaccurate thereby.  Each such notification and supplementation shall be made no later than three (3) days before the date set for the Closing by the parties, it being understood that information contained in any supplement to the Schedules provided pursuant to this Section 5.3(c) shall not be deemed to cure any breach, or modify any Schedule, for purposes of Article 7 hereof; provided, however, that the bring-down of Section 4.1(r) pursuant to Article 7 shall be subject to additions to Schedule 4.1(r) of Material Contracts entered into after the date hereof.

SECTION 5.4     Employment Covenants and Other Undertaking.

(a)     Future Employment.  Schedule 5.4 sets forth a complete and correct list of all employees and officers of Sellers and their respective Affiliates who have been involved in the operation of the Acquired Business.  Sellers shall promptly, from time to time, deliver to Buyer written notice of any changes to Schedule 5.4 that are necessary to cause the first sentence of this Section 5.4 to be true and correct as of the Closing.  Prior to the Closing, Buyer shall, or shall cause its designated Affiliate or Affiliates to, provide offers of employment to those current employees and officers of Sellers and Affiliates of Sellers as identified by Buyer in its sole discretion, on similar terms as they are currently employed; provided, however, that such offers of employment will not be required to provide for similar compensation or benefits, including, without limitation, with respect to severance.  Such employees and/or officers who accept Buyer's and its Affiliates' offer of employment, and commence employment with Buyer and its Affiliates on or following the Closing are referred to as "Transferred Employees."  Sellers will be solely responsible for obligations (including notice) under the WARN Act (and any similar state law or other applicable law) that arise based in any part on events that occur from or after the Closing with respect to any employees of Sellers that are not Transferred Employees.

(b)     COBRA.  Sellers shall provide, or cause to be provided, to any current or former employee of Sellers, other than a Transferred Employee (and their "qualified beneficiaries" within the meaning of COBRA) whose "qualifying event" (within the meaning of COBRA) occurs on or prior to the Closing, or in connection with the transactions contemplated by this Agreement and the Ancillary Agreements, with such COBRA continuation coverage as any such individual has elected or may elect.  Buyer shall provide, or shall cause to be provided,

34

COBRA continuation coverage to any Transferred Employee (and such individual's qualified beneficiaries) whose qualifying event occurs after the Closing.

(c)     No Right to Employment.  Notwithstanding Section 5.4(a), nothing herein expressed or implied shall confer upon any of the employees of Sellers any right to employment or continued employment for any specified period, of any nature or kind whatsoever under or by reason of this Agreement.

(d)     401(k) Accounts.  As of the Closing Date or as soon as administratively practicable thereafter, Sellers shall contribute to the 401(k) accounts for the benefit of the Transferred Employees (i) all contributions due with respect to the last pay period ending prior to the Closing Date and (ii) all employer and employee contributions for the pay period including the Closing Date to which the Transferred Employees are entitled with respect to compensation earned by the Transferred Employees as of the Closing Date.  As soon as administratively practicable following the Closing Date, Sellers shall allow Transferred Employees to roll-over account balances from 401(k) plan sponsored by Sellers, including outstanding loans, to 401(k) plan sponsored by Buyer.

(e)     Buyer and its Affiliates shall recognize the service of Transferred Employees with the Sellers prior to the Closing Date as service with Buyer and its Affiliates in connection with any qualified retirement plan and welfare benefit plan or policy (including vacations and severance policies) maintained by Buyer and its Affiliates that is made available following the Closing Date by Buyer or one of its Affiliates for purposes of satisfying or determining any waiting period, vesting, eligibility or benefit entitlement (but excluding benefit accruals thereunder).

(f)     With respect to any employee welfare benefit plan maintained by Buyer or its Affiliates in which the Transferred Employees are eligible to participate after the Closing Date, Buyer shall use commercially reasonable efforts, to the extent permitted by the third party providers of such plan, to, or shall cause any Affiliate to use reasonable best efforts to, (i) waive all limitations as to preexisting conditions, exclusions and waiting periods and actively-at-work requirements with respect to participation and coverage requirements applicable to the Transferred Employees and their dependents and beneficiaries under such plan to the extent waived under the applicable corresponding Employee Benefit Plan immediately prior to the Closing Date, and (ii) provide each Transferred Employee and his or her eligible dependents and beneficiaries with credit under such plan for any co-payments and deductibles paid under corresponding Employee Benefit Plans prior to the Closing Date in the calendar year in which the Closing Date occurs for purposes of satisfying any applicable deductible or out-of-pocket requirements (and any annual and lifetime maximums).

(g)     To the extent allowable under the Code and regulations issued thereunder, with respect to the Transferred Employees who have elected to participate in the Sellers' health care and dependent care flexible spending account plans ("Sellers' FSA Plans"), Sellers and Buyer shall take all necessary action to cause the Sellers' FSA Plans to transfer each Transferred Employee's respective health care and dependent care flexible spending account elections and any unused amounts in the Sellers' FSA Plans with respect thereto, if any, as the same exist as of

35

the Closing Date, to the health care and dependent care flexible spending account plan sponsored by Buyer.

SECTION 5.5    Ownership of Genmar Name and Acquired Intellectual Property.

(a)    Sellers covenant and agree that, subject to Section 5.5(d), Sellers shall, and Sellers shall cause all of their Affiliates which use the Genmar Name, to pass all required resolutions and to amend their respective certificates of incorporation or formation or other organizational documents to change their corporate or company name to a name that does not include the word "Genmar" or any name intended or likely to be confused or associated with the Genmar Name or product no later than 30 days after the Closing Date.

(b)    Sellers acknowledge that the Genmar Name and all other Acquired Intellectual Property shall be and remain, subsequent to the Closing, the sole and exclusive property of Buyer.  Prior to the Closing, Sellers shall terminate any Contract granting an Affiliate (other than Sellers) the right to use the Genmar Name or any Acquired Intellectual Property.

(c)    Subsequent to the Closing, subject to Section 5.5(d) and Section 5.8(a), none of Sellers or any of their Affiliates shall have any right, title or interest in or to, and Buyer is not granting Sellers or any of their Affiliates, a license to use, any of the Acquired Intellectual Property.

(d)    The obligations in this Section 5.5 shall not apply (i) to the extent use of the Genmar Name is required by law or otherwise reasonably required pending the registration of the change of corporate names (as set out in this Section 5.5), provided that Sellers use reasonable best efforts to effectuate such registration as promptly as practicable, (ii) to the extent use of the Genmar Name is reasonably required in order to enable collection or payment of invoices issued by Sellers or any of their Affiliates prior to the Closing, (iii) to the extent the Genmar Name is reasonably required to pursue a Claim in the Bankruptcy Case or (iv) to the extent the Genmar Name is reasonably required in connection with the Bankruptcy Case; provided, however, that in any case contemplated by clause (i), (ii), (iii) or (iv) above, Sellers shall, and shall cause any applicable Affiliate to (x) limit use of the Genmar Name to the minimum use reasonably necessary for the identified purpose and (y) make clear that Sellers and such Affiliates are no longer affiliated with the Acquired Business or any Person then using (except as specifically permitted herein) the Genmar Name.

SECTION 5.6    Non-Assignment of Assigned Contracts.

Sellers shall use their reasonable best efforts to obtain any consent, approval or amendment, if any, required to novate and/or assign any Assigned Contract to be assigned to Buyer hereunder which the Bankruptcy Court determines is not able to be assumed and assigned under section 365(c) of the Bankruptcy Code or otherwise (a "Nonassignable Contract").  Sellers shall keep Buyer reasonably informed from time to time of the status of the foregoing and Buyer shall cooperate with Sellers in this regard.  To the extent that the rights of Sellers under any Nonassignable Contract, or under any other Acquired Asset, may not be assigned without the consent of a third party which has not been obtained prior to the Closing, this Agreement shall

36

not constitute an agreement to assign the same.  If any such consent has not been obtained or if any attempted assignment would be ineffective or would impair Buyer's rights under the instrument or other Acquired Asset in question so that Buyer would not acquire the benefit of all such rights, then Sellers, to the maximum extent permitted by applicable law and the instrument or other Acquired Asset, shall act as Buyer's agent in order to obtain for Buyer the benefits thereunder and shall cooperate, to the maximum extent permitted by applicable law and the instrument or other Acquired Asset, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer (including, without limitation, by entering into an equivalent arrangement enforcing at Buyer's request, or allowing Buyer to enforce, any rights of Sellers under such instrument or other Acquired Asset); provided, however, that after Closing, Buyer shall be responsible for all payment and other obligations under, and for all costs of obtaining such rights under such Nonassignable Contract.

SECTION 5.7    Bankruptcy Actions.

(a)    Sale Motion.  Within one Business Day following the date hereof, Sellers shall file with the Bankruptcy Court a motion in form and substance satisfactory to Buyer in its reasonable discretion seeking approval of the Sale Procedures Order and the Sale Approval Order (the "Sale Motion"), substantially in the form attached as Exhibit F.

(b)    Sale Procedures Order.  For purposes of this Agreement, "Sale Procedures Order" shall mean the order of the Bankruptcy Court in the form attached as Exhibit G hereto and without modification except as Buyer may consent (A) approving sale procedures and bidding protections in connection with the sale of substantially all of the Debtors' (including Sellers) assets pursuant to Sections 363 and 365 of the Bankruptcy Code; (B) scheduling an auction and hearing to consider approval of the sale of substantially all of the Debtors' (including Sellers) assets (the "Auction"); and (C) granting related relief.  Sellers shall use their reasonable efforts so that the Bankruptcy Court, as part of its Sale Procedures Order, (A) schedules a hearing to approve this Agreement, (B) requires the payment of the Break-Up Fee and Expense Reimbursement in accordance with the terms of Section 8.3 hereof and with the liens, priorities and other terms and conditions otherwise set forth in this Agreement and (C) requires a deposit in the amount of the Deposit in accordance with Section 2.2 hereof.

(c)    Sale Approval Order.  For purposes of this Agreement, the term "Sale Approval Order" shall mean the order of the Bankruptcy Court entered pursuant to Sections 105, 363 and 365 of the Bankruptcy Code in the form attached as Exhibit H hereof and without modification except as Buyer may consent, in part, (A) approving this Agreement and the transactions contemplated hereby; (B) approving the sale of the Acquired Assets to Buyer free and clear of all Liens (other than Permitted Liens of which the Sale Approval Order does not provide for the Acquired Assets to be sold free and clear), Claims and Encumbrances (other than Permitted Liens of which the Sale Approval Order does not provide for the Acquired Assets to be sold free and clear) pursuant to Section 363(f) of the Bankruptcy Code, (C) finding that Buyer is a good-faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code; (D) confirming that Buyer is acquiring the Acquired Assets free and clear of the Excluded Assets and the Excluded Liabilities; (E) providing that the provisions of Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure are waived and there will be no stay of execution of the Sale Approval Order under Rule 62(a) of the Federal Rules of Civil Procedure; and (F)

37

retaining jurisdiction of the Bankruptcy Court to interpret and enforce the terms and provisions of this Agreement.

(d)     Assignment Motion and Order.  Sellers shall use commercially reasonable efforts to file with the Bankruptcy Court, at least 20 days prior to the Sale Hearing, a motion (which may be included in the Sale Motion) for an order (the "Assignment Order") authorizing the assumption and assignment pursuant to Section 365 of the Bankruptcy Code of the Assigned Contracts (the "Assignment Motion").  Sellers shall identify the Assigned Contracts on an exhibit to the Assignment Motion.  Such exhibit shall set forth the amounts necessary to cure defaults under each of such Assigned Contracts as determined by Sellers based on Sellers' books and records.  In situations in which Sellers are unable to establish that a default exists based upon a review of their books and records, or other relevant information, the relevant cure amount shall be set at $0.00.  Buyer agrees to cooperate with Sellers in connection with furnishing information pertaining to the satisfaction of the requirement of adequate assurances of future performance as required under Section 365(f)(2)(B) of the Bankruptcy Code.  Both the Assignment Motion and the Assignment Order shall be in form and substance satisfactory to the Buyer in its reasonable discretion.

(e)     Notice and Reasonable Efforts.  Sellers shall provide appropriate notice of the hearing(s) on the Sale Motion, the Assignment Motion, and, after approval by the Bankruptcy Court, the Auction, as is required by the Bankruptcy Code and the Bankruptcy Rules and other applicable law to all parties entitled to notice, including, but not limited to, all parties to the Acquired Contracts and all taxing and environmental authorities in jurisdictions applicable to Sellers.  Sellers shall also publish notice of the Bidding Procedures established in the Sale Procedures Motion and of hearing(s) seeking the Sale Approval Order, the Assignment Motion, and the Auction in at least one (1) national newspaper and one (1) regional newspaper, each in a form reasonably acceptable to the Buyer.  Thereafter, Sellers shall (i) take all actions as may be reasonably necessary to cause each of the Orders to be issued, entered and become a Final Order in the form contemplated by this Agreement and (ii) consult with Buyer concerning the Orders and provide Buyer with copies of requested applications, pleadings, notices, proposed orders and other documents to be filed by Sellers relating to the Orders (collectively, the "Bankruptcy Pleadings") prior to submission to the Bankruptcy Court (with a reasonable opportunity to review and comment on same) and which Bankruptcy Pleadings shall be in form and substance satisfactory to Buyer in its reasonable discretion.

(f)     Excluded Assets; Excluded Contracts.  Notwithstanding anything herein to the contrary, Sellers shall have the right to offer for sale or sell, in their sole discretion (but on notice to Buyer), any of the Excluded Assets; provided, that no Seller may, prior to or after the Closing, sell any Excluded Asset that, individually or together with any other Excluded Asset, would reasonably be expected to be necessary for one or more Sellers to enter into or perform their respective obligations under this Agreement or any of the Ancillary Agreements, or to consummate the transactions contemplated hereby and thereby.  In addition,  from and after the Designated Deadline, Sellers shall have the right, in their sole discretion (but on notice to Buyer) to reject any Excluded Contract, other than the Assigned Contracts, and to take all actions necessary to effectuate any such rejection or rejections, including prosecuting a motion in the Bankruptcy Court seeking authorization, as necessary, to reject such Excluded Contracts.

38

(g)      _Appeals of Bankruptcy Orders_.  If, following the Closing, any of the Orders or any other order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), Buyer and Sellers agree to cooperate in all efforts as may be reasonable and appropriate to defend against such appeal, petition or motion, and each party hereto shall endeavor to obtain an expedited resolution of such appeal.

(h)      _Further Solicitation_.  Sellers shall not, and shall use commercially reasonable efforts to assure that their respective Affiliates, officers, directors, employees, representatives or agents do not, directly or indirectly, encourage, solicit, participate in or initiate discussions or negotiations with, provide any information to, or enter into any agreement with, any Person or group of Persons (other than Buyer and its Affiliates) in furtherance of any transaction (by merger, sale of stock or assets or otherwise) of all or any material portion of the Acquired Assets or a sale of any shares of capital stock or other equity interests of any Seller; provided that, after Sellers file, in accordance with this Agreement, a motion seeking Bankruptcy Court approval of the Bidding Procedures, and until the entry of the Sale Approval Order, Sellers retain the right to solicit participation in the Auction from interested parties and to engage in actions otherwise described in this Section 5.7(h); provided, further that such solicitations will be conducted in strict compliance with the Bidding Procedures as proposed in accordance with this Agreement (prior to the Bankruptcy Court Order) or as ordered (after receipt of the Bankruptcy Court Order on the Bidding Procedures).

SECTION 5.8      Use of Names.

(a)      Notwithstanding anything contained herein to the contrary, for a period of 90 days after the Closing Date, each of Sellers' respective controlled Affiliates (collectively, the "Subject Affiliates") shall have a limited non-exclusive, royalty-free, non-transferable license to use any and all of the trademarks, service marks, trade dress, logos, trade names and corporate names included in the Acquired Intellectual Property only in the jurisdictions in which they are registered, which items are located on (i) any finished goods and other supplies owned by the Subject Affiliates as of the Closing Date, (ii) any advertising or promotional materials used by the Subject Affiliates as of the Closing Date and (iii) any stationery, business cards, business forms and other similar items owned by any of the Subject Affiliates as of the Closing Date; provided, however, that Sellers shall only permit the Subject Affiliates to use such trademarks, service marks, trade dress, logos, trade names and corporate names in the operation of their respective businesses in the ordinary course consistent with past practice, it being understood and agreed that Sellers shall not permit the Subject Affiliates to use any such Acquired Intellectual Property in connection with any other activities.  Without limiting the foregoing, during such 90-day period, Sellers shall not permit any Subject Affiliate to:  (a) hold itself out as having any affiliation or relationship of any kind with Buyer or any Affiliate thereof or (b) use such Acquired Intellectual Property in a manner that would be reasonably likely to reflect negatively thereon or on Buyer or its Affiliates.  The parties acknowledge and agree that the Subject Affiliates shall be entitled to enforce the provisions of this Section 5.8.  Notwithstanding the foregoing, nothing contained in this Section 5.8 shall operate to limit the rights of Sellers pursuant to Section 5.5(d) hereof.

39

SECTION 5.9        Lenders' Acknowledgment.

Contemporaneously with the execution and delivery of this Agreement, Sellers shall deliver to Buyer a duly executed acknowledgment from the senior secured lenders to Sellers under the Credit Agreement, pursuant to which such lenders agree (i) to carve-out, for the benefit of Buyer, sufficient funds (in an amount up to the Carve-Out Amount) from the collateral that secures Sellers' obligations to such lenders to permit Sellers to pay to Buyer the Break-Up Fee and Expense Reimbursement and consent in the context of an Alternative Transaction to the payment of the Break-Up Fee, as and when such payments are due in accordance with Section 8.3; (ii) subject to the Auction and the possibility of an Alternative Transaction, to the sale of the Acquired Assets to Buyer and its one or more designated Affiliates free and clear of any Encumbrances securing obligations to such lenders, (iii) not to raise any objection to the Sale Motion or the Sale Procedures Order, provided, in the case of this clause (iii), that the Sale Motion and the Sales Procedure Order are in the forms attached hereto as Exhibit F and Exhibit G, respectively, and (iv) to confirm their consent to allowing payment of the expense reimbursement, if any, payable under the Exclusivity and Expense Letter until the Bankruptcy Court approves and enters the Sale Procedures Order in all material respects in the form attached as Exhibit G.

SECTION 5.10        Title Insurance.

(a)        No later than thirty (30) days after the date of this Agreement, Sellers shall cause First American Title Insurance Company (the "Title Company") to deliver to Buyer (to the extent Buyer has not already received), with respect to each parcel of Real Property, such title commitment plus a copy of each of the underlying documents corresponding to the exceptions set forth in such commitment and in preparation for the Closing, pro forma title insurance policies, in the form and with the endorsements required under Section 5.10(b).  On the Closing Date, Sellers shall cause the Title Company to deliver to Buyer an ALTA Owner's Policy of Extended Title Insurance (2006, except that for Sarasota, Florida, an ACTA 1992 form policy will be provided) (or other form of policy reasonably acceptable to Buyer) issued by the Title Company, in such amount as Buyer may reasonably determine to be the fair market value of the Real Property (including all Improvements located thereon), insuring title to the Real Property to be in Buyer or its designee as of the Closing, subject to such exceptions that are Permitted Liens.

(b)        Each title insurance policy delivered under this Section 5.10 shall, as of the Closing Date, (i) insure Buyer's or its designee's title to the Real Property and all recorded easements benefiting the same, (ii) contain an "extended coverage endorsement" insuring over the general or standard exceptions contained customarily in such policies, (iii) contain an endorsement insuring that the Real Property described in the title insurance policy is the same real estate as shown on the survey delivered with respect to such Real Property, (iv) contain an endorsement for "restrictions, encroachments and minerals," and (v) any other endorsements reasonably requested by Buyer.

(c)        Sellers and Buyer shall each pay fifty percent (50%) of the cost of a Standard ALTA Owner's Policy of Title Insurance, including any extended coverage and all endorsements.

SECTION 5.11          Surveys.

Sellers shall cause to be delivered to Buyer or its designee at the Closing, with respect to each parcel of the Real Property in form and substance reasonably satisfactory to Buyer, a current survey certified to Buyer, the Title Company and one or more lenders designated by Buyer, prepared by a licensed surveyor and conforming to current ALTA and ACSM minimum standard detail requirements for land title surveys, disclosing the location of all improvements, easements, party walls, sidewalks, roadways, utility lines, and other matters shown customarily on such surveys, and showing access affirmatively to public streets and roads (the "Survey"). The Survey shall not disclose, with respect to any parcel of Real Property, any survey defect or encroachment from or onto such parcel of the Real Property which (i) would reasonably be expect to materially impair the value or use of such parcel of Real Property and (ii) has not been insured over as of the Closing.  Sellers shall bear all costs and expenses related to the preparation of the Surveys.

SECTION 5.12          Post-Closing Access to Insurance.

If at any time after the Closing, any Person (other than Buyer or any of its Affiliates) asserts a claim relating to any Excluded Liability (each, an "Excluded Claim") against Buyer or any of its Affiliates, or any of their respective assets, then Sellers shall cooperate with Buyer with respect to such Excluded Claim.  Without limiting the foregoing, Sellers shall use all reasonable efforts, at their sole cost and expense, to provide Buyer with the benefit of any insurance policies covering Sellers or their respective Affiliates that relate to the applicable Excluded Liability ("Excluded Insurance Policies").  No Seller shall, and each Seller shall cause its Affiliate not to, assign or otherwise transfer (including without limitation in any liquidation or dissolution) any interest or right in or to any Excluded Insurance Policy without requiring, prior to any such assignment or transfer, the applicable assignee or transferee to agree with Buyer to be bound by this Section 5.13.

SECTION 5.13          Sarasota PHASE II Provisions.

(a)          Without limiting the provisions of Section 5.1(c), from the date of this Agreement until the Closing, Sellers shall as promptly as practicable, and in any event within one (1) Business Day of a written request from Buyer, permit Buyer and its representatives, and shall cooperate with and use reasonable best efforts to facilitate Buyer's and its representatives' efforts, to conduct such investigation of Sarasota Plant 1, including without limitation conducting soil and groundwater testing, as Buyer and its representatives determine is appropriate in connection with preparing a Phase II environmental assessment report (the "Phase II Report"), including by permitting Buyer and its representatives reasonable access during normal business hours to all applicable areas of Sarasota Plant 1.

(b)          If, after having received and reviewed the Phase II Report, Buyer determines in good faith that the Phase II Report reveals the existence of Hazardous Materials in the soil or groundwater at Sarasota Plant 1, or otherwise reveals, in Buyer's good faith determination, a reasonable risk of exposure in connection with the acquisition, ownership, operation or sale of Sarasota Plant 1 to any material amount of liabilities related to Hazardous

41

Materials or otherwise under any Environmental Laws, Buyer shall have the option in its sole and absolute discretion not to acquire Sarasota Plant 1.

(c)     If Buyer elects, by written notice delivered to Sellers prior to the Closing Date, not to acquire Sarasota Plant 1, Sarasota Plant 1 shall be an Excluded Asset for all purposes under this Agreement, with no adjustment to the Purchase Price therefor.

SECTION 5.14     COBRA Reduction.

In the event that (i) Buyer determines that the condition set forth in Section 7.2(k) to its obligations to consummate the transactions contemplated by this Agreement has not been satisfied and (ii) subject to the conditions set forth in this Section 5.14, Buyer would be willing to waive such condition in exchange for the Sellers' agreement to put a portion of the Purchase Price in escrow to provide recourse to Buyer for all costs, expenses and other amounts (collectively, "COBRA Losses") that Buyer or its designated Affiliates incur in respect of liabilities or obligations under COBRA with respect to any current or former employees of Sellers or their respective Affiliates (other than the Transferred Employees) or their "qualified beneficiaries" (within the meaning of COBRA), including without limitation with respect to the provision of COBRA continuation coverage for any "M&A qualified beneficiaries" (within the meaning of COBRA), then Buyer shall, prior to the Closing, notify Sellers' Representative in writing of its desire to provide an escrow for COBRA Losses, which notice shall propose a nationally recognized accounting firm or actuary to determine the COBRA Losses. Sellers' Representative shall respond promptly to Buyer's notice, agreeing to Buyer's proposed accounting firm or actuary or proposing another nationally recognized accounting firm or actuary. If Sellers' Representative proposes another firm, Buyer and Sellers' Representative will instruct their respective proposed firms to select a third nationally recognized accounting firm or actuary (Buyer's selected firm or, if Sellers' Representative does not agree to Buyer's selected firm, the third firm, the "Actuary"). Buyer and Sellers' Representative shall promptly provide the Actuary with their respective assumptions with respect to the potential number of current or former employees of Sellers or their respective Affiliates or their qualified beneficiaries who could be M&A qualified beneficiaries, the cost to Buyer and its designated Affiliates of providing COBRA continuation coverage with respect to qualified beneficiaries and the likely duration of such coverage, as well as any appropriate information or documentation with respect to the potential amount of COBRA Losses. The Actuary shall promptly calculate its best estimate of the range of COBRA Losses it believes could reasonably be expected. The "COBRA Escrow Amount" shall mean the highest amount in the range of outcomes reported by the Actuary; provided that, Buyer and Sellers' Representative may determine, in their mutual discretion, to forego the escrow (in which case there will be no COBRA Escrow Amount) and, instead, agree to a reduction in the Purchase Price equal to an amount within the Actuary's range of reasonably likely COBRA Losses (such agreed amount, if any, the "COBRA Reduction"). In the event that a COBRA Escrow Amount is determined prior to the Closing, Buyer and the Sellers' Representative shall cooperate in good faith to agree to the terms of the applicable escrow arrangement providing recourse to Buyer for COBRA Losses and distributing to Sellers any remaining balance of the COBRA Escrow Amount not used for such purpose. Sellers acknowledge that no action or omission of Buyer or its representatives, including any action contemplated by this Section 5.14, shall waive the condition set forth in Section 7.2(k), unless Buyer expressly agrees in writing to waive such condition.

42

SECTION 5.15        Additional Post-Closing Services.

Buyer and Sellers shall use commercially reasonable efforts, prior to the Closing, to negotiate and enter into, as of the Closing, a transitional services agreement pursuant to which Buyer agrees, for a period of time following the Closing, to provide to Sellers certain services, including administrative and accounting services, that prior to the Closing were provided to Sellers using the Acquired Assets, or by Transferred Employees. Sellers shall pay Buyer reasonable fees in exchange for such services.  In addition, Buyer and Sellers will use commercially reasonable efforts to enter into mutually satisfactory transitional arrangements with respect to Inventory and any other Acquired Assets located at facilities included in the Excluded Assets.

ARTICLE 6

TAXES

SECTION 6.1        Taxes Related to Purchase of Acquired Assets.

All transfer, documentary, sales, use, stamp, registration and other such Taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with the consummation of the transactions contemplated by this Agreement (collectively, "Transfer Taxes") shall be paid one-half by Buyer or its designated Affiliate or Affiliates, and one-half by Sellers, when due, and Buyer or its designated Affiliate or Affiliates shall, and Sellers shall cooperate with Buyer and its Affiliates to, file all necessary Tax Returns and other documentation with respect to all such Taxes, fees and charges, and, if required by applicable law, the parties will, and will cause their Affiliates to, join in the execution of any such Tax Returns and other documentation.  Buyer and Sellers shall cooperate in good faith to (a) determine the amount of Transfer Taxes payable in connection with the transactions contemplated under this Agreement, (b) minimize the amount of Transfer Taxes that may be imposed or assessed as a result of the Transaction, (c) provide all requisite exemption certificates to minimize the amount of Transfer Taxes that may be imposed or assessed as a result of the transactions contemplated hereby and (d) prepare and file any and all required Tax Returns for or with respect to such Transfer Taxes with any and all appropriate Government Authorities.

SECTION 6.2        Cooperation on Tax Matters.

(a)        Buyer and Sellers shall furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Acquired Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other required or optional filings relating to Tax matters, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer to any Government Authority relating to Tax matters.

(b)        Sellers shall retain possession of all Tax Records for a period of at least six (6) years from the Closing Date.  Sellers shall give Buyer notice and an opportunity to retain

43

any Tax Records in the event that Sellers determine to destroy or dispose of them after such period.  In addition, from and after the Closing Date, Sellers shall provide access to Buyer and its representatives (after reasonable notice and during normal business hours and without charge), to the Tax Records as Buyer may reasonably deem necessary to properly prepare for, file, prove, answer, prosecute and/or defend any Tax Return, claim, filing, tax audit, tax protest, suit, proceeding or answer.

(c)    Buyer shall retain possession of all accounting, business and financial records and information (other than Tax Records) (i) relating to the Acquired Assets or the Assumed Liabilities that are in existence on the Closing Date and transferred to Buyer hereunder and (ii) coming into existence after the Closing Date that relate to the Acquired Assets or the Assumed Liabilities before the Closing Date, for a period of at least six (6) years from the Closing Date.  Buyer shall give Sellers notice and an opportunity to retain any such records in the event that Buyer determines to destroy or dispose of them after such period.  In addition, from and after the Closing Date, Buyer shall provide access to Sellers and their representatives (after reasonable notice and during normal business hours and without charge), to the books, records, documents and other information relating to the Acquired Assets or the Assumed Liabilities as Sellers may reasonably deem necessary to (i) properly prepare for, file, prove, answer, prosecute and/or defend any such Tax Return, claim, filing, tax audit, tax protest, suit, proceeding or answer, (ii) administer or complete any cases under Chapter 11 of the Bankruptcy Code of Sellers or (iii) pursue any Claim.

(d)    Notwithstanding anything to the contrary in this Agreement, Sellers shall assign to Buyer or its designated Affiliate or Affiliates, and shall cooperate with Buyer and any such Affiliates to obtain any necessary approvals or consents to affect such assignment, any and all interests in, or rights to, any property tax abatements, incentive agreements, or other similar arrangements with any taxing authority related to the Acquired Business or the Acquired Assets to the extent allowed under applicable law.

(e)    To the extent the Transferred Employees include any employees of Sellers or their Affiliates in the United States, Sellers shall cooperate with Buyer and its Affiliates and their respective representatives and agents (the "Buyer Persons") promptly to provide Buyer and its Affiliates the adequate payroll tax records required by federal and state agencies necessary for Buyer and its Affiliates to optimize federal and state payroll tax law relating to successor-in-interest transactions, including the transactions contemplated by this Agreement and the Ancillary Agreements.  Such records shall include, but not be limited to, the following:

(i)    An executed release form granting permission to Buyer Persons to obtain quarterly payroll data from all states within which the Acquired Business was conducted by Sellers.

(ii)    When required by state taxing agencies, Sellers shall provide signatures (or notarized signatures) necessary to grant permission for Buyer or its designated Affiliate or Affiliates to file for transfers of experience of payroll tax accounts in states which require a signed release by any predecessor Seller.

44

(iii)     Sellers shall provide Buyer Persons with the most recent Annual 940 Report (including Schedule A), and most recent years' "tax rate notices" received from individual state agencies.

(iv)     Sellers shall provide copies of all Sellers' quarterly wage detail reports filed with individual state agencies in the calendar year through the Closing Date.

(v)     If Sellers utilized an outside payroll tax administrator, then Sellers hereby grant Buyer Persons permission to have access to relevant successor-in-interest reports from the payroll vendor, such as state tax rate notices, state quarterly contribution reports, W2s and federal recap reports such as 940 and 941. Sellers shall provide Buyer with a contact person at the payroll vendor.

SECTION 6.3     Allocation of Purchase Price.

Buyer and Sellers' Representative shall agree to an allocation of the Purchase Price among the Acquired Assets (the "Allocation") that is sufficiently detailed to satisfy applicable accounting and tax requirements, and shall cooperate to agree to the Allocation with respect to Real Property in a timely fashion such that Transfer Taxes can be determined.  Such Allocation will be binding upon Buyer and Sellers and their respective successors and assigns, and none of the parties to this Agreement will take any position (whether in returns, audits or otherwise) that is inconsistent with the Allocation.  Buyer and Sellers will report the purchase and sale of the Acquired Assets on all tax returns, including, without limitation, Form 8594 as provided for in Section 1060 of the Code, in accordance with the Allocation and will cooperate in timely filing with the Internal Revenue Service their respective Forms 8594.  If Sellers and Buyer do not so agree within 180 days of the Closing Date, each of Sellers and Buyer may prepare their own Allocation (provided that such Allocation is consistent with Section 2.1) and, for the avoidance of doubt each of Buyer and Sellers will have no liability to the other for any additional Taxes that may be imposed by any Government Authority as a result of inconsistencies between the respective allocations of Buyer and Sellers.

ARTICLE 7

CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES

SECTION 7.1     Conditions Precedent to Performance by Sellers.

The obligation of Sellers to consummate the transactions contemplated by this Agreement is subject to the fulfillment, as of the Closing, of the following conditions, any one or more of which (other than the conditions contained in Section 7.1(c)) may be waived in writing by Sellers' Representative, in its sole discretion:

(a)     Representations and Warranties of Buyer.  The representations and warranties of Buyer made in Section 4.2 of this Agreement, in each case, shall be true and correct in all material respects as of the Closing Date (except for the representations and warranties of Buyer contained in Section 4.2(g), which shall be true and correct in all respects as of the Closing Date) as though made by Buyer as of the Closing Date, except to the extent representations and warranties expressly relate to an earlier date, in which case such

45

representations and warranties shall be true and correct on and as of such earlier date, and except in each case for any breach that would not reasonably be expected to have a material adverse effect on Buyer's ability to perform its obligations hereunder, and Sellers shall have received a certificate signed by a duly authorized officer of Buyer to such effect.

(b)     Performance of the Obligations of Buyer.  Buyer shall have (i) performed in all material respects all obligations required under this Agreement or any Ancillary Agreement to which it is party which are to be performed by it at or before the Closing (except with respect to any obligations qualified by materiality, which obligations shall be performed in all respects as required under this Agreement), (ii) delivered all certificates, instruments, and other documents required herein or otherwise in a form and substance reasonably satisfactory to Sellers required to effect the transactions contemplated hereby and (iii) Sellers shall have received a certificate signed by a duly authorized officer of Buyer to the effect set forth in clause (i).

(c)     Governmental Consents and Approvals.  If applicable, the waiting period applicable to the consummation of the transactions contemplated by this Agreement under the HSR Act shall have expired or been terminated.  The Orders shall have been entered and shall not have been vacated, modified, amended or stayed.

(d)     No Violation of Orders.  No preliminary or permanent injunction or other order of any court of competent jurisdiction or applicable Government Authority that declares this Agreement invalid or unenforceable in any material respect or which prevents the consummation of the transactions contemplated hereby shall be in effect.

(e)     Assignment and Assumption of Liabilities.  Buyer shall have executed and delivered to Sellers an instrument of assignment and assumption of liabilities with respect to the Assumed Liabilities reasonably satisfactory in form and substance to counsel for Sellers.

(f)     No Litigation.  There shall not be pending by any Government Authority any suit, action or proceeding, challenging or seeking to restrain, prohibit, alter or materially delay the consummation of any of the transactions contemplated by this Agreement.

SECTION 7.2     Conditions Precedent to the Performance by Buyer.

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment, as of the Closing, of the following conditions, any one or more of which (other than the conditions contained in Section 7.2(c)) may be waived by Buyer, in its sole discretion:

(a)     Representations and Warranties of Sellers.  The representations and warranties of Sellers made in Section 4.1 of this Agreement, in each case, shall be true and correct in all material respects as of the date of this Agreement and as of the Closing Date with the same force and effect as though made by Sellers as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date.

46

(b)    Performance of the Obligations of Sellers. Each Seller shall have (i) performed in all material respects all obligations required under this Agreement or any Ancillary Agreement to which such Seller is party which is to be performed by such Seller at or before the Closing (except with respect to any obligations qualified by materiality, which obligations shall be performed in all respects as required under this Agreement), (ii) delivered all certificates, instruments, and other documents required herein or otherwise required to effect the transactions contemplated hereby, and (iii) Buyer shall have received a certificate signed by a duly authorized officer of Sellers to the effect set forth in clause (i).

(c)    Governmental Consents and Approvals. If applicable, the waiting period applicable to the consummation of the transactions contemplated by this Agreement under the HSR Act shall have expired or been terminated.  The Orders shall have been entered and shall not have been stayed.  Notwithstanding the foregoing, nothing in this Agreement shall preclude Buyer from consummating the transactions contemplated herein if Buyer, in its sole discretion, waives the requirement that the Sale Approval Order shall have become a Final Order.  No notice of such waiver of this condition or any other condition to the Closing need be given except to Sellers, it being the intention of the parties that Buyer shall he entitled to, and is not waiving, the protection of Section 363(m) of the Bankruptcy Code, the mootness doctrine and any similar statute or body of law if the Closing occurs in the absence of the Sale Approval Order becoming a Final Order.

(d)    No Violation of Orders. No law or preliminary or permanent injunction or other order of any court of competent jurisdiction or applicable Government Authority that declares this Agreement invalid or unenforceable in any material respect or prevents or makes illegal the consummation of the transactions contemplated hereby shall be in effect.

(e)    No Litigation. There shall not be pending by any Government Authority any suit, action or proceeding, challenging or seeking to restrain, prohibit, alter or materially delay the consummation of any of the transactions contemplated by this Agreement.

(f)    Third Party Consents and Approvals. Those Consents identified on Schedule 7.2(f) shall have been obtained.

(g)    Name Change. Sellers shall have provided Buyer a certificate signed by a duly authorized officer of Sellers and acceptable to Buyer evidencing Sellers' compliance with Section 5.5(a).

(h)    Sale Approval Order and Bidding Procedures Order. The Sale Procedures Order, the Sale Approval Order and the Assignment Order shall each have become a Final Order and each shall be in full force and effect and not vacated, modified, amended or stayed as of the Closing Date.

(i)    Material Adverse Effect. Since the date of this Agreement, there has been no change, event, occurrence, development or effect that, individually or in the aggregate, has had or reasonably would be expected to have, a material adverse effect on the property, business, operations, assets or condition of the Acquired Business, taken as a whole, or the Acquired Assets or the Assumed Liabilities, taken as a whole.

DC\1250585.16

(j)     Floor Plan Financing.  Buyer shall have entered into a definitive agreement with GE Commercial Distribution Finance Corporation reasonably acceptable to Buyer providing for a long-term floor plan financing arrangement for the Acquired Business.

(k)     COBRA.  Sellers shall have obtained such prepaid insurance policies, or entered into such other arrangements, such that Buyer determines that it will not be required to assume or pay any liabilities or obligations under COBRA with respect to any current or former employees of Sellers or their respective Affiliates (other than the Transferred Employees) or their "qualified beneficiaries" (within the meaning of COBRA), including without limitation with respect to the provision of COBRA continuation coverage for any "M&A qualified beneficiaries" (within the meaning of COBRA).

ARTICLE 8

TERMINATION

SECTION 8.1     Conditions of Termination.  This Agreement may be terminated only in accordance with this Section 8.1.  This Agreement may be terminated at any time before the Closing, as follows:

(a)     by mutual written consent of Sellers' Representative (on behalf of Sellers) and Buyer;

(b)     by Buyer, by written notice to Sellers' Representative, on or after (i) February 4, 2010 or (ii) if prior to January 31, 2010 Buyer waives its condition to closing under Section 7.2(b) with respect to the Sale Approval Order and Assignment Order becoming Final Orders, January 31, 2010 (the "Termination Date"), subject, however, to extension by the mutual written consent of Sellers' Representative and Buyer, if the Closing shall not have occurred on or prior to the Termination Date, provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 8.1(b) if Buyer is then in material breach of this Agreement;

(c)     by Sellers' Representative (on behalf of Sellers), by written notice to Buyer, on or after the Termination Date, subject, however, to extension by the mutual written consent of Buyer and Sellers' Representative, if the Closing shall not have occurred on or prior to the Termination Date, provided, however, that Sellers' Representative shall not have the right to terminate this Agreement under this Section 8.1(c) if any Seller is then in material breach of this Agreement;

(d)     by Buyer, by written notice to Sellers' Representative, if (i) (A) any representation or warranty of Sellers contained in Section 4.1 is inaccurate, which inaccuracy would reasonably be expected to result in, individually or in the aggregate with the results of other inaccuracies, the conditions in Section 7.2(a) not being satisfied, or (B) there shall have occurred on the part of any Seller a material failure to perform any covenant of any Seller contained in this Agreement or any Ancillary Agreement to which a Seller is party, or in any Order, and (ii) Sellers have failed, within ten (10) Business Days after written notice of such inaccuracy or failure, to remedy such inaccuracy or perform such covenant; provided, however,

48

that Buyer shall not have the right to terminate this Agreement under this <u>Section 8.1(d)</u> if Buyer is then in material breach of this Agreement;

(e)    by Sellers' Representative (on behalf of Sellers), by written notice to Buyer, if (i)(A) any representation or warranty of Buyer contained in <u>Section 4.2</u> is inaccurate, which inaccuracy would reasonably be expected to result in, individually or in the aggregate with the results of other inaccuracies, the conditions set forth in <u>Section 7.1(a)</u> not being satisfied, or (B) there shall have occurred on the part of Buyer a material failure to perform any covenant of Buyer contained in this Agreement or any Ancillary Agreement to which Buyer is party, and (ii) Buyer has failed, within ten (10) Business Days after written notice of such inaccuracy or failure, to remedy such inaccuracy or perform such covenant; <u>provided</u>, <u>however</u>, that Sellers' Representative (on behalf of Sellers) shall not have the right to terminate this Agreement under this <u>Section 8.1(e)</u> if any Seller is then in material breach of this Agreement;

(f)    by Buyer if (i) Sellers have not filed the Sale Motion within one (1) Business Day of the date hereof, (ii) the Bankruptcy Court has not entered the Sale Procedures Order on or before December 9, 2009, (iii) the Auction is not held on or before January 9, 2010, (iv) the Sale Hearing is not held on or before January 15, 2010, or (v) the Sale Approval Order is not entered by the Bankruptcy Court on or before January 21, 2010; <u>provided</u>, <u>however</u>, with respect to clauses (i), (ii), (iii), (iv) and (v) above, that the satisfaction of the applicable grounds for termination did not result from a material breach of this Agreement by Buyer;

(g)    by Buyer, (i) if Sellers withdraw or seek authority to withdraw the Sale Motion, (ii) if Sellers or any other party authorized to file a plan of reorganization pursuant to Section 1121 of the Bankruptcy Code announces or files any stand-alone plan of reorganization or liquidation (or support any such plan filed by any other party whether or not authorized to be filed under Section 1121 of the Bankruptcy Code) that would reasonably be expected in any material respect to delay, hinder, modify or otherwise interfere with this Agreement and the transactions contemplated by this Agreement, (iii) if the Bankruptcy Case is dismissed or converted to a case under chapter 7 of the Bankruptcy Code pursuant to section 1112 of the Bankruptcy Code, or (iv) if a Trustee or Examiner with expanded powers is appointed in the Bankruptcy Case pursuant to section 1104 of the Bankruptcy Code;

(h)    by Buyer or Sellers' Representative (on behalf of Sellers), if (i) Sellers have accepted or selected and the Bankruptcy Court shall have approved by Final Order, the bid or bids (including a credit bid) of any Person or Persons other than Buyer or any of its Affiliates to purchase all or a significant portion of the businesses and assets of Sellers constituting the Acquired Business (an "<u>Alternative Transaction</u>"), (ii) Buyer is not the successful or backup bidder at the Auction, or (iii) Buyer is the backup bidder at the Auction and thirty (30) days have passed since the Auction;

(i)    by either Buyer or Sellers' Representative (on behalf of Sellers), if a Government Authority issues a final and non-appealable ruling or order prohibiting the transactions contemplated by this Agreement; or

(j)    by Buyer, if (i) the Sale Procedures Order is modified in any material respect without Buyer's prior written consent, (ii) any rules are adopted in connection with the

49

Auction that, in any material respect, are not consistent with the Bidding Procedures or (iii) the Bidding Procedures approved in the Sale Procedures Order are modified in any material respect without the prior written consent of Buyer.

SECTION 8.2    Effect of Termination.

In the event of termination of this Agreement pursuant to Section 8.1, this Agreement shall become null and void and have no effect (other than the provisions of Section 8.2, Section 8.3, the provisions of Section 2.2 relating to the disposition of the Deposit following termination of this Agreement and (to the extent applicable to the interpretation or enforcement of such provisions) Article 10 and Article 11, all of which shall expressly survive termination), and except for (a) Sellers' obligations with respect to payment of the Break-Up Fee and Expense Reimbursement under Section 8.3 and (b) the payment of the Deposit by the Escrow Agent in accordance with Section 2.2, none of Sellers or Buyer, or their respective Affiliates or respective representatives, shall have any liability whatsoever with respect to this Agreement or any Ancillary Agreement.

SECTION 8.3    Break-Up Fee and Expense Reimbursement.

(a)    The parties hereto acknowledge and agree that the terms and conditions set forth in this Section 8.3 with respect to the payment of the Break-Up Fee and Expense Reimbursement shall only become operative if and to the extent that the Bankruptcy Court enters the Sale Procedures Order approving such terms and conditions, it being understood and agreed that the consummation of the transactions contemplated by this Agreement shall be conditioned upon the approval by the Bankruptcy Court of the provisions of the Sale Procedures Order and the entry of an order with respect thereto.  In the event that this Agreement is terminated by (A) Buyer pursuant to Sections 8.1(d) (unless Buyer's right to termination arose solely under clause (i) of Section 8.1(d) as a result of one or more inaccuracies of Sellers' representations and warranties that, to the knowledge of Sellers, were true and correct in all material respects as of the date of this Agreement), 8.1(f)(i), 8.1(f)(v), 8.1(g), or 8.1(j) or (B) Buyer or Sellers' Representative, as applicable, pursuant to Section 8.1(h), then Buyer shall have an Allowed Termination Claim equal to the amount of the Break-Up Fee and Sellers shall pay the Break-Up Fee to Buyer in cash in accordance with this Section 8.3.  In addition, if (I) (x) this Agreement is terminated pursuant to Section 8.1(b) or 8.1(c), and the condition set forth in Section 7.2(j) is not satisfied or (y) this Agreement is terminated by Buyer pursuant to Section 8.1(d) and Buyer's right to termination arose solely under clause (i) of Section 8.1(d) as a result of one or more inaccuracies of Sellers' representations and warranties that, to the knowledge of Sellers, were true and correct in all material respects as of the date of this Agreement and (II) Buyer has complied in all material respects with all obligations required under this Agreement to be performed by it through the date of such termination, then Buyer shall have an Allowed Termination Claim equal to the amount of the Expense Reimbursement, and Sellers shall pay the Expense Reimbursement to Buyer in cash in accordance with this Section 8.3.  Payment of the Break-Up Fee or the Expense Reimbursement, as applicable, pursuant to this Section 8.3 shall be made on the earlier of (i) the date on which Sellers consummate an Alternative Transaction, including, but not limited to, a sale, recapitalization or securitization, (ii) the effective date of a plan of reorganization for one or more of the Sellers or (iii) the date that is five (5) Business Days after the termination of this Agreement.  Except as specifically set forth in this Section 8.3,

50

the Break-Up Fee and Expense Reimbursement shall not be payable in connection with any termination of this Agreement.  Except in the case of fraud or intentional misconduct by any Seller, Buyer's right to receive payment of the Break-Up Fee or the Expense Reimbursement, as applicable, from Sellers as herein provided shall be the sole and exclusive remedy available to Buyer against Sellers or any of their respective former, current or future stockholders, directors, officers, Affiliates or agents with respect to this Agreement and the transactions contemplated hereby in the event that this Agreement is terminated pursuant to the terms set forth herein, and upon payment of the Break-Up Fee or the Expense Reimbursement, as applicable, in accordance with this Agreement in circumstances described herein, none of Sellers or any of their respective former, current or future stockholders, directors, officers, Affiliates or agents shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby.  Sellers' right to terminate this Agreement and receive payment of the Buyer Termination Fee as herein provided shall be the sole and exclusive remedy available to Sellers against Buyer or any of its former, current or future stockholders, directors, officers, Affiliates or agents with respect to this Agreement and the transactions contemplated hereby, and upon payment of the Buyer Termination Fee in accordance with this Agreement in the circumstances described herein, neither Buyer nor any of its former, current or future stockholders, directors, officers, Affiliates or agents shall have any further liability or obligation relating to or arising out of this Agreement or the transactions contemplated hereby.  The Parties expressly agree and acknowledge that (i) it would be extremely difficult or impracticable to ascertain the actual damages that would be incurred in the event of a termination in the circumstances in which the Break-Up Fee or the Expense Reimbursement, on the one hand, or the Buyer Termination Fee, on the other hand, is payable in accordance with this Agreement, (ii) neither the Break-Up Fee , Expense Reimbursement, nor the Buyer Termination Fee is a penalty, but rather they constitute liquidated damages in a reasonable amount that will compensate the applicable Parties in the circumstances in which such amounts are payable for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, and (iii) the agreements contained in Sections 2.2 and 8.3 are an integral part of the transactions contemplated by this Agreement, and that, without these agreements, neither Buyer nor Sellers would enter into this Agreement.

(b)    Payment of the Break-Up Fee or the Expense Reimbursement, as applicable, subject to the final sentence of this Section 8.3(b), shall be made by wire transfer of immediately available funds at the time that such payment is required to be made pursuant to the terms hereof.  If the Bankruptcy Court shall enter the Sale Procedures Order approving the Break-Up Fee or the Expense Reimbursement, then the Break-Up Fee or the Expense Reimbursement, as applicable, shall be paid in accordance with the terms and conditions set forth herein and in such Sale Procedures Order and shall have such status as is specified herein and in such Sale Procedures Order.

(c)    Notwithstanding anything to the contrary contained in this Agreement, any obligation to pay the Break-Up Fee or the Expense Reimbursement hereunder shall be absolute and unconditional and joint and several.  Buyer's right to receive payment of the Break-Up Fee or Expense Reimbursement, as applicable, pursuant to this Agreement shall be an Allowed Termination Claim.  The Break-Up Fee and the Expense Reimbursement shall be payable as specified herein and are not subject to any defense, claim, counterclaim, offset, recoupment, or

51

reduction of any kind whatsoever.  Sellers and Buyer agree that the Break-Up Fee and Expense Reimbursement were a material inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated hereby and shall be payable as specified herein.

(d)    Notwithstanding anything to the contrary in this Agreement or that letter agreement, dated October 28, 2009, as amended on November 16, 2009 and November 27, 2009, between Platinum Equity Advisors, LLC and GHI (the "<u>Exclusivity and Expense Letter</u>"), nothing in this Agreement will supersede the expense reimbursement provisions of the Exclusivity and Expense Letter, which provisions will remain in full force and effect, until the Bankruptcy Court approves and enters the Sale Procedures Order in all material respects in the form attached as <u>Exhibit G</u>.


ARTICLE 9

<u>SURVIVAL</u>

SECTION 9.1    <u>Survival</u>.

Each of the representations and warranties, covenants and agreements of Sellers and Buyer made in this Agreement shall not survive the Closing Date; provided, however, that any covenant or agreement in this Agreement which, by its terms, is to survive the Closing Date, shall survive the Closing Date for the duration of such covenant or agreement.

SECTION 9.2    <u>Covenant Not to Sue</u>.

(a)    On and after the Closing Date, Buyer on the one hand, and Sellers, on the other hand, each covenants and agrees not to sue or otherwise bring any action against the other and each of the current and former directors, officers, employees, agents, managers, advisors, attorneys and representatives (solely in their capacity as such and in no other capacity) of the other with respect to any and all Claims based in whole or in part upon any act, omission, or transaction, taking place at any time on or before the Closing Date in connection with this Agreement or the transactions contemplated hereby, with the exception of acts, omissions, transactions, events or occurrences resulting from or involving the intentional misconduct, the breach of any covenant or agreement set forth herein or in any Ancillary Agreement or fraud, in each case of any such Persons, as determined by a final order of the Bankruptcy Court or other court of competent jurisdiction.

(b)    Notwithstanding any other term in this Agreement to the contrary, the waivers, covenants and agreements contained in this <u>Section 9.3</u> shall survive the Closing and shall bind and inure to the benefit of, as the case may be, the Buyer and its successors and assigns and Sellers, their Affiliates, and their estate, creditors, successors and assigns, including, without limitation, any trustee in any case under chapter 7 of the Bankruptcy Code.

ARTICLE 10

MISCELLANEOUS

SECTION 10.1     Joint Drafting.

The parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

SECTION 10.2     Further Assurances; Records.

At the request and the sole expense of the requesting party, Buyer or Sellers, as applicable, shall execute and deliver, or cause to be executed and delivered, such documents as Buyer or Sellers, as applicable, or their respective counsel may reasonably request to effectuate the purposes of this Agreement, the Ancillary Agreements or the Bankruptcy Case, as applicable. If requested by Buyer, Sellers shall cause their Affiliates identified on Schedule 10.2 to execute and deliver such bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer or its designated Affiliate or Affiliates all the right, title and interest of such Affiliates in, to or under all assets, if any, that would be Acquired Assets if such Affiliates were Sellers.  Without limiting the foregoing, each Party shall promptly provide the other Party with copies of all Records owned or controlled by such Party to the extent that they are related to the Acquired Business or the Acquired Assets, in the case of such Records held by Sellers, or the Excluded Business or the Excluded Assets, in the case of such Records held by Buyer, and to the extent they already exist, including upon either Party's reasonable request.  In the case of such Records to be delivered to either Party that are maintained in electronic format, such Records shall be delivered in an electronic format reasonably requested by the requesting Party to the extent practicable.

SECTION 10.3     Successors and Assigns.

This Agreement shall be binding on and inure to the benefit of Buyer and Sellers and their respective successors and permitted assigns, including, without limitation, any trustee appointed in the Bankruptcy Case or subsequent case under chapter 7 of the Bankruptcy Code. No party may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written consent of the other party, except that all or any portion of the rights of Buyer hereunder may be assigned, without the consent of Sellers, (a) to any Affiliate of Buyer or its designated Affiliate or Affiliates, provided that the assignee shall assume in writing all of Buyer's (or its applicable Affiliate's) obligations to Sellers hereunder, and (b) as collateral security to any lenders of Buyer or its designated Affiliate or Affiliates; in each case, provided that (i) Buyer shall not be released from any of its obligations hereunder by reason of such assignment and (ii) such assignment shall not delay or otherwise impede in any respect the timing for the consummation of the transactions contemplated hereby.

53

SECTION 10.4     Governing Law; Jurisdiction; Waiver of Trial by Jury.

This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of Minnesota (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law.  For so long as Sellers are subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.  After Sellers are no longer subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court having jurisdiction over Hennepin County, Minnesota.  To the fullest extent permitted by applicable law, the parties hereby irrevocably and expressly waive all right to trial by jury in any action, proceeding or counterclaim (whether based in contract, tort or otherwise) arising out of or relating to this Agreement, the Ancillary Agreements, or the actions of Sellers, Buyer or their respective representatives in the negotiation, preparation, performance or enforcement of this Agreement.

SECTION 10.5     Expenses.

Except as set forth in Section 8.3, each of the parties will bear its own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby.

SECTION 10.6     Severability.

In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms shall provide for the consummation of the transactions contemplated hereby in substantially the same manner as originally set forth at the later of (a) the Execution Date and (b) the date this Agreement was last amended.

SECTION 10.7     Notices.

(a)     All notices, requests, demands, consents and other communications under this Agreement shall be in writing and shall be deemed to have been duly given:  (i) on the date of service, if served personally on the party to whom notice is to be given; (ii) on the day of transmission, if sent via facsimile transmission to the facsimile number given below; (iii) on the day of delivery, if delivered by Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service addressed to the party to whom notice is to be given; or (iv) upon receipt, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

54

If to a Seller:

        c/o Genmar Holdings, Inc.
        2900 IDS Center
        80 South Eighth Street
        Minneapolis, MN 55402
        Attn.:  David J. Huls
        Fax:  (612) 337-1930

With a copy (which shall not constitute notice) to:

        Fredrikson & Byron, P.A.
        200 South Sixth Street
        Suite 4000
        Minneapolis, MN 55402
        Attn.:  James L. Baillie, Esq.
                Robert K. Ranum, Esq.
        Fax:  (612) 492-7077

If to Buyer:

        Project Boat Holdings, LLC
        c/o Platinum Equity, LLC
        52 Vanderbilt Avenue
        New York, NY 10017
        Attn:  Louis Samson
        Fax:  (212) 905-0011

With copies (which shall not constitute notice) to:

        Project Boat Holdings, LLC
        c/o Platinum Equity, LLC
        360 North Crescent Drive, South Building
        Beverly Hills, CA 90210
        Attn:  Eva M. Kalawski
        Fax:  (310) 712-1863

        and

        Latham & Watkins LLP
        555 11th Street, N.W.
        Suite 1000
        Washington, DC 20004
        Attn:  Daniel T. Lennon, Esq.
                David I. Brown, Esq.
        Fax:  (202) 637-2201

(b)    Any party may change its address or facsimile number for the purpose of this Section 10.7 by giving the other parties written notice of its new address in the manner set forth above.

SECTION 10.8    Amendments; Waivers.

This Agreement may be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may be waived, only by a written instrument executed by Buyer and Sellers' Representative, or in the case of a waiver, by the party waiving compliance. Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

SECTION 10.9    Public Announcements.

Sellers, on the one hand, and Buyer, on the other hand, shall not make any press release or public announcement concerning the transactions contemplated by this Agreement without the prior written agreement from Sellers' Representative (in the case of Sellers) or Buyer, as applicable, unless a press release or public announcement is required by law, the rules of any stock exchange or order of the Bankruptcy Court. If any such announcement or other disclosure is required by law, the rules of any stock exchange or order of the Bankruptcy Court, the form and content of any such announcing or other disclosure shall be subject to the prior written consent of Sellers' Representative (in the case of Sellers) or Buyer, as applicable, which consent shall not be unreasonably withheld.

SECTION 10.10    Entire Agreement.

This Agreement, the Ancillary Agreements and the Confidentiality Agreement contain the entire understanding among the parties with respect to the transactions contemplated hereby and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions. All Schedules and Exhibits hereto and any documents and instruments delivered pursuant to any provision hereof are expressly made a part of this Agreement as fully as though completely set forth herein.

SECTION 10.11    No Third Party Beneficiaries.

Except as set forth in Sections 5.8 and 9.2, and except with respect to the limitations on remedies against Persons (other than the parties to this Agreement) set forth in Section 8.3 (which shall be enforceable by such Persons), nothing in this Agreement is intended to or shall confer any rights or remedies under or by reason of this Agreement on any Persons other than Sellers and Buyer and their respective successors and permitted assigns. Nothing in this Agreement is intended to or shall relieve or discharge the obligation or liability of any third Persons to Sellers or to Buyer. Except as set forth in Sections 5.8 and 9.2, and except with respect to the limitations on remedies against Persons (other than the parties to this Agreement) set forth in Section 8.3 (which shall be enforceable by such Persons), this Agreement is not

56

intended and shall not give any third Persons any right of subrogation or action over or against Sellers or against Buyer.

SECTION 10.12    <u>Headings</u>.

The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

SECTION 10.13    <u>Counterparts</u>.

This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument.

SECTION 10.14    <u>Construction</u>.

Any reference to any federal, state, local or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation.  Any reference to the singular in this Agreement shall also include the plural and vice versa.

SECTION 10.15    <u>Sellers' Representative</u>.

Each Seller hereby irrevocably appoints GHI to act as representative, agent, proxy and attorney-in-fact for all Sellers for all purposes under this Agreement (GHI, in such capacity, being "<u>Sellers' Representative</u>"), including, without limitation, the full power and authority on each Seller's behalf to:  (i) receive notices or service of process; (ii) negotiate, determine, compromise, settle and take any other action permitted or called for by Sellers under this Agreement; (iii) execute any and all intellectual property assignment agreements on behalf of Sellers; and (iv) execute and deliver any termination of, amendment to or waiver under this Agreement.  Each Seller agrees that such agency and proxy are coupled with an interest and are, therefore, irrevocable without the consent of Sellers' Representative and shall survive the bankruptcy, dissolution or liquidation of any Seller.  All decisions and actions by Sellers' Representative shall be binding upon all Sellers, and no Seller shall have the right to object, dissent, protest or otherwise contest same.  Sellers' Representative shall have no duties or obligations hereunder except those specifically set forth herein and such duties and obligations shall be determined solely by the express provisions of this Agreement.  Each Seller agrees to indemnify and hold harmless Sellers' Representative from and against all expenses (including reasonable attorneys' fees), judgments, fines and amounts incurred by Sellers' Representative in connection with any action, suit or proceeding to which Sellers' Representative is made a party by reason of the fact it is or was acting as a Sellers' Representative under this Agreement. Neither Sellers' Representative nor any agent employed by Sellers' Representative shall incur any liability to any Seller relating to the performance of its duties hereunder except for actions or omissions constituting fraud or bad faith.  Sellers' Representative shall have no liability in respect of any action, claim or proceeding brought against Sellers' Representative by any Seller if Sellers' Representative took or omitted taking any action in good faith.

57

# ARTICLE 11

## DEFINITIONS

As used in this Agreement, the following terms have the following meanings:

"Accounts Receivable" has the meaning set forth in <u>Section 1.1(e)</u>.

"Acquired Assets" has the meaning set forth in <u>Section 1.1</u>.

"Acquired Business" means (i) the business conducted by Sellers and their Affiliates of designing, manufacturing, selling, marketing and distributing recreational, performance and luxury boats and similar craft and trailers under the following brands or brand names: Ranger, Stratos, Champion, Wellcraft, Four Winns, Glastron and Larson (including Genmar's transportation logistics operations and function), (ii) except to the extent solely related to the Excluded Assets, the business and operations of Sellers and their Affiliates at the Acquired Facilities, (iii) the business conducted by the Genmar International division, and (iv) any and all general and/or administrative or other support functions, operations or services conducted or provided relating to the businesses and operations described in clauses (i), (ii) and (iii) of this definition, including, without limitation, managerial, treasury, pay-roll, financial, information services, benefits administration, legal and similar functions.

"Acquired Contracts" has the meaning set forth in <u>Section 1.1(d)</u>.

"Acquired Facilities" means the facilities of Sellers and its Subsidiaries located in Flippin, Arkansas; Cadillac, Michigan; and Murfreesboro, Tennessee.

"Acquired Intellectual Property" has the meaning set forth in <u>Section 1.1(g)</u>.

"Actions" has the meaning set forth in <u>Section 4.1(f)</u>.

"Actuary" has the meaning set forth in <u>Section 5.14</u>.

"Adjustment Balance Sheet" has the meaning set forth in <u>Section 2.3(b)</u>.

"Adjusted Net Working Capital" means (i) the current assets of Sellers of the type listed on <u>Schedule 2.3(b)</u> to the extent included in the Acquired Assets, minus (ii) the current liabilities of Sellers to the extent included in the Assumed Liabilities, in each case determined as of the Closing Date in accordance with the standards set forth in <u>Section 2.3(b)</u>.

"Affiliate" has the meaning given that term in Section 101(2) of the Bankruptcy Code.

"Aggregate Cash Consideration" has the meaning set forth in <u>Section 2.1(a)</u>.

"Agreement" has the meaning set forth in the Preamble.

"Allocation" has the meaning set forth in <u>Section 6.3</u>.

"Allowed Termination Claim" means a claim (as such term is defined in section 101(5) of the Bankruptcy Code), which (i) shall be allowed as an administrative expense claim in each of the Debtors' chapter 11 cases pursuant to sections 503(b) and 507 of the Bankruptcy Code and (ii) shall be senior (in an amount up to the Carve-Out Amount or, in the case of the consummation of an Alternative Transaction, in an amount up to the amount of the Break-Up Fee) to any and all liens, claims, encumbrances, interests and administrative expenses, including with respect to prepetition and postpetition amounts, owing to any of the Debtors' prepetition and post petition secured lenders, including, without limitation, Wells Fargo Bank N.A. and Fifth Third Bank N.A. in their capacities as lenders under the Credit Agreement.

"Alternative Transaction" has the meaning set forth in Section 8.1(h).

"Ancillary Agreement" means the Escrow Agreement, the Bill of Sale, Assumption and Assignment Agreement, IP Assignments, Assumption and Assignment of Leases, the Transition Services Agreement, the VEC License and any other agreement that a Seller or Buyer, as applicable, may reasonably enter into in connection with the consummation of the transactions contemplated hereby.

"Applicable Claim" has the meaning set forth in Section 4.1(u).

"Applicable Product" has the meaning set forth in Section 4.1(u).

"Applicable Rate" means, at any time, a rate equal to the then applicable three-month U.S. Libor rate plus 400 basis points.

"Assigned Contracts" has the meaning set forth in Section 1.5(b).

"Assigned Contracts List" has the meaning set forth in Section 1.5(b).

"Assignment Motion" has the meaning set forth in Section 5.7(d).

"Assignment Order" has the meaning set forth in Section 5.7(d).

"Assumed Leases" has the meaning set forth in Section 1.1(b).

"Assumed Liabilities" has the meaning set forth in Section 1.3.

"Assumption and Assignment Agreement" means the Assumption and Assignment Agreement in substantially the form of Exhibit C.

"Auction" has the meaning set forth in Section 5.7(b).

"Audited Financial Statements" has the meaning set forth in Section 4.1(p).

"Auditor" has the meaning set forth in Section 2.3(d).

"Avoidance Actions" means all avoidance Claims or causes of action arising under the Bankruptcy Code or other applicable law, including, without limitation, all rights and avoidance Claims of Sellers arising under Chapter 5 of the Bankruptcy Code.

59

"Bankruptcy Case" has the meaning set forth in the Recitals.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Pleadings" has the meaning set forth in Section 5.7(e).

"Bankruptcy Rules" has the meaning set forth in the Recitals.

"Benchmark Adjusted Net Working Capital" has the meaning set forth in Section 2.3(a).

"Bidding Procedures" means the procedures, provisions and conditions set forth in the Sale Procedures Order.

"Bill of Sale" means the Bill of Sale substantially in the form of Exhibit E and without modification except as Buyer may consent.

"Break-Up Fee" means an amount in cash equal to $2,500,000.00, which shall be granted the lien status and administrative claim priority set forth in this Agreement and in the Sale Procedures Order.

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in Minneapolis, Minnesota are authorized by law or other governmental action to close.

"Buyer" has the meaning set forth in the Preamble.

"Buyer Estimated Adjusted Net Working Capital" has the meaning set forth in Section 2.3(a).

"Buyer Persons" has the meaning set forth in Section 6.2(e).

"Buyer Termination Fee" has the meaning set forth in Section 2.2.

"Carve-Out Amount" means an amount equal to $1,750,000.

"Cash" means all cash and cash equivalents.

"Causes of Action" means all Claims and causes of action (of any kind or character and whether arising prior to, on or after the Petition Date).

"Claim" has the meaning given that term in Section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 3.1.

"Closing Date" has the meaning set forth in Section 3.1.

"Closing Date Calculation Certificate" has the meaning set forth in Section 2.3(a).

60

"Closing Date Payment" has the meaning set forth in <u>Section 2.1(b)</u>.

"COBRA" means the United States Consolidated Omnibus Budget Reconciliation Act of 1985.

"COBRA Escrow Amount" has the meaning set forth in <u>Section 5.14</u>.

"COBRA Losses" has the meaning set forth in <u>Section 5.14</u>.

"COBRA Reduction" has the meaning set forth in <u>Section 5.14</u>.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidential Information" means any information concerning the operations and affairs of Sellers, their Affiliates and/or the Acquired Business that is not already generally available to the public.

"Confidentiality Agreement" means that certain Confidentiality Agreement, dated as of August 31, 2009, 2009, by and between Houlihan Lokey (on behalf of Genmar Holdings, Inc.) and Platinum Equity Advisors, LLC.

"Consents" has the meaning set forth in <u>Section 4.1(e)</u>.

"Contract" means any written contract, agreement, lease or sublease, license or sublicense, instrument, indenture, commitment or undertaking.

"Credit Agreement" means the Amended and Restated Credit and Security Agreement and Waiver of Defaults among Sellers, Wells Fargo Bank, N.A. and Fifth Third Bank, N.A., as amended, restated, supplemented or otherwise modified from time to time.

"Cure Costs" means, with respect to any Contract, the cash amounts payable under Section 365 of the Bankruptcy Code that will be required to be paid to cure any monetary defaults on the part of Sellers in connection with the assumption and assignment of such Contract.

"Debtors" means GHI and its affiliated debtors and debtors-in-possession having their chapter 11 cases jointly administered in the Bankruptcy Court for the District of Minnesota under Case Number 09-43537 (DDO).

"Deficit Amount" has the meaning set forth in <u>Section 2.3(e)</u>.

"Deposit" has the meaning set forth in <u>Section 2.2</u>.

"Deposit Amount" has the meaning set forth in <u>Section 2.2</u>.

"Designation Deadline" has the meaning set forth in <u>Section 1.5(b)</u>.

"Determination Date" has the meaning set forth in <u>Section 2.3(d)</u>.

61

"Determined Cure Cost" has the meaning set forth in Section 1.5(d).

"Disputed Contract" has the meaning set forth in Section 1.5(d).

"Employee Benefit Plans" means all employee benefit plans as defined in Section 3(3) of ERISA, all compensation, pay, severance pay, salary continuation, bonus, incentive, stock option, retirement, pension, profit sharing, deferred compensation, equity or equity-like, retiree medical, disability of life insurance or supplemental retirement plans, Contracts, programs, funds or arrangements of any kind and all other employee benefit plans, programs, funds or arrangements (whether written or oral, legally enforceable or not, formal or informal, qualified or nonqualified, funded or unfunded, foreign or domestic, currently effective or terminated, and whether or not subject to ERISA) and any trust, escrow or similar agreement related thereto, whether or not funded.

"Encumbrance" means any Lien, pledge, charge, Claim, interest, security interest, option, right of first refusal, mortgage, easement, right of way, lease, sublease, license, sublicense, adverse claim, title defect, encroachment, other survey defect, or other encumbrance of any kind, including, with respect to real property, any covenant or restriction relating thereto.

"Environmental Laws" means all applicable federal, state and local statutes, ordinances, rules, orders, judgments, junctions, decrees, regulations and other provisions having the force of law, all judicial and administrative orders and determinations, and all common law concerning pollution or protection of human health and the environment and natural resources, including, without limitation, all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, release, threatened release, control, exposure to or cleanup of any Hazardous Materials.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means, with respect to any Person, any trade or business (whether or not incorporated) (i) under common control within the meaning of Section 4001(b)(1) of ERISA with such Person or (ii) which together with such Person is treated as a single employer under Sections 414(b), (c), (m), (n) or (o) of the Code.

"Escrow Agent" has the meaning set forth in Section 2.2.

"Escrow Agreement" has the meaning set forth in Section 2.2.

"Escrow Amount" means (i) unless an Objection Notice is delivered by Buyer and the dispute as to the Estimated Adjusted Net Working Capital that is the subject of the Objection Notice has not been resolved prior to Closing in accordance with Section 2.3(a), zero and (ii) if an Objection Notice has been delivered by Buyer pursuant to Section 2.3(a) and the dispute as to the Estimated Adjusted Net Working Capital that is the subject of the Objection Notice has not been resolved prior to Closing in accordance with Section 2.3(a), the excess of the Estimated Adjusted Net Working Capital over the Buyer Estimated Adjusted Net Working Capital.

"Escrow Funds" means, at any given time after the Closing, the funds remaining in one or more accounts in which the Escrow Agent has deposited the Escrow Amount in accordance with the Escrow Agreement.

"Estimated Adjusted Net Working Capital" has the meaning set forth in Section 2.3(a).

"Estimated Aggregate Cash Consideration" has the meaning set forth in Section 2.3(a).

"Excluded Assets" has the meaning set forth in Section 1.2.

"Excluded Business" has the meaning set forth in Section 1.1(i).

"Excluded Contracts" has the meaning set forth in Section 1.2(c).

"Excluded Claim" has the meaning set forth in Section 5.12.

"Excluded Insurance Policies" has the meaning set forth in Section 5.12.

"Excluded Inventory" has the meaning set forth in Section 1.2(q).

"Excluded Leases" has the meaning set forth in Section 1.2(p).

"Excluded Liabilities" has the meaning set forth in Section 1.4.

"Execution Date" has the meaning set forth in the Preamble.

"Expense Reimbursement" means an amount equal to the documented, out-of-pocket expenses incurred by or on behalf of or borne by Buyer in connection with (i) the preparation, negotiation, execution, delivery and performance of this Agreement and the Ancillary Agreements and the process leading up thereto (including Buyer's due diligence review of the Acquired Business, the Acquired Assets and the Assumed Liabilities), (ii) its appearance or participation in the Bankruptcy Case, and (iii) its participation in the process contemplated by the Bidding Procedures, in each case including, without limitation, all documented fees and expenses of counsel, accountants and financial and other advisors related to the transaction contemplated hereby and investigating Sellers, the Acquired Business, the Acquired Assets and the Assumed Liabilities, up to an aggregate amount of $1,500,000, and which shall be granted the lien status and administrative claim priority set forth in this Agreement and in the Sale Procedures Order.

"Final Adjusted Net Working Capital" has the meaning set forth in Section 2.3(e).

"Final Order" means an action taken or Order issued by the applicable Government Authority as to which:  (i) no request for stay of the action or Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the action or Order, or protest of any kind, is pending before the Government Authority and the time for filing any such petition or protest is passed; (iii) the Government Authority does not have the action or Order under reconsideration or review on its own motion and the time for such

63

reconsideration or review has passed; and (iv) the action or Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"GAAP" means generally accepted accounting principles in the United States, consistently applied.

"Genmar Name" means any name including the word "Genmar" and any other trade names, trademarks or service marks owned by Sellers or licensed to Sellers.

"GHI" has the meaning set forth in the Preamble.

"Government Authority" means any agency, court, division, subdivision or governmental or regulatory authority or any adjudicatory thereof, of the United States, any state, municipality or other political subdivision thereof or any foreign jurisdiction, including, without limitation, the Bankruptcy Court, or (whether or not a governmental authority) any arbitral or mediatory body.

"Hazardous Materials" means any hazardous or toxic substance or waste or any contaminant or pollutant regulated, monitored or otherwise creating liability under Environmental Laws, including, without limitation, "hazardous substances" as defined by the Comprehensive Environmental Response Compensation and Liability Act, as amended. "toxic substance" as defined by the Toxic Substance Control Act, as amended, "hazardous wastes" as defined by the Resource Conservation and Recovery Act, as amended, "hazardous materials" as defined by the Hazardous Materials Transportation Act, as amended, thermal discharges, radioactive substances, PCBs, natural gas, asbestos, petroleum products or byproducts and crude oil.

"HSR Act" means the Hart-Scott-Rodino Anti-trust Improvements Act of 1976, as amended.

"Immediate Family Member" means, with respect to any natural person, the legal spouse of such person or any of their respective parents, siblings, children or other direct lineal descendants, nieces, nephews, adopted children or direct lineal descendants of such adopted children, nieces or nephews.

"Improvements" means the buildings, improvements, structures and fixtures now existing on Real Property or demised under any lease of, or other Contract for the use of, Real Property, and any and all fixtures appurtenant thereto.

"Increase Amount" has the meaning set forth in Section 2.3(e).

"Indebtedness" of any Person means, without duplication, (i) the principal of and premium (if any) in respect of (A) indebtedness of such Person for borrowed money and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such

64

Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued current liabilities arising in the Ordinary Course of Business (other than the current liability portion of any indebtedness for borrowed money)); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of such Person under interest rate or currency swap transactions (valued at the termination value thereof); (vi) the liquidation value, accrued and unpaid dividends; prepayment or redemption premiums and penalties (if any), unpaid fees or expenses and other monetary obligations in respect of any redeemable preferred stock of such Person; (vii) all obligations with respect to any factoring programs of any Seller; (viii) all obligations of the type referred to in clauses (i) through (vii) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (ix) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Information Technology" has the meaning set forth in <u>Section 4.1(i)</u>.

"Intellectual Property" means any and all of the following:  (i) any and all inventions, discoveries, ideas, processes, formulae, designs, models, industrial designs, know-how, trade secrets, confidential information and proprietary information, whether or not patented or patentable, and including all improvements thereto, research and development, compositions, manufacturing and production processes and techniques, technical data, proprietary tools, designs, drawings, specifications, technology, systems, databases, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, divisionals, extensions and reexaminations thereof; (ii) all trademarks, service marks, trade dress, logos, trade names, and corporate names, together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith; (iii) all copyrightable works, software, all copyrights, and all original designs of vessel hulls (as such term is used in the Vessel Hull Design Protection Act, Title 17, Chapter 13, of the United States Code, as amended), and all applications, registrations and renewals in connection therewith; (iv) all mask works and all applications, registrations and renewals in connection therewith; (v) all Internet Web sites, including domain names (and registrations therefor) and content, software, audio and audio-visual files, and other works of authorship included therein; (vi) all rights to sue and recover for past, present, and future infringements of any of the foregoing; and (vii) all copies and tangible embodiments thereof (in whatever form or medium).

"Interim Balance Sheet" has the meaning set forth in <u>Section 4.1(p)</u>.

"Inventory" means all the finished goods, raw materials, work in process, raw or packaging materials or component parts and other supplies owned by Sellers on the Closing Date.

"IP Assignments" has the meaning set forth in <u>Section 3.2(b)</u>.

65

"Knowledge" when referring to Sellers means the actual knowledge of the individual officers of GHI listed on Schedule 11(b).

"Law" means any law (including common law), treaty, statute, ordinance, rule, regulation, order, writ, judgment, injunction or decree of any Government Authority, including the Code.

"Lease Deposit Amounts" means the aggregate amount of all lease deposits made by Sellers or any of their Affiliates pursuant to the Assumed Leases and (i) set forth on Schedule 11(d) or (ii) made after the Execution Date and on or before the Closing Date.

"Leased Property" has the meaning set forth in Section 1.1(b).

"Liability" means any debt, loss, claim (as defined in Section 101(5) of the Bankruptcy Code), damage, demand, fine, judgment, penalty, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability, successor liability or otherwise), and including all costs and expenses relating thereto (including fees, discounts and expenses of legal counsel, experts, engineers and consultants and costs of investigations).

"Lien" has the meaning given to that term in Section 101(37) of the Bankruptcy Code.

"Little Falls License Agreement" has the meaning set forth in Section 3.2(f).

"Material Adverse Effect" means any adverse change in or effect with respect to the Acquired Assets or the condition (financial or otherwise), business or results of operations of the Acquired Business which is material to the Acquired Business, taken as a whole, excluding any changes or effects to the extent resulting from (i) general changes in economic, geographic, market, financial or capital market, regulatory or political conditions, (ii) terrorism, war or the outbreak of hostilities, or natural disasters, (iii) changes in conditions generally applicable to the industries in which the Acquired Business is involved, (iv) changes in the Law or GAAP or interpretations thereof, (v) any failure, in and of itself (but not the underlying circumstances), by the Acquired Business to meet any internal or published (by the Acquired Business or otherwise) projections, forecasts or revenue or earnings predictions, (vi) changes as a result of any action consented to in writing by Buyer to the extent those effects were specifically described by Buyer in advance of such consent or were otherwise reasonably foreseeable effects of the action that was the subject of such consent or (vii) changes or litigation which result from the announcement of the transactions contemplated hereby, or required by this Agreement, or the consummation of the transactions contemplated hereby, except in the case of any change or effect described in clause (i), (ii), (iii), (iv), to the extent such change, relative to other participants in the industries in which the Acquired Business is involved, disproportionately impacts the Acquired Business.

"Material Contract" has the meaning set forth in Section 4.1(r).

"Maximum Estimated Reduction Amount" means the sum of $8,000,000 and the excess, if any, of (i) the Minimum Working Capital Threshold over (ii) the Estimated Adjusted Net Working Capital.

66

"Maximum Reduction Amount" means the sum of $8,000,000 and the excess, if any, of (i) the Minimum Working Capital Threshold over (ii) the Final Adjusted Net Working Capital.

"Minimum Working Capital Threshold" has the meaning set forth in Schedule 2.3(a).

"Nonassignable Contract" has the meaning set forth in Section 5.6.

"Objection Notice" has the meaning set forth in Section 2.3(a).

"Orders" means the Sale Approval Order, the Sale Procedures Order, and the Assignment Order.

"Ordinary Course of Business" means the ordinary and usual course of operations of the Acquired Business (including acts and omissions of Sellers in the ordinary and usual course) consistent with past practice for the period beginning from and after the Petition Date through the date hereof.

"Owned Machinery and Equipment" has the meaning set forth in Section 1.1(c).

"Parties" means Buyer and Sellers.

"Permits" has the meaning set forth in Section 1.1(h).

"Permitted Liens" mean: (a) with respect to real property, easements, licenses, recorded real estate agreements, restrictions and other matters of record which either (i) the title company has agreed to affirmatively insure against loss caused thereby in the applicable title policy, by way of ALTA coverage or other affirmative cover, reasonably acceptable to Buyer, or (ii) do not materially and adversely affect the ownership, use, value or operation of the real property, (b) with respect to real property, any state of facts a survey or other visual inspection would show that do not materially and adversely affect the ownership, use, value or operation of the real property and (c) Liens arising from, and solely in respect of, the Assumed Liabilities.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or Government Authority.

"Personnel" has the meaning set forth in Section 4.1(q).

"Petition Date" has the meaning set forth in the Recitals.

"Petition for Relief" has the meaning set forth in the Recitals.

"Pre-Petition Ordinary Course of Business" means the ordinary and usual course of operations of the Acquired Business (including acts and omissions of Sellers in the ordinary and usual course), as conducted prior to March 31, 2009.

"Price Adjustment Amount" has the meaning set forth in Section 2.3(e).

67

"Proceeding" means any action, arbitration, audit, claim, cause of action, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Government Authority, court or arbitrator.

"Purchase Price" has the meaning set forth in <u>Section 2.1(a)</u>.

"Real Property" has the meaning set forth in <u>Section 1.1(a)</u>.

"Real Property Leases" has the meaning set forth in <u>Section 4.1(m)</u>.

"Records" has the meaning set forth in <u>Section 1.1(i)</u>.

"Rejected Contracts" has the meaning set forth in <u>Section 1.5(a)</u>.

"Sale Approval Order" has the meaning set forth in <u>Section 5.7(c)</u>.

"Sale Hearing" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement or a competing transaction.

"Sale Motion" has the meaning set forth in <u>Section 5.7(a)</u>.

"Sale Procedures Order" has the meaning set forth in <u>Section 5.7(b)</u>.

"Sales Agents" means manufacturer's representatives or other salespersons or sales agents of the Acquired Business.

"Sarasota Plant 1" means the Real Property located at 7150 15th St. East, Sarasota Florida 34243, as further described in <u>Schedule 1.1(a)</u>.

"Seller Benefit Plans" has the meaning set forth in <u>Section 1.2(d)</u>.

"Seller Controlled Group" has the meaning set forth in <u>Section 1.2(d)</u>.

"Sellers" has the meaning set forth in the Preamble.

"Sellers' Representative" has the meaning set forth in <u>Section 10.15</u>.

"Subject Affiliates" has the meaning set forth in <u>Section 5.8(a)</u>.

"Subject Internet Domain Names" has the meaning set forth in <u>Section 5.1(e)</u>.

"Subsidiary" of any Person means any other Person (i) of which such first Person (either alone or through or together with one or more other Subsidiaries) owns, directly or indirectly, more than 50% of the capital stock or other equity securities of such other Person, the holders of which are generally entitled to vote for the election of the board of directors or other governing body of, or otherwise control the business and affairs of, such other Person or (ii) the operations of which are consolidated with such first Person, pursuant to GAAP, for financial reporting purposes.

68

"Tax Records" has the meaning set forth in <u>Section 1.2(n)</u>.

"Tax Return" means any report, declaration, return, information return, filing, claim for refund or other information relating to Taxes, including any Schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"Taxes" means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Government Authority, whether payable by reason of contract, assumption, transferee liability, operation of law or Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under state, local or foreign law), which taxes shall include all income taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise, franchise, gross receipts, occupation, real and personal property, stamp, transfer, workmen's compensation, customs duties, registration, documentary, value added, alternative or add-on minimum, estimated, environmental (including taxes under Section 59A of the Code) and other assessments or obligations of the same or a similar nature, whether arising before, on or after the Closing Date.

"Termination Date" has the meaning set forth in <u>Section 8.1(b)</u>.

"Transfer Taxes" has the meaning set forth in <u>Section 6.1</u>.

"Transferred Employees" has the meaning set forth in <u>Section 5.4(a)</u>.

"Transferred Internet Domain Names" means all internet domain names (including domain name registrations) used in connection with the Acquired Business as well as all Internet Web sites related to such domain names, including content, software, audio and audio-visual files, and all other works of authorship, and any copyrights in any of the foregoing, used or held for use in connection with such Web sites.

"VEC License" has the meaning set forth in <u>Section 3.2(j)</u>.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1998.

*  *  *  *  *

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed by their respective officers thereunto duly authorized as of the Execution Date.

BUYER:
Project Boat Holdings, LLC

By: _Eva M. Kalawski_
Its: __Vice President & Secretary__

SELLERS:

GENMAR HOLDINGS, INC.

By: _____
Its: _____

WOOD MANUFACTURING COMPANY, INC.

By: _____
Its: _____

GENMAR INDUSTRIES, INC.

By: _____
Its: _____

GENMAR MICHIGAN, L.L.C.

By: _____
Its: _____

GENMAR IP, L.L.C.

By: _____
Its: _____

GENMAR MINNESOTA, INC.

By: _____
Its: _____

GENMAR TENNESSEE, INC.

By: _____
Its: _____

GENMAR TRANSPORTATION, INC.

By: _____
Its: _____

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed by their respective officers thereunto duly authorized as of the Execution Date.

<u>BUYER</u>:

Project Boat Holdings, LLC

By: _____
Its: _____

SELLERS:

GENMAR HOLDINGS, INC.

By: _____
Its: _____
President + COO

GENMAR INDUSTRIES, INC.

By: _____
Its: _____
Vice President

GENMAR IP, L.L.C.

By: _____
Its: _____
Vice President

GENMAR TENNESSEE, INC.

By: _____
Its: _____
Vice President

WOOD MANUFACTURING COMPANY, INC.

By: _____
Its: _____
Vice President

GENMAR MICHIGAN, L.L.C.

By: _____
Its: _____
Vice President

GENMAR MINNESOTA, INC.

By: _____
Its: _____
Vice President

GENMAR TRANSPORTATION, INC.

By: _____
Its: _____
Vice President